In re **VERMONT TOY WORKS, INC., Debtor.**

**CHITTENDEN TRUST COMPANY, Plaintiff,**

v.

**SEBERT LUMBER, CO., INC., Defendant,**

**J.C. Palmisano, Esq., Trustee and Intervening Defendant.**

**Bankruptcy No. 85–252.**
**Adv. P. No. 86–0007.**

United States Bankruptcy Court, D. Vermont.

Dec. 23, 1987.

264

J.B. Anderson, Ryan Smith & Carbine, Ltd., Rutland, Vt., and M.H. Scribner, Burlington, Vt., for Chittenden Trust Co. (Chittenden).

J.R. Canney, III, and B.P. Dempsey, Carroll, George & Pratt, Rutland, Vt., for Sebert Lumber, Co., Inc. (Sebert).

P. Gabel, Goldstein, Manello, Burak & Gable, Burlington, Vt., for Vermont Wood Industries, Inc. (Vermont Wood).

J.C. Palmisano, Barre, Vt., for the Trustee (Trustee).

## MEMORANDUM DECISION [1] DENYING DECLARATORY RELIEF AND RELIEF FROM STAY, AND DIRECTING MARSHALING OF ASSETS

FRANCIS G. CONRAD, Bankruptcy Judge.

This proceeding began with Chittenden's complaint for a declaratory judgment. Chittenden requests that we determine the collateral it repossessed from Vermont Toy Works, Inc. prepetition is not property of the Debtor's estate. In the alternative, Chittenden moves for relief from the automatic stay of the Bankruptcy Code, and approval of its repossession.

---

**1.** We have subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b), and the authority to enter a final order over this core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G). This Memorandum Decision constitutes our finding of facts and conclusions of law under Rules of Practice and Procedure in Bankruptcy Rule 7052. During the time this matter was under advisement, amended Rules of Practice and Procedure in Bankruptcy went into effect on August 1, 1987. All references to the Rules in this Memorandum Decision refer to the Bankruptcy Rules in effect prior to August 1, 1987.

Based upon the litigated evidence, pleadings, and the voluminous and competent briefings by counsels, we hold: that the Trustee has standing as a hypothetical judicial lien creditor to affirmatively raise the equitable doctrine of marshaling [2] of assets; that an unsecured creditor's attorney may prosecute on behalf of the Trustee a contested matter with the Trustee's consent and the Court's approval; that the inequitable conduct of Debtor's director, officer, and shareholder is sufficient to warrant the piercing of the corporate veil and the application of the marshaling of assets doctrine; that Chittenden may seek satisfaction of its secured claim from the personal guaranties of Debtor's president and vice president; that Chittenden may use the securities hypothecated by Debtor's director, officer, shareholder, and his spouse, and pledged by the Debtor for its loans in the unlikely event the guarantees are insufficient; that the proceeds from the repossessed collateral are property of the Estate; and, after marshaling, that Debtor's director, officer, and shareholder's inequitable conduct requires equitable subordination of his subrogated guarantor relationship under 11 U.S.C. § 510(c).

### PROCEDURAL POSTURE

On December 31, 1985, Sebert, an unsecured creditor, with other unsecured creditors filed an involuntary Chapter 7 petition against Vermont Toy Works, Inc. (Debtor). 11 U.S.C. § 101 et seq.

Sebert concomitantly filed an ex parte motion for an order staying Debtor from disposing of some or all of its assets at a private sale, scheduled for the morning of December 31, 1985, between Chittenden and Vermont Wood. We denied Sebert's motion by our Order Denying Motion for A Specific Stay, filed December 31, 1985, holding that 11 U.S.C. § 303(f) [3] permits a Debtor to operate its business and conduct its affairs as if a petition had not been filed during the "involuntary gap" period, (between the date of the filing of the involuntary petition and the order of relief), and that Sebert failed to "satisfy the legislatively suggested reasons" for judicial curtailment of Debtor's financial affairs.[4] In addition to Sebert's failure to establish the exception to the general rule of permitting the Debtor to operate its business within the "gap period," we said:

> We also deny the relief requested because other subsequent relief may be available, if the movant herein, makes a case under 11 USC Section 362(a)(6) or (7), or if an Order for relief is subsequently entered and the trustee moves under 11 USC Section 547.

Order Denying Motion for A Specific Stay, page 3, filed December 31, 1985. (Emphasis supplied).

Chittenden perceived the December 31, 1985 Court Order, as placing a "cloud" on its title to the pre-petition repossessed collateral. On January 17, 1986, Chittenden filed a "Complaint For Declaratory Judgment Or Motion For Relief From Automatic Stay" [5] to remove the alleged "cloud" so

---

**2.** For the interest of lexicographers and grammarians, "marshaling" is spelled with one "l" and, true to the wonderful complexity of the English language, defies the rules of grammar with only one "l" being required when coupled with an "ing" ending.

**3.** 11 U.S.C. § 303(f) provides:
Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

**4.** In particular, we noted that Sebert's exhibit, attached to its motion for the ex parte stay,

indicated: that Debtor's secured creditors, (Chittenden and Vermont Industrial Development Authority, (VIDA)), had already taken possession of their collateral; the secured creditors intended to dispose, by private sale to Vermont Wood, Debtor's assets at above fair market value; and, it appeared that Debtor had already dismantled its business. Order Denying Motion for A Specific Stay, page 2, filed December 31, 1985, citing *House Report* No. 95–595, 95th Cong., 1st Sess. 324 (1977); See *Senate Report* No. 95–989, 95th Cong., 2d Sess. 34 (1978), U.S. Code Cong. & Admin.News 1978, p. 5787.

**5.** We understood the requirement of 11 U.S.C. § 362(e) had been waived by Chittenden, and this requirement was formally waived by Chittenden on the record. (June 27, 1986 transcript, page 151).

Chittenden and Vermont Wood could complete their pre-petition contract for the sale and purchase of the disputed collateral. For some reason, discernable only to it, Chittenden's complaint named Sebert as Defendant. Sebert answered the complaint on January 30, 1986.

Sebert filed, on January 28, 1986, a motion for an appointment of interim trustee and, on January 29, 1986, we entered an Order for Relief Under Chapter 7 and Order Appointing Interim Trustee.

At a February 21, 1986 hearing, the Trustee, Chittenden, and Sebert consented, with conditions, to allow Chittenden to sell the disputed pre-petition repossessed equipment and machinery collateral to Vermont Wood. On March 7, 1986, we entered an Order Authorizing Sale of Property which approved the conditions and permitted Chittenden, as agent of the Trustee, to sell the pre-petition repossessed collateral, for the amount of the outstanding balance of Chittenden's and the Vermont Industrial Development Authority's notes, to Vermont

Wood free and clear of all liens, encumbrances, and interests of any party. We also Ordered that Chittenden's security interest attach to the proceeds and that the proceeds were to be held in an interest bearing account pending the outcome of this adversary proceeding.[6]

Within 60 days of the Trustee's appointment and the Court's Order for relief, 11 U.S.C. § 108(b)(2), the Trustee filed a petition to marshal assets and moved in Open Court, during the first of a five day bench trial, to intervene as a matter of right, Rules of Practice and Procedure in Bankruptcy, Rule 7024,[7] in this adversary proceeding. Chittenden initially objected to the Trustee's intervention motion; however, it withdrew its objection and the Court granted the Trustee permission to intervene. (April 1, 1986 transcript, page 55). We then ordered that the Trustee's petition to marshal assets, as a hypothetical judicial lien creditor under 11 U.S.C. § 544,[8] consolidated with the instant adversary proceeding.

**6.** Vermont Industrial Development Authority, (VIDA), along with Chittenden, represent Debtor's only creditors with security interests in the pre-petition repossessed collateral. VIDA did not file an appearance in this adversary proceeding although its counsel was physically present at the initial stage of this proceeding. VIDA's interest is not represented by Chittenden. VIDA, for reasons known only to them, has chosen to take no other part in this proceeding and, accordingly, we are not well informed about its interests. We do find, however, that it has a $50,000.00 security interest in the collateral which security interest is ahead of Chittenden, but, because it chose not to participate, it will have to look to Chittenden, David Winer and Gordon Winer to enforce its interest. (See, finding # 8).

**7.** Rules of Practice and Procedure in Bankruptcy, Rule 7024, *Intervention,* states: "Rule 24 F.R.Civ.P. applies in adversary proceedings." Federal Rules of Civil Procedure, Rule 24(a), *Intervention,* provides:

(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the ap-

plicant's interest is adequately represented by existing parties.

**8.** 11 U.S.C. § 544(a)(1) and (2), *Trustee as lien creditor and as successor to certain creditors and purchasers,* provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists;

(Nov. 6, 1978, P.L. 95–598, Title I, § 544, 92 Stat. 2596; July 10, 1984, P.L. 98–353, Title III, Subtitle H, § 459, 98 Stat. 377). Section 544 was amended by § 459 of the Bankruptcy Amendment and Federal Judgeship Act of 1984 to make it clear that the trustee's rights and powers under this "strong arm clause" are in the disjunctive and not the conjunctive.

Sebert, as the named defendant in Chittenden's declaratory action, also timely raised the doctrines of marshaling and piercing the corporate veil as affirmative defenses.[9] After the Trustee's intervention, however, Sebert's attorney assumed the role of pursuing these affirmative defenses on behalf of the Trustee for the benefit of Debtor's estate.[10] (June 27, 1986 transcript, pages 36–39). Chittenden timely preserved its objections to the Trustee's standing to marshal and pierce Debtor's veil, albeit through Sebert's attorney's prosecution. (April 1, 1986 transcript, page 57; June 18, 1986 transcript pages 2–3; June 26, 1986 transcript page 50; June 27, 1986 transcript pages 32–39).

9. Chittenden initially objected to Sebert's raising the doctrines of marshaling and piercing the corporate veil as affirmative defenses when Sebert had not made formal amendments to its answer amending them. (April 1, 1986 transcript, pages 28–29; June 18, 1986 transcript, page 83). Although Sebert never formally amended its answer to include these affirmative defenses, we consider these defenses as if there had been a formal amendment since the parties were well aware of and fully litigated these issues. See e.g. Bankruptcy Rules of Practice and Procedure, Rule 7015 (F.R.Civ.P. Rule 15 applies in adversary proceedings); Federal Rules of Civil Procedure, Rule 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.... but failure so to amend does not affect the result of the trial of these issues."); *Wasik v. Borg*, 423 F.2d 44, 46 (2d Cir.1970) (third party defendant held directly liable to plaintiff although plaintiff did not plead against third party defendant where issues of fact was tried between those parties); *Montgomery Ward and Company, Inc. v. Blackburn (In re Blackburn)*, 68 B.R. 870, 872–73 (Bkrtcy. N.D.Ind.1987) (Court allowed amendment during trial in the absence of bad faith by the plaintiff or demonstrated prejudice to the defendant); *Matsuda v. Sasaki (In re Sasaki)*, 71 B.R. 492, 498 (Bkrtcy.D.Ha.1987) (F.R.Civ.P. Rule 15(b) conforming amendments were not required when issues actually litigated determined the outcome).

10. Since Sebert's attorney had already obtained extensive knowledge of the facts and familiarity with the defense of Sebert, the intervening Trustee consented to, and the Court approved of, Sebert's attorney's presentation of the Trustee's marshaling defense in this proceeding to prevent undue mid-trial delay. Additionally, the Trustee filed his report stating this was a "no-asset" case and we specifically found that

This proceeding was tried, briefed, and reserved for decision.[11]

## FINDINGS OF FACT

1. Debtor, Vermont Toy Works, Inc., filed its Articles of Incorporation with the Vermont Secretary of State. Debtor's Certificate of Incorporation was issued by that Office on May 31, 1979, (Sebert's Exhibit # 37, page 1; June 19, 1986 transcript, page 32), and stated as some of its corporate purposes:

(a). To design, develop and manufacture products and sell such products and other products made by others and to engage in distribution of items to wholesale and retail trade....,

the Trustee's delegation to Sebert's attorney's prosecution was based upon the Trustee's unwillingness to actively engage in a lengthy and expensive trial unless Sebert committed its own resources to prove the intervening Trustee's equitable defenses. (June 27, 1986 transcript, pages 36–39). Any affirmative relief obtained through Sebert's attorney's diligence is for the direct benefit of the Estate. Sebert's only reward is indirect in that it may share a dividend with all of Debtor's other unsecured creditors. Under these circumstances, we see no reason why this intervening Trustee cannot permit a creditor's attorney, at the creditor's expense and with the Court's approval, to proceed where the Trustee may also defend. We hold, that for the limited purposes of this proceeding, Sebert's attorney meets the "disinterested person" test of 11 U.S.C. § 101(13)(E) and 11 U.S.C. §§ 327(a) and (c). See e.g., *Fondiller v. Robertson (In re Fondiller)*, 15 B.R. 890, 891–92 (9th Cir. BAP 1981), appeal dismissed, 707 F.2d 441 (9th Cir. 1983) ("While creditors are specifically named as 'not disinterested' by § 101(13)(A), attorneys for creditors are not. The only attorney specially noted as 'not disinterested' by this section are those who have represented certain investment bankers involved in the securities of the debtor." Id.); *In re Iorizzo*, 35 B.R. 465, 468–69 (Bkrtcy.E.D.N.Y.1983).

11. In addition to briefing, the parties also submitted extensive requests for findings of fact. Rules of Practice and Procedure in Bankruptcy, Rule 7052 ("Rule 52 F.R.Civ.P. applies in adversary proceedings."). The Second Pretrial Order, paragraph 12, filed May 9, 1986, however, made it clear, and the parties understood during trial, that *the Court would make its own factual findings based upon the litigated evidence.* (June 26, 1986 transcript, page 59). Accordingly, no effort is made in this decision to specifically accept or reject the parties proposed findings of fact.

(c). To borrow money without limitation as to amount of corporate indebtedness or liability.

(Exhibit 37, page 2).

2. Debtor, a closed family Sub–Chapter S corporation, (June 18, 1986 transcript, pages 104–105; June 27, 1986 transcript, page 83), engaged in the manufacturing of finished wood products, and had three directors who also served as its officers: Gordon Winer, Chairman of the board of directors, and president, (April 1, 1986 transcript, page 16); David Winer, Gordon Winer's father, vice president, (Exhibit C–4; April 1, 1986 transcript, page 12); and, Janet Winer, David Winer's spouse, treasurer, (Exhibit 37, page 11).

3. David Winer is Debtor's sole shareholder. David Winer's total equity (capital) contribution to the Debtor is $10,000.00. (June 18, 1986 transcript, page 59; Exhibit 37, pages 13–14; Exhibit C–3).

4. On November 15, 1984, Debtor executed two demand collateral notes: a $98,-562.00 purchase money note for additional equipment; and, a $50,000.00 working capital note. (April 1, 1986 transcript, page 13). Both notes were in favor of Chittenden. (Exhibit 1, pages 6, 7).

5. The $98,562.00 demand note pledged the following described property as collateral:

> **MORTGAGE DEED DATED 11/15/84** and Security Agreement dated 11/15/84 including all machinery and equipment and any attachments or replacements thereof, all inventory, accounts receivable, contracts entered into or contract rights, etc., assigned **STOCKS AND BONDS AND** life insurance policy.

(Exhibit 1, page 6) (emphasis ours).

The above emphasized words, "Mortgage Deed dated 11/15/84 and," and, "stocks and bonds and," were struck and initialed by Debtor's president and Chittenden's in-house attorney. (Exhibit 1, page 6).

6. The $50,000.00 demand note pledged the following described property as collateral:

> Security Agreement dated 11/15/84 including all machinery and equipment and any attachements (sic) or replacements thereof, all inventory, accounts receivable, contracts entered into or contract rights, etc., **ASSIGNED STOCKS AND BONDS AND** life insurance policy.

(Exhibit 1, page 7) (emphasis ours).

The above emphasized words, "assigned stocks and bonds and," were struck and replaced with the word "assigned" and initialed by Debtor's president and Chittenden's in-house attorney. (Exhibit 1, page 7).

7. At Chittenden's request, the two original notes were subsequently replaced by two new notes, which were then back dated to November 15, 1984 and with the same principal amounts as the original notes. (Exhibits A & B; June 26, 1986 transcript, page 180). The new notes were not executed on November 15, 1984, but were executed several months after the original notes.[12] (June 18, 1984 transcript, page 26). The collateral described in the new notes is different from the original notes. (June 18, 1986 transcript, pages 27–28; June 26, 1986 transcript, pages 163–165). The two new notes each contain identical descriptions of the security:

> Security Agreement dated 11/15/84 including all machinery, equipment, all inventory, accounts receivable, contracts entered into or contract rights, etc., and any attachments or replacements thereof, stocks and bonds in (sic) the current market value of not less than $200,000, as hypothecated to the Bank and described more particularly in a Hypothecation Agreement of even date herewith from David A. Winer and Janet R. Winer, and life insurance policy in the amount of $250,000 on the life of Gordon E. Winer.

(Exhibits A & B).

8. The Debtor executed with Chittenden a security agreement dated November 15,

---

**12.** Exhibit 1, pages 6 and 7, the original notes have handwritten across each note the words "replaced." We are not told whether the word "replaced" was entered on November 15, 1984 or some date subsequent.

1984 for the two notes. The security interest describes the collateral as follows:

All of Debtor's interest in accounts receivable and/or contract rights, past, present and future of the manufacturer of wooden products known as Vermont Toy Works, Inc., and all goods and inventory, past, present and future, equipment, improvements, fixtures, machinery, special tools, and all additions, accessions, renewals and replacements for all or any part thereof, and all other intangible, or mixed personal property of Debtor of any type or class, and all products and proceeds of all the foregoing (all hereinafter called 'Collateral'). The 'Collateral' shall further include, without limitation, any personal property of Debtor which may come into the Bank's possession or control in any manner or for whatever purpose.* The Collateral shall remain personal property regardless of the manner in which it is attached to realty.

---

* The 'Collateral' shall further include, without limitation, the **COLLATERAL ASSIGNMENT OF CERTAIN MARKETABLE SECURITIES AND/OR MUNICIPAL BONDS IN AN AMOUNT OF NOT LESS THAN $200,000** and further an assignment of a Key Man Life Insurance policy in the amount of $250,000 on the life of Gordon Winer.

(Exhibit C) (parenthetical in original; emphasis ours).

The above emphasized words "the collateral assignment of certain marketable securities and/or municipal bonds in an amount of not less than $200,000" were also struck and initialed by Debtor's president and Chittenden's in-house attorney from this security agreement. No evidence was introduced on when these changes were made. (Exhibit C). Chittenden filed financing statements for both notes, ($98,-562.00, "Note # 75," Exhibit A; $50,000.00, "Note # 83," Exhibit B), with the Town Clerk for Bristol, Vermont on November 16, 1984, and with the Vermont Secretary of State on November 27, 1984. (Exhibit D). On their face, the financing statements incorporated the November 15, 1984 security agreements. No evidence was introduced, however, on whether the financing statements were filed before or after the changes were made to the security agreements and no new or relevant amended financing statements were filed. Chittenden later filed an amended financing statement with the Town Clerk for Bristol, Vermont on April 25, 1985 and with the Vermont Secretary of State on April 29, 1985. The amendment expressed that Chittenden agreed to subordinate $50,000 of its security interest in certain machinery and equipment to VIDA's November 15, 1984 security agreement and interest. (Exhibits D; G).

9. The $98,562.00 note, "Note # 75," (Exhibit A), was used by Debtor to acquire certain additional machinery and equipment for Debtor's expansion, (April 1, 1986 transcript, page 13), and subject to the security agreement. (Exhibit C). There was no formal vote of approval on this loan by Debtor's board of directors prior to its consummation. (June 18, 1986 transcript, pages 51–52; Exhibit 10). Debtor already had pre-expansion machinery and equipment in place that was not acquired from the $98,526.00 note proceeds. (April 1, 1984 transcript, page 13).

10. The $50,000.00 note, "Note # 83," (Exhibit B), was used by the Debtor for working capital purposes. (April 1, 1984 transcript, page 13).

11. Chittenden required the personal guarantees of David and Gordon Winer as additional collateral for Debtor's two notes, ($98,562.00, "Note # 75," Exhibit A; $50,000.00, "Note # 83," Exhibit B). (Exhibit J; April 1, 1986 transcript, pages 18–19). The guaranty, (one document with two guarantors), was executed on or about November 15, 1984 in the amount of $148,-562.00 and provided in part:

IN CONSIDERATION of and as an inducement to financial accommodations given and/or further and continued extension of credit by said Chittenden ... to Vermont Toy Works, Inc. ... (hereafter 'Borrower') ... we, Gordon E. Winer and David A. Winer (hereafter 'Guarantors'), hereby jointly and severally unconditionally guarantee ... all indebtedness ... from said Borrower to the Chittenden ... to the amount in the aggregate

of ... ($148,562.00).... This Guaranty shall continue until all of Borrower's indebtedness referred to hereunder and all other sums due from Borrower are paid. Guarantors hereby waive notice of the acceptance of this Guaranty, and hereby also waive notice of presentment, demand, nonpayment, or protest of any such note or other obligation representing an indebtedness or liability of Borrower to said Bank, covered by this Guaranty ... This Guaranty shall be deemed to be a guaranty of payment and not of collection.

(Exhibit J) (parentheticals in original).

12. Janet Winer is not a party to the guaranty. (April 1, 1986 transcript, pages 20, 51; June 26, 1986 transcript, page 38).

13. On or about November 15, 1984, David Winer and Janet Winer executed a "Hypothecation Agreement," which authorized Debtor, as "Borrower," to:

[P]ledge as collateral security for the payment of any and all loans now or hereafter made by you (Chittenden) to the Borrower (Debtor) ... and for the payment of any direct or indirect liability of the Borrower's to you, due or to become due ... and for the payment of any note or notes now or hereafter given by the Borrower to you, and upon the terms stated therein, the following securities ... :

Chittenden Corporation Cert. #34240 22 shares
" " " #18345 1000 shares
" " " #25386 21 shares
" " " #37508 110 shares

Southern California Edison Co. Cert. # RJJU17130 $25,000
The Pacific Telephone & Telegraph Company Cert. # R22928 $50,000
and all additions or replacements thereof. Also any securities ... which the Borrower may hereafter deposit with you for the purposes aforesaid; and ... hereby give you the same powers with respect to said securities as is contained in any note or notes given you as aforesaid by said Borrower, hereby authorizing you to deal with said securities in the same way and with the same force and effect as if said securities pledged by said Borrower as collateral security

therefor had belonged to said Borrower.... [A]uthorize you to deliver to said Borrower the said securities ... whenever you may wish ... meaning and intending to authorize said Borrower to act with said securities as if the Borrower were the absolute owner thereof.

(Exhibit K) (parentheticals supplied). The hypothecation agreement is a Chittenden standard form. It was changed to reflect the intentions of David and Janet Winer, Debtor, and Chittenden that Debtor be given the right to use the Winer's hypothecated securities as collateral for Debtor's loans with the Chittenden. The hypothecated securities appreciated to approximately $125,000.000 as of June 26, 1986. (June 26, 1986 transcript, pages 153–154).

14. Debtor pledged the hypothecated securities to Chittenden as collateral for the two replacement notes. Chittenden accepted the securities after it was satisfied that David and Janet Winer had hypothecated the securities to Debtor. (June 26, 1986 transcript, page 165).

15. The securities hypothecated to Debtor, used to secure Debtor's replacement notes, were also used to secure personal promissory notes of David and Janet Winer to the Chittenden:

a). $80,000.00 "Demand Collateral Note", signed by David and Janet Winer, dated April 30, 1985, (Note # 133, Exhibit L); and,

b). $156,000.00, "Commercial Real Estate Mortgage Note" by David Winer, dated November 15, 1984, (Mortgage note # 141, Exhibit L1).

(June 26, 1986 transcript, pages 144–148).

16. The intended purpose of the loan proceeds from personal Note # 141 was for the construction of improvements to Debtor's leased manufacturing premises. (June 26, 1986 transcript, page 147).

17. David Winer and Janet Winer "lent" Debtor the proceeds from their personal note # 133 to provide the Debtor with working capital. (Exhibits L; April 1, 1986 transcript, page 20).

18. Debtor is in default on its notes # 75 and # 83. (June 26, 1986 transcript,

page 148). As of March 18, 1986, the outstanding balances on the notes were: a). Note # 75, $98,470.55 with a per diem of $28.96880; and, b). Note # 83, $51,540.91 with a per diem of $14.38356. (Exhibit E).

19. The Winers' notes, (Notes # 133, 141), are not in default. Chittenden is prepared to "roll over" these personal notes at the conclusion of this adversary proceeding. (June 26, 1986 transcript, pages 146, 174–175; June 27, 1986 transcript, pages 73–74).

20. David Winer is the owner in fee simple of the premises on which the Debtor conducted its wood manufacturing business. (Exhibit P; June 26, 1986 transcript, page 147).

21. On November 15, 1984, David Winer, as lessor, and Debtor, as lessee, entered into a "Lease Agreement." (Exhibit W; April 1, 1986 transcript, pages 73–74). The pertinent provisions of this lease include:

2. The term of this Lease shall be three (3) years, commencing on November 15, 1984 and ending on November 14, 1987. The Tenant (Debtor) shall have an option to extend this lease for an additional three-year term by giving written notice to Landlord (David Winer) sixty (60) days prior to the expiration of the then current term....

3. Tenant (Debtor) shall pay rent of THREE THOUSAND DOLLARS ($3,000.00) per month during the initial three-year term of the Lease. Rental for the renewal period of an additional three years shall be FOUR THOUSAND DOLLARS ($4,000.00) per month.

8. Landlord (David Winer) agrees that any personal property or fixtures brought upon the premises by Tenant (Debtor) may be removed upon the termination of this Lease Agreement. Tenant (Debtor) shall make any repairs required as a result of such removal.

(Exhibit W) (parentheticals supplied for clarity).

22. Debtor never made any rental payments to David Winer. (April 1, 1986 transcript, pages 73–74).

23. Despite the absence of rental payments, David Winer never provided Debtor with either a written demand notice for rental payments or with a written termination notice of default. (April 1, 1986 transcript, pages 73–75). After David Winer was sure that Debtor was insolvent and, in what he characterizes as an effort to keep the Debtor "going," David Winer, individually, and Gordon Winer, as Debtor's president, agreed that the Debtor would execute a $48,000.00 "Demand Note" on July 31, 1985, (Exhibit U), to David Winer for unpaid rent for the period from November 15, 1984 through November 15, 1985. (Exhibit U; June 19, 1986 transcript, page 13).

24. Between 1979 and 1985, David Winer "lent" Debtor approximately $466,000.00 from the personal loans he or he and Janet Winer had obtained from the Chittenden or from other sources not disclosed to us. (Exhibit C–1; Exhibit C–3, Debtor's 1984, 1983, 1982 Federal Income Tax Returns, page 4, line 18 "Loans from shareholders;" June 19, 1986 transcript page 12; June 26, 1986 transcript pages 16–19).

25. David Winer "lent" Debtor monies for the purpose of providing working capital to maintain Debtor's operations, (June 18, 1986 transcript, pages 37, 62), since the Debtor's financial condition was woefully inadequate to borrow money on its own. (April 1, 1986 transcript, pages 21–22).

26. The three directors of Debtor did not formally meet or vote their approval for the personal loans from David Winer to the Debtor prior to the loan transactions. (June 26, 1986 transcript, page 125; Exhibits C–1, 37). David Winer, an interested party to the personal loan transactions with Debtor, testified that he and the other two directors, his spouse and their son, had weekly informal discussions concerning personal loans and repayments. (June 26, 1986 transcript, pages 125, 131). David Winer also testified that Debtor's directors might have had meetings every few months, but not every meeting or discussion was constituted as a meeting and, they might have acted without corporate minutes. (June 18, 1986 transcript, pages 33–34; June 26, 1986 transcript, page 27).

27. At the same time David Winer caused Debtor to execute the demand note for the unpaid past and future rent, (finding 23), David Winer also caused Debtor to execute promissory notes for his personal loans to the Debtor. Debtor's promissory and demand notes to David Winer were not contemporaneous with the personal loans, and may have been made several months to a year after the actual loans were made. (June 18, 1986 transcript, pages 13, 19, 41; Exhibits C–1, U, and V; June 19, 1986 transcript, page 13). We are not told of the actual dates.

28. Debtor's promissory notes to David Winer were made at David Winer's request, (June 18, 1986 transcript, page 41; June 19, 1986 transcript, page 13), and at a time when he knew that Debtor was hopelessly insolvent. (June 18, 1986 transcript, pages 56–57).

29. David Winer never requested that Debtor make payments on any of the loans because he knew that Debtor's financial condition would not permit it to do so, and, as he stated: "I would be asking it of myself." (June 18, 1986 transcript, page 37).

30. On July 31, 1985, David Winer and Debtor entered into a "Settlement Agreement," (Exhibit C–2), which required Debtor to execute the two demand notes, (Exhibits U; V), to David Winer for the unpaid and future rents, (November 15, 1984 through November 15, 1985), of $48,000.00 and the $132,580.00 consolidated personal loans from David Winer, (for the period of January 1, 1985 through July 31, 1985). (June 26, 1986 transcript, pages 22–23; 134).

31. David Winer intended the "Settlement Agreement" to provide him with a mechanism to make the leased premises available if Debtor failed. (June 26, 1986 transcript, page 23). The "Settlement Agreement" also provided for a "Security Agreement" and described the following collateral:

All of Debtor's interest in accounts receivable and/or contract rights, past, present and future of Vermont Toy Works, Inc., and all goods and inventory,

past, present and future, equipment, improvements, fixtures, machinery, special tools, and all additions, accessions, renewals and replacements for all or any part thereof, and all other tangible, intangible, or mixed personal property of the Debtor of any type or class, and all products and proceeds of all the foregoing (all hereinafter called "Collateral"). The Collateral shall remain personal property regardless of the manner in which it is attached to realty.

(Exhibit C–2). Financing statements (UCC–1) from the transaction were filed with the Vermont Secretary of State on November 8, 1985 and the Bristol Town Clerk on November 14, 1985. (Exhibit D). The UCC–1's were filed several months after the "Settlement Agreement," but shortly before Debtor's demise. We also find that the date on the Bristol UCC–1, (there was no date on the State UCC–1), was changed, altered, or backdated from a November date to "7/31/85," leaving us to conclude that the UCC–1s were not contemporaneous with the "Settlement Agreement," and to further conclude that this was a blatant attempt on the part of David Winer to overcome his insecurities about his unsecured position.

32. Gordon Winer, Debtor's president, personally lent over $25,000.00 to Debtor. (June 19, 1986 transcript, page 3). Barbara Winer, Gordon Winer's spouse, personally lent Debtor approximately $30,000.00. (June 19, 1986 transcript, page 14). Like the loans from David Winer, these loans were not formally approved by a disinterested quorum of Debtor's directors, nor did Debtor execute contemporaneous promissory notes. (Exhibits 37, C–1; June 19, 1986 transcript, pages 4, 14–15).

33. By the middle of 1985, Chittenden was well aware of Debtor's insolvent condition. (Exhibits 13; 14). A Chittenden internal "Memorandum" entitled "Loan Review and Audit on David Winer d/b/a Vermont Toyworks, Inc.," dated July 11, 1985, reveals:

... Gordon Winer's experience with running this type of facility is indeterminable. It is known that his father, David

Winer, came to the aid of his son in the winter months in an attempt to help him with the financial aspects of the corporation ...

Misdirection of construction loan funds further show the company's cash flow problems. The construction loan was written for $156,000 on November 15, 1984. Two of the initial drawdowns paid off two previous notes.... The misdirecting of these funds apparently left the customer short of cash during the renovation period for the building ... (See, finding # 15, supra)

The corporate checking account has been overdrawn 36 times since it was opened on July 31, 1984. The overdrafts occurred regularly at least once a month since November of 1984. The overdrafts ranged from $267.25 on February 15, 1985, to $38,619.72 on December 12, 1984. This further evidences the poor cash flow position of the company.

As of May 19, 1985, the customer had only six clients. This is based on an unsigned workpaper developed by Vermont Toyworks and submitted to Vice President Ronson on May 15, 1985 ... Also noted during the closing interview ... was that the company was attempting to phase out their largest purchaser, Creative Woodcraft, because of differences with their management. Creative Woodcraft was responsible for 77.8% of accounts receivable for Vermont Toyworks ...

To summarize, there is a strong possibility that the bank will lose an indeterminable amount of money if Vermont Toyworks is unable to solve its financial problems ...

(Exhibit 13, pages 1–5) (parenthetical supplied).

34. Chittenden's auditor recommended that Chittenden "Require additional collateral prior to any further advances." (Exhibit 13, page 6). The auditor's "Memorandum" also contained "Exceptions Notes," which stated under "General Exceptions: 'Corporate Resolution must be signed by another corporate officer other than Vice President, David Winer.'" (Exhibit 13, page 7).

35. David Winer used funds intended for Debtor's working capital to pay off his pre-November 1984 personal loans from Chittenden. (Exhibit 13, pages 3, 8; June 26, 1986 transcript, pages 160–62).

36. During May of 1985, David Winer consented to a $60,000.00 transfer of Federal National Mortgage Association bonds from his Smith Barney account to Chittenden's custody account at First of Boston. (Exhibit 12; June 18, 1986 transcript, pages 53–54). David Winer testified that he and Chittenden had an understanding that these bonds were to be added to Chittenden's collateral pool for his loans. (April 1, 1986 transcript, pages 65–66). Later in the trial he contradicted this statement. (June 18, 1986 transcript, pages 53–54). Chittenden's internal auditor noted that these bonds, as of July 11, 1985, had not yet been assigned to Chittenden. (Exhibit 13, page 5). The auditor recommended in a July 11, 1985 "Memorandum" regarding the "Subject: Loan Review and Audit on **DAVID WINER D/B/A VERMONT TOYWORKS, INC.**" that Chittenden: "f. Have customer, (David Winer d/b/a Vermont Toyworks, Inc.), immediately assign the RMS (we were not informed what "RMS" means) held portfolio to the CTC (Chittenden) to increase the value of the collateral." (Exhibit 13, pages 1, 6) (parentheticals and emphasis supplied). Contrary to David Winer's testimony, (June 18, 1986 transcript, pages 53–54), that the bonds were not intended to be pledged as additional security to Chittenden, we find his earlier testimony is corroborated by the auditor's report which states:

Regarding recommendation 'F' that deals with the immediate assignment of readily marketable securities currently held in portfolio by the Chittenden, it should be noted that David Winer has agreed that this can be done and that we can cross-collateralize the readily marketable securities to all of his personal obligations at the bank. By so doing, we will increase our collateral position by approximately $60,000.00. Additionally, in a recent discussion with David Winer, he has further agreed to provide us with another $100,-

000.00 worth of marketable securities in two (2) $50,000.00 increments which should be available to us within the next 30–45 days. Consequently, we are looking at being able to improve our collateral position as to the David Winer and David Winer and Janet Winer debt by approximately $160,000.00.

(Exhibit 14, page 2, August 14, 1985 "Memorandum" by Chittenden's auditor regarding the subject "Review and audit on David Winer and Vermont Toy Works, Inc.;" Exhibit 15, page 4, August 20, 1985 "Problem Loan Status Report" of David and Janet Winer by Chittenden).

37. During the summer of 1985, David Winer, Debtor's attorney, and Chittenden had frequent discussions:

[A]s to whether or not the company is liquidated, placed in bankruptcy, or the assets are voluntarily surrendered to the Chittenden. The only event which would forestall these activities would be if they are able to find an outside investor who is willing to come up with the necessary capital to keep the company going.

(Exhibit 14, page 2; June 18, 1986 transcript, pages 57–58; Exhibit 15, page 1).

38. David Winer admits to the receipt of a Chittenden "demand letter," which gave Debtor until August 31, 1985 to be current on its loans with Chittenden. (June 18, 1986 transcript, page 56).

39. Chittenden was unwilling to provide additional capital funds when Debtor repeatedly demonstrated its inability to carry its current debt load. (June 18, 1986 transcript, page 59). Chittenden placed one of Debtor's notes on "interest only" status in an effort to make Debtor more attractive to potential outside investors and to preserve Debtor's working capital. (June 18, 1986 transcript, pages 60–61). Some of David Winer's personal loans from Chittenden, "lent" to Debtor to provide working capital, were also put on an "interest only" status. (June 18, 1986 transcript, pages 61–62; Exhibit 16).

40. David Winer was unsuccessful in finding outside investors who were interested in the Debtor as an investment opportunity. (June 18, 1986 transcript, pages 57–58).

41. Debtor was the owner of a wood toy patent. David Winer acquired ownership of this patent from Debtor during March or April of 1985. (June 19, 1986 transcript, page 5). He paid $25,000.00 for it. None of Debtor's officers or directors estimated the patent's value, voted by a disinterested quorum, or approved its transfer to David Winer. (June 19, 1986 transcript, pages 6–7).

42. During the fall of 1985, David Winer, Debtor's attorney, and Chittenden met and discussed the possibility of forming a new corporation which would acquire Debtor's personalty. (June 18, 1986 transcript, pages 64–65, 72). An October 28, 1986 memorandum by a Chittenden officer, Mr. Burnell, of a meeting among himself, a Chittenden employee, Chittenden's in-house attorney and Debtor's attorney, reveals that Mr. Burnell had problems with the passing of Debtor's personality to a new corporation and that Chittenden's in-house attorney and Debtor's attorney were to pursue and devise the legal aspects for the pass through of Debtor's personality:

Gable—(Patricia Gable, Esq., Debtor's and Vermont Wood's attorney) pursuing various ways of possibly transferring personality to a new corp. I have problems with this. Mark (Mark Scribner, Esq., Chittenden's in-house attorney) and pat (sic) Gable to pursue legal aspects and get back to us.

(Exhibit 18, parentheticals supplied for clarity; June 26, 1986 transcript, pages 175–77). The formation of a new corporation was devised by David Winer and Chittenden to carry on Debtor's business prior to Debtor's demise because:

With the growing difficulties of Vermont Toy and the lack of success of our (sic) developing investors for Vermont Toy, we thought it would be a good idea to have a company that would be available to continue producing items similar to those at Vermont Toy that would use the facility and might be able to be favorably considered for investment on the part of

a businessman interested in going into this kind of business.

(June 26, 1986 transcript, page 99).

Through efforts on behalf of Vermont Wood Industries, sales of products were generated, and these were products that were going to be produced in the facilities of Vermont Toy Works. There was growing concern that Vermont Toy Works would not survive. We were unable to bring in investment from others, and the thought that perhaps a new company that would generate investment, new investment, from others might be able to carry on. The customers were unwilling to consider certain placement of orders with Vermont Toy in the event that the company would not be able to survive. So discussions were held to assure (sic) the fact that these customer requirements could be satisfied.

(June 18, 1986 transcript, page 67).

43. During the summer of 1985, Debtor was introduced to Mr. Bruce Brosler, president of Tech Furnishings, Inc., a potential furniture customer for Debtor. (June 26, 1986 transcript, pages 93–94). Debtor contemplated that Tech Furnishings, Inc. would purchase within a year as much as $40,000.00 of finished furniture from it. (June 26, 1986 transcript, page 94). Mr. Brosler submitted a detailed cost estimate, dated September 27, 1985, for a "Brosler C206" case to be produced by Debtor. (Exhibit 33; June 18, 1986 transcript, pages 71–72).

44. Mr. Brosler, on behalf of Tech Furnishings, Inc., placed an order with Debtor on October 17, 1985, (June 18, 1986 transcript, page 84); however, Debtor lacked working capital to purchase the wood inventory to fill the order. (June 26, 1986 transcript, page 95). Neither Mr. Brosler nor David Winer, like Chittenden, were willing to advance any further funds to Debtor. (June 18, 1986 transcript, pages 84–85). Mr. Brosler then introduced a Mr. Jacobson to David Winer as a potential investor of much needed capital for the necessary raw material to fill Tech Furnishings, Inc.'s order. Mr. Jacobson was unwilling to invest directly in Debtor, be-

cause of its precarious financial condition, and the "Tech Deal" collapsed. (June 26, 1986 transcript, page 95).

45. Vermont Wood Industries, Inc., (Vermont Wood), "Certificate of Incorporation" was issued by the Vermont Secretary of State on October 30, 1985. (Exhibit 19, page 1; June 26, 1986 transcript, page 96–97). Vermont Wood's "Articles of Association" listed David Winer as the sole initial director, and listed Debtor's attorney as the incorporator of Vermont Wood. Vermont Wood's "Articles of Association" stated specific corporate purpose is:

Engaging in the business of designing, manufacturing, distributing, selling, buying, repairing, exporting, importing and otherwise dealing in and with, at wholesale and retail, all kinds of furniture, furnishings, decorative fixtures and products constructed out of wood and/or out of other building materials, as well as in and with all raw materials and replacement parts therefor.

(Exhibit 19, pages 2, 3).

46. There was a six week overlap between Vermont Wood's incorporation, October 30, 1985, and Debtor's cessation. (June 18, 1986 transcript, pages 65–67).

47. David Winer became Vermont Wood's president, chairman of the board, treasurer, fifty percent shareholder, and one of three directors (April 1, 1986 transcript, page 24) as a result of a November 12, 1985 "Shareholders Agreement" with Mr. Jacobson. (Exhibit T). In consideration for Jacobson's financial investment in Vermont Wood, David Winer agreed to relinquish his sole shareholder interest and directorship position in Vermont Wood and share control of Vermont Wood with Mr. Jacobson. Mr. Jacobson was made a fifty percent shareholder in Vermont Wood on November 12, 1985, and was given the right to name two of Vermont Wood's three directors. (April 1, 1985 transcript, page 24; June 26, 1986 transcript, page 42). Mr. Jacobson named himself and Tech Furnishings, Inc.'s president, Mr. Brosler, as Vermont Wood's second and third Directors. (April 1, 1986 transcript, page 24; June 26, 1986 transcript, page 96). Under

the November 12, 1985 "Shareholders Agreement," Mr. Brosler has the right to purchase stock (price unknown) in Vermont Wood, (Exhibit T; June 18, 1986 transcript, page 68), but David Winer's ownership could not be less than fifty (50) percent of all issued shares.

48. Before Debtor's cessation, Mr. Jacobson and David Winer agreed to salvage the aborted Tech Furnishing contract, and to provide Vermont Wood with the necessary capital to fund Debtor's manufacturing of Tech Furnishings, Inc.'s order. (June 26, 1986 transcript, page 95). Vermont Wood then entered into a contract with Mr. Brosler for the original furniture order with Debtor. (June 26, 1986 transcript, page 95).

49. On November 12, 1985, David Winer, on behalf of Vermont Wood, and Gordon Winer, on Debtor's behalf, entered into a consignment "Agreement." (Exhibit Y). The consignment agreement was designed to protect Vermont Wood in the event that Debtor failed. (June 18, 1986 transcript, page 84). Under the consignment agreement and in furtherance of its contract with Tech Furnishing, Inc., Vermont Wood agreed to purchase lumber, (inventory), and pay Debtor for the manufacturing of finished product. (June 26, 1986 transcript, pages 93–96; June 27, 1986 transcript, page 100).

50. Mr. Jacobson and David Winer also agreed to commit Vermont Wood to purchase Debtor's machinery and equipment in order to discharge David Winer's and Gordon Winer's personal guarantees on Debtor's loan obligations with Chittenden. Thus, as early as November 12, 1985, Vermont Wood, David Winer, and Mr. Jacobson were committed on an option basis to purchase Debtor's equipment and machinery for the amount required to discharge Debtor's obligations to Chittenden. (April 1, 1986 transcript, pages 33–34; June 26, 1986 transcript, pages 42–43).

51. In mid-November, 1985, and after Debtor had defaulted on its loan obligations to Chittenden, David Winer on behalf of Vermont Wood entered into negotiations with Chittenden to enable Vermont Wood to obtain Chittenden's collateral in Debtor's machinery and equipment. (This was ultimately consummated on December 9, 1985 in an agreement entitled "Equipment Lease Agreement;" finding 59). Vermont Wood's consideration was the payoff figure on Vermont Toy's debts to Chittenden. (June 26, 1986 transcript, page 100).

52. Also, by mid-November, David Winer and Mr. Jacobson agreed that Vermont Wood would pay off Debtor's rent arrearage owed to David Winer and enter into a real estate lease with David Winer after David Winer terminated Debtor's lease.

53. After Vermont Wood was created and Mr. Jacobson was committed to invest in Vermont Wood: Debtor, ceased doing business on December 7, 1985; stopped making payments on its loans to Chittenden; and, Chittenden declared Debtor in default of its notes # 75 and # 83. (April 1, 1985 transcript, pages 22–23; June 26, 1986 transcript, page 148).

54. On December 6, 1985, Gordon Winer, Debtor's president, and Chittenden entered into a "Repossession Acknowledgement," (Exhibit M), which provided in part:

1. On November 15, 1984, Debtor executed the following notes payable to the Chittenden Trust Company:

(a) Demand Collateral Note in the amount of $98,562.00; and

(b) Demand Collateral Note in the amount of $50,000.00 ...

5. Debtor is in default under the terms of the promissory notes described above.

6. The collateral described herein does not constitute a going concern. Debtor consents to the peaceable repossession of the collateral by the secured parties without the necessity of instituting legal proceedings, and voluntarily surrenders said collateral to the possession of secured parties ...

8. Debtor waives its right to redeem the collateral prior to any disposition.

9. Debtor agrees that if the secured parties lease the machines and equipment to a third party and thereafter sell the collateral to said Lessee, the secured parties shall be deemed to have used

reasonable care in the custody and preservation of said collateral and to have kept collateral identifiable so long as (1) debtor receives a copy of the proposed lease and signs its written consent to the terms thereof and (2) said lease is hereafter entered into without modification, followed by a private sale to said Lessee. (April 1, 1986 transcript, page 23; June 26, 1986 transcript, page 38).

55. Before the December 6, 1985 "Repossession Acknowledgement," Chittenden held meetings with David Winer where David Winer agreed to become Chittenden's agent:

In addition to calling me, I met with the people at the bank in the days immediately preceding the December 6th or 7th date. I was aware that the bank had made a demand for payment on the debts that were due, and I was aware that the company (Debtor) was unable to make those payments, and I was instructed by the bank (Chittenden) during meetings at the bank that I was to make certain that all machinery and equipment which is identified on an inventory list be maintained on the premises and maintained in good working condition and preserved. I was instructed to segregate all Vermont Toy Works inventory; and in order to save administrative costs and expenses which would be generated, I was instructed as to how the pallets were to be assembled and segregated and marked; and I presented to the bank that that (sic) was done as it was done. I provided them with complete lists of documentation as to the pallet identifications and the machinery and equipment.

(April 1, 1986 transcript, pages 85–86) (parentheticals supplied for clarity). Chittenden's counsel, on re-direct, tried to establish that Chittenden gave David Winer instructions after the "Repossession Acknowledgement" was signed: "Q. Did the Chittenden Bank give Vermont Toy any instructions after the repossession agreement was signed on December 6, 1985? A. They did." (June 26, 1986 transcript, page 38). In our view, this attempt at rehabilitation bears no fruit. It is clear Chittenden instructed David Winer, prior to the "Re-

possession Acknowledgement," how to handle the collateral owned by the Debtor. It is equally clear that Chittenden, David Winer and Debtor's successor, Vermont Wood, had Debtor's business death as an agendum long before the ink of the "Repossession Acknowledgement" was dried.

56. Chittenden never took actual or direct physical possession of Debtor's machinery and equipment. (April 1, 1986 transcript, pages 80–81). Neither did it obtain the keys to Vermont Toy's business premises, nor did it personally mark or otherwise identify the alleged repossessed collateral. (April 1, 1986 transcript, pages 84–85).

57. Prior to the "Repossession Acknowledgement," David Winer was instructed orally by Chittenden to act as its repossession agent and to preserve, segregate and identify Debtor's equipment, machinery, inventory and accounts receivable. (June 26, 1986 transcript, page 39). David Winer instructed Debtor's employees to verify Chittenden's collateral according to Chittenden's pre-existing list of Debtor's machinery and equipment. (April 1, 1986 transcript, page 86). Chittenden instructed David Winer to separate the Debtor's inventory on a "pallet-by-pallet basis and to make sure it was properly labelled so that it was identified as property of the bank." (April 1, 1986 transcript, page 47). David Winer and Debtor's employees prepared approximately 120 pallets of corrugated boxes, finished goods, toys, and parts. The bulk of the pallets were "fall off" wood. This "fall off" wood is part of the work in process from certain raw material that was too good to throw out and yet not good enough to use in on-going product. (April 1, 1986 transcript, page 47). David Winer estimated that of the 120 pallets, there were approximately 70 to 80 pallets of "fall off" material. (April 1, 1986 transcript, page 48).

58. On December 6, 1985, Gordon Winer, Debtor's president, executed a written "Consent to Lease of Equipment," (Exhibit O), whereby Debtor consented "to the terms, execution and performance of the Equipment Lease Agreement," not yet con-

summated, pursuant to paragraph nine (9) of the December 6, 1985 "Repossession Acknowledgement." (Exhibits M; O; Q). David Winer and Gordon Winer decided, during a director's meeting, that Debtor would execute the "Consent to Lease of Equipment." Janet Winer was absent from this meeting. (April 1, 1986 transcript, pages 109–110). There is no evidence that Debtor, on or prior to December 6, 1985, independently approved of the December 9, 1985 Chittenden's "Equipment Lease Agreement," (Exhibit N), with Vermont Wood.

59. On December 9, 1985, David Winer, on behalf of Vermont Wood, and Chittenden executed a Chittenden prepared document entitled "Equipment Lease Agreement." (Exhibit N; April 1, 1986 transcript, page 103). Chittenden proclaimed itself "lessor" of Debtor's machinery and equipment under its alleged acquired possession of Debtor's collateral (Exhibit N, page 1), and paragraphs 6 and 9, (Exhibit M) of the "Repossession Acknowledgement." (June 26, 1986 transcript, page 39).

60. The "Equipment Lease Agreement" provides that the machinery and equipment are to remain Debtor's property. (Exhibit N, page 3, paragraph 5.1; April 1, 1985 transcript, pages 104–105). The term of the "Equipment Lease Agreement" was for one year. The rental payments were calculated to maintain Debtor's loan payment schedule with Chittenden. (Exhibit N, page 3, para. 4; June 26, 1986 transcript, pages 39–40). Vermont Wood pays Chittenden approximately $2,400.00 a month

under this "Equipment Lease." (April 1, 1986 transcript, pages 106–108).

61. Findings 59 and 60 are examples of the quagmire Chittenden and David Winer planned and created for the Debtor. Chittenden proclaims both itself and Debtor as owners of the machinery and equipment. David Winer also claims an interest *vis a vis* his "Settlement Agreement" and his belatedly filed UCC–1. (finding 31). Mercifully, we do not have to resolve who is on first because our holding does not require it.[13]

62. The "Equipment Lease Agreement" also provides Vermont Wood with an option to purchase Debtor's machinery and equipment, (Exhibit N, page 4), from Chittenden, (lessor), for "[T]he principal balance owed to Lessor by Vermont Toy Works, Inc. or the debt incurred to purchase the equipment." (Exhibit N, page 4; June 26, 1986 transcript, page 40; April 1, 1986 transcript, pages 32–33).

63. Although no written termination or notice to vacate the real estate lease was given by David Winer, lessor, to Debtor, lessee, David Winer considered the lease terminated when Debtor ceased doing business on December 7, 1985. (April 1, 1986 transcript, page 75).

64. The original real property lease between Debtor and David Winer, (Exhibit W), did not express when Debtor was to make its monthly rental payments. The "Settlement Agreement" between Debtor and David Winer, stated, inter alia: "3. The Corporation (Debtor) shall, commencing on November 15, 1985, make all rental payments when due under the Lease Agree-

---

**13.** This reminds us of the following excerpt from the famous routine of *Abbott and Costello:*

A: Now, on the St. Louis team we have Who's on first, What's on second, I Don't Know is on third—
C: That's what I want to find out—
A: I'm telling you. Who's on first, What's on second, I Don't Know is on third—
C: Well all I'm trying to find out is what's the guy's name on first base.
A: Oh, no, no, What's on second base.
C: I'm not asking you who's on second.
A: Who's on first.
C: That's what I'm trying to find out.
A: Well, don't change the players around.
C: I'm not changing nobody.
A: Now, take it easy.
C: What's the guy's name on first base?
A: What's the guy's name on second base.
C: I'm not askin' ya who's on second.
A: Who's on first.
C: I don't know.
A: Please. Now what is it you want to know?
C: What is the fellow's name on third base?
A: What is the fellow's name on second base.
C: I'm not askin' ya who's on second.
A: Who's on first.
C: I don't know.
(With apologies to Abbott and Costello if our memory fails us about this routine).

ment." (Exhibit C–2). Because of the November 12, 1985 agreement between David Winer and Mr. Jacobson, David Winer intended that Vermont Wood would become the successor lessee to Debtor prior to Debtor's cessation.

65. On December 9, 1985, Vermont Wood, Lessee, and David Winer, lessor, executed a real estate "Lease Agreement" for the same land and building premises (the Bristol property) as David Winer had leased to Debtor. (Exhibit Q; April 1, 1986 transcript, page 31). The term of Vermont Wood's lease is for five years from December 9, 1986 through December 31, 1990, with an option to extend the term of the lease for two additional five year terms. (Exhibit Q, page 1). In the event that Vermont Wood purchased Debtor's equipment and machinery under the "Equipment Lease Agreement," then the term "shall be deemed a month to month tenancy." (Exhibit N, page 1). Vermont Wood's rent for the five year term is $4,000.00 a month with the exception that:

... [N]o rent shall be required to be paid during any month that Lessee's (Vermont Wood's) revenues, less returns, do not exceed $35,000. Rent for these months shall be accrued. When such gross revenues, less returns, exceed $35,-000 for any month, the rent paid during that month shall equal eight (8) percent of such revenues, and shall be applied first to rent accrued for prior months and then to the month in question; PROVIDED, HOWEVER, that under no circumstances shall rent paid exceed $4,000 per monthduring (sic) the first five year term. . . .

(Exhibit Q, pages 1–2, para. # 4) (parentheticals supplied for clarity).

66. As a result of Vermont Wood's "Shareholders Agreement," (Exhibit T), David Winer became a "minority" director and could be "overruled" by the other two directors on matters of Vermont Wood's operations. David Winer could, however, overrule the other two directors of Vermont Wood on matters which concerned David Winer's interests, such as Vermont Wood's building and real estate rental pay-

ments to David Winer, because these matters required the Directors' unanimous votes. (April 1, 1985 transcript, page 25).

67. Vermont Wood commenced its wood manufacturing business on December 9, 1985. (April 1, 1986 transcript, pages 83–84).

68. On December 17, 1985, Debtor's new attorney sent a letter to Debtor's creditors to inform them that Chittenden had taken possession of Debtor's assets and:

... As of October 31, 1985, the principal amount of loans owed to the Bank (Chittenden) and VIDA exceeded $190,000.00 Unsecured trade debt exceeded $237,-000.00 The principal amount of shareholder and insider loans to the Corporation (Debtor) exceeded $400,000.00, of which over $135,000.00 was loaned to the Corporation by shareholder David Winer within the last ten months ...

Consequently, the amount of the debt to the secured parties exceeds the value of collateral. We do not anticipate that any assets will be available to satisfy the $237,000.00 debt owed to unsecured creditors or the debt of over $380,000.00 in loans and $36,000.00 in unpaid rent which is owed to shareholder David Winer.

... We have been advised that the Bank intends to foreclose the machinery and equipment at a private sale on December 27, 1985 ... The buyer is expected to be Vermont Wood Industries, Inc., which is controlled by a businessman from Massachusetts who had no previous affiliation with Vermont Toy Works, Inc. or David Winer. David Winer, who, as guarantor of the Debt to the Chittenden and VIDA, remains personally liable for any deficiency on such debt, is also a stockholder in Vermont Wood Industries, Inc.

Vermont Wood Industries, Inc. is expected to lease the building previously rented by Vermont Toy Works, Inc. and to hire some of the individuals previously employed by Vermont Toy Works. Associates of the Massachusetts investor in Vermont Wood Industries, Inc. bring with them a new market for the wood products to be made by the new company.

The management of Vermont Toy Works, Inc. ... has been assured by Vermont Wood Industries, Inc. (it) will use its best efforts to do business with the creditors of Vermont Toy Works Inc ...

(Exhibit 35, parenthetical supplied for clarity; June 18, 1986 transcript, page 88; June 19, 1986 transcript, page 12). This letter contains many misstatements. For example, it did not disclose: that David Winer's insider shareholder loans are unsecured; that David Winer is the original sole shareholder and director of Vermont Wood; and, that the "businessman from Massachusetts" and David Winer are each presently fifty (50%) percent owners of Vermont Wood. Nor did this letter disclose that Chittenden, Debtor, Vermont Wood and David Winer had already negotiated contracts for: Vermont Wood to lease and purchase Debtor's machinery and equipment for an amount calculated to discharge Debtor's debt to Chittenden; the rental of the premises with an option to purchase to Vermont Wood; the discharges of David Winer's guaranty to Chittenden as well as Debtor's rental arrearage owed to David Winer; and, that Chittenden and Debtor both claimed ownership of the Debtor's assets.

69. David Winer testified that Vermont Wood was not established as Debtor's successor and that Vermont Wood was different from Debtor because:

In the first place, the ownership and control would be different. The customer basis would be different. The products would be different. The markets would be different.

(June 18, 1986 transcript, pages 67–68). We disagree.

69(a). Vermont Wood's corporate purpose is similar to Debtor's, i.e., to produce wood products. (April 1, 1986 transcript, pages 89–90). With minor differences in type of wood and style, (June 26, 1986 transcript, pages 100–101) both Vermont Wood and Debtor manufactured wood furniture products with the same machinery and equipment. Indeed, on November 12, 1985, Vermont Wood contracted with Debt-

or for the latter to produce certain wood products for Vermont Wood. (Exhibit Y; Exhibit C–6; June 26, 1986 transcript, pages 89–93; April 1, 1986 transcript, pages 90–91; June 18, 1986 transcript, pages 78, 80).

69(b). Vermont Wood continues to service many of the same customers, (Exhibit 21; June 18, 1986 transcript, pages 73–74), that Debtor had at the time it had closed. (June 26, 1986 transcript, pages 100–101, 2 to 3 customers carryover; Exhibit 13, page 3, para. 5, as of May 19, 1985, Debtor only had 6 customers).

69(c). Vermont Wood's key personnel are the same as those of Debtor: David Winer, Debtor's vice president, is Vermont Wood's president; Gordon Winer, Debtor's president, is Vermont Wood's "plant manager." (June 18, 1986 transcript, page 64); Barbara Winer, Gordon Winer's wife and Debtor's office manager, is Vermont Wood's "business manager." (June 27, 1986 transcript, pages 4, 58); and, Debtor's corporate former counsel is now Vermont Wood's counsel, (June 18, 1986 transcript, page 65; June 26, 1986 transcript, pages 8–10).

70. David Winer testified that he calculated the value of the "fall off" (finding 57) by factoring into the value, the gaps between the material on the pallet, the current market price of the material, and the likely yield that would result if the "fall off" materials were to be used. (April 1, 1986 transcript, pages 48–49). David Winer's opinion established the fair market value of Debtor's "fall off" as approximately $13,000.00. (April 1, 1986 transcript, pages 48–49). In Debtor's December 17, 1985 letter to creditors, (finding 68) however, this inventory's value was between $15,000.00 and $20,000.00: "Inventory consists largely of 'fall off' lumber and custom design boxes and is estimated not to exceed a value of $15,000.00 to $20,000.00." (Exhibit 35). We find the value of the "fall off" inventory is $15,000.00.

71. David Winer testified that Debtor had uncollected accounts receivable of approximately $52,000.00 at the time of Debtor's demise. (April 1, 1986 transcript, page

49). He also testified that two of Debtor's major customers, Creative Woodcraft, ($45,000.00), and Enrico Bartellini, ($3,000.00), represented approximately $48,-000.00 of the total uncollected accounts receivable, and that Debtor would be "fortunate to get $15,000.00 from them in total." (April 1, 1986 transcript, pages 49, 51). No evidence was produced as to the collectability or uncollectability of the $4,000.00 balance of the Debtor's total accounts receivable. Thus, the value of the Debtor's accounts receivable is $15,000.00.

72. The parties agreed that the value of Debtor's machinery and equipment ranges from $90,000.00 to the $141,800.00 sales price to Vermont Wood. (April 1, 1986 Stipulation; Exhibits H, I). Vermont Wood is willing to offer $141,800.00 for Debtor's machinery and equipment because the machinery and equipment is in place and fully operational. (April 1, 1986 transcript, pages 27, 29; June 26, 1986 transcript, page 42). In addition to the going concern value, Vermont Wood is also willing to offer the $141,800.00 sales price in order to discharge Debtor's two notes by assuming Debtor's obligation (April 1, 1986 transcript, page 32) and to release David and Gordon Winer from their personal guarantees of Debtor's obligations. (April 1, 1986 transcript, pages 31–32; June 26, 1986 transcript, pages 41–42). With no other evidence before us, the $141,800.00 sales price is the fair market value of Debtor's machinery and equipment.

73. Sebert Lumber, Inc. (named Defendant in this proceeding) was a major supplier of raw materials to Debtor and a purchaser of finished product. (April 1, 1986 transcript, pages 37–38). During July and August of 1985 David Winer approached Sebert's president with a request to invest in Debtor. He provided Sebert with Debtor's financial data and information about potential customers such as Tech Furnishings, Inc. (April 1, 1986 transcript, pages 40, 59–60; June 27, 1986 transcript, page 98). There was no competent evidence that Se-

bert or any of Debtor's other unsecured trade creditors were informed about Debtor's under-capitalization or that the proceeds from Chittenden's personal loans to David Winer were used by David Winer for his shareholder loans to the Debtor. Sebert declined David Winer's offer to invest in Debtor. (June 18, 1986 transcript, page 69).

74. David Winer never requested that Mr. Sebert invest in Vermont Wood. (June 27, 1986 transcript, page 88). David Winer never told Sebert, or any other unsecured creditor, about Vermont Wood, and Sebert did not know of Vermont Wood's existence (June 27, 1986 transcript, page 97; June 18, 1986 transcript, page 81) until the first disclosure of Vermont Wood was made through the Debtor's December 17, 1985 attorney's letter. (June 27, 1986 transcript, pages 88, 97). In rebuttal to Sebert's testimony regarding nondisclosure of Vermont Wood or of David Winer's intentions of forming a new company, David Winer testified that during late October or early November of 1985 he discussed with Sebert's president and/or Sebert's vice president about the possibility of forming a successor corporation to Debtor. (June 27, 1986 transcript, pages 102–103). On this point, we perceive Sebert as credible and not David Winer. When testifying in response to questions from Chittenden's counsel, David Winer had a rather remarkable memory, not unlike a picture from a camera; however, when questioned by Sebert's counsel, David Winer's memory was as if the negative had been underdeveloped.

75. Sebert, with others, initiated the involuntary bankruptcy proceeding against Debtor to stop the December 27, 1985 private sale, disclosed in Debtor's December 17, 1985 attorney's letter, between Chittenden and Vermont Wood. (June 27, 1986 transcript, pages 95–96).

76. Debtor's outstanding loan obligations with Chittenden are summarized as follows:

| Note # | Date | Borrower | Payoff | Collateral |
|--------|------|----------|--------|------------|
| 75 | 11/15/84 | Debtor | $99,400.00 | Debtor's machinery; equipment; accounts receivables; inventory; hypothecated securities; personal guarantees |
| 83 | 11/15/84 | Debtor | $51,600.00 | Debtor's machinery; equipment; accounts receivables; inventory; hypothecated securities; personal guarantees |

(Exhibit C–7; June 26, 1986 transcript, pages 149–150).

77. A summary of the outstanding personal loan obligations of David Winer or of David Winer and Janet Winer with Chittenden is as follows:

| Note # | Date | Borrower | Payoff | Due Date | | Collateral |
|--------|------|----------|--------|----------|---|------------|
| 26 | 4/14/77 | David Winer Janet Winer | $53,500.00 | 4/86 5/86 | P* I! | First Mortgage on Barnard |
| 141 | 11/15/84 | David Winer | $158,200.00 | 4/86 3/86 | P I | First Mortgage on Bristol & Securities |
| 117 | 4/22/85 | David Winer Janet Winer | $153,000.00 | 5/86 Mature | | First Mortgages on Barnard & Bristol |
| 125 | 4/22/85 | David Winer Janet Winer | $73,300.00** | 4/86 5/86 | P I | First Mortgage on Barnard & Second on Bristol |
| 133 | 4/30/85 | David Winer Janet Winer | $81,500.00 | 5/86 Mature | | Securities |

(* Principal; ! Interest; ** $26,000.00 has not been disbursed by the Chittenden to David Winer, and has not been added to note #125's payoff figure of $73,300.00). (Exhibit C–7; June 26, 1986 transcript, pages 143–151, 166).

78. David Winer's Bristol property, leased by Debtor and Vermont Wood for wood manufacturing, was appraised on September 18, 1984 at a fair market value of $213,000.00, and was subject to increase to $355,000.00 if certain proposed improvements were made to the subject property and surrounding non-subject property. (Exhibit C–10; June 26, 1986 transcript, page 64).

78(a). The appraiser of the Bristol property testified that substantial improvements have been made to the subject premises since his 1984 appraisal: the subject premises have been surveyed; an operational septic system, an expanded electrical system to meet the needs of the machinery and equipment, a heating system, including a new boiler, and an outside and an inside cyclone and sawdust collection systems have been installed; and, an office, employee lounge, and fire protected storage areas have been constructed in the subject prem-

ises. (June 26, 1986 transcript, pages 64–69). The appraiser observed that a fire in the boiler room caused some damage and was informed that the boiler room leaked and was not operational. (June 26, 1986 transcript, page 70).

78(b). The Bristol property appraiser also testified that a number of contemplated improvements on the premises had not been made, i.e., a thirty-foot by thirty-foot addition and an eighteen-foot high door with a loading dock facility attached to the front of the subject building. (June 26, 1986 transcript, pages 69–70). When performing the appraisal, the appraiser also considered potential improvements on adjacent property, not owned by David Winer, in his 1984 final value. The following contemplated improvements to the adjacent property were not made: removal of approximately ten truckloads of debris; two steel frame buildings were to have been repaired and put into good appear-

ance; and, a 2,000 square foot concrete building was to be leveled. (June 26, 1986 transcript, pages 65–67).

78(c). The appraiser testified that the present market value, as of June 26, 1986, of the Bristol premises was approximately $250,000.00, (June 26, 1986 transcript, page 64); however, the appraiser failed to conduct any sale comparisons with other comparable manufacturing sites for his updated appraisal. (June 26, 1986 transcript, pages 71–72). Based on the appraiser's testimony and other evidence at trial, we find the fair and present market value of David Winer's Bristol premises to be $300,000.00.

79. David Winer submitted a "Personal Statement" of his financial affairs to Chittenden which indicated that as of June 11, 1984, his net worth was $1,212,000.00. (Exhibit 38; June 26, 1986 transcript, pages 171–173). David Winer listed on "Schedule A—U.S. Governments and Marketable Securities" of his "Personal Statement" the following deposits, accounts and corresponding market values:

| | |
|---|---|
| Smith Barney Account | $125,000.00 |
| Merrill Lynch Account | 20,000.00 |
| IRA/Keough Account | 25,000.00 |
| $50,000 PT & T 2016 Bonds | 34,000.00 |
| 1215 Shares Chittenden Bank Stock | 26,000.00 |
| Misc Stock | 30,000.00 |
| Total | $260,000.00 |

(Exhibit 38, page 2; June 26, 1986 transcript, page 173).

79(a). David Winer testified that part of his June 1984 "Personal Statement" was no longer accurate as of June of 1986, (June 27, 1986 transcript, page 68), and, as required by his loan agreements with Chittenden, he never provided Chittenden with the required written notice of a change in his financial status. (June 27, 1986 transcript, page 80).

79(b). David Winer testified that the current values of the deposits and accounts listed on the "Schedule A—U.S. Governments and Marketable Securities" on his "Personal Statement," had changed as follows:

| | |
|---|---|
| Smith Barney Account | $ 45,000.00 |
| Merrill Lynch Account | 0.00 |
| IRA/Keough Account | 0.00 |
| $50,000 PT & T 2016 Bonds | 50,000.00 |
| 1215 Shares Chittenden Bank Stock | 48,000.00 |
| Misc Stock | 65,000.00 |
| Total | $208,000.00 |

(June 27, 1986 transcript, page 69).

79(c). David Winer testified that Chittenden never requested that he set forth, in his 1984 "Personal Statement," which properties were held individually by him or jointly with Janet Winer, however, he had a "long history" of discussions with Chittenden on this subject and had always included jointly held properties in the many statements he had provided to Chittenden. (June 27, 1986 transcript, page 78).

79(d). David Winer's "Personal Statement" discloses that, as of June 11, 1984, his Barnard property was appraised at a market value of $325,000.00 with a Chittenden mortgage of $60,000.00. (Exhibit 38, page 2). David Winer has placed several more Chittenden mortgages against the Barnard property. (finding 77). David Winer, however, testified that the current value of the Barnard property was approximately $150,000.00, since a substantial portion of the land and a dwelling has been sold. (June 27, 1986 transcript, pages 70, 76).

80. On Chittenden's direct examination, David Winer testified that his present net worth was approximately $300,000.00 (June 27, 1986 transcript, page 72); however, on cross examination, he admitted that this estimate did not include: his $180,000.00 of antiques and arts, (June 27, 1986 transcript, page 81); his $250,000.00 home in Shelburne, Vermont (June 27, 1986 transcript, page 75) (we were not told if there are any mortgages on this property and assume there are none); his $40,000.00 equity in North Carolina property (June 27, 1986 transcript, page 76); his approximate $22,000.00 net loan receivable from property in Storrs, Connecticut (June 27, 1986 transcript, pages 80–81); and, he also omitted the toy patent worth at least $25,000.00. (Finding # 41).

80(a). Based on David Winer's own testimony, we find that his present net worth is approximately $817,000.00:

| Winer's Estimate | | $300,000.00 |
|---|---|---|
| Increases to Winer's Estimate | Es- | |
| Antiques and Arts | $180,000.00 | |
| Shelburne Home | 250,000.00 | |
| North Carolina | 40,000.00 | |
| Storrs' Receivables | 22,000.00 | |
| Toy Patent | 25,000.00 | |
| Total Assets Forgotten | | $517,000.00 |
| Total Present Net Worth | | $817,000.00 |

80(b). This 1986 net worth of $817,-000.00 compares with David Winer's 1984 net worth of $1,212,000.00, a reduction of $395,000.00. Additionally, we find David Winer's testimony that over $912,000.00 of his assets had disappeared between his 1984 net worth and his original 1986 estimates as inconsistent with the evidence and doubtful at best. We find that he is financially capable of paying his guarantee of Debtor's loans from Chittenden.

80(c). We also find that David Winer has sufficient assets to meet his and/or his and his wife's personal loan obligations.

81. Chittenden acknowledges that the hypothecated securities were also used, at Chittenden's request, as collateral for David Winer's or David Winer's and Janet Winer's personal notes #133 and #141 (finding 15; June 26, 1986 transcript, pages 149–150, 166) which are not in default. (Finding 19). Chittenden's in-house attorney testified that if the hypothecated securities were to be used to discharge Debtor's notes #75 and #83, then Chittenden would lose its collateral on the Winers' personal note #133 (June 26, 1986 transcript, pages 151) and the Winers would be in default unless they pledged additional sufficient securities within twenty-four hours of the Chittenden's request. (June 26, 1986 transcript, pages 152, 174–175). Chittenden, however, is well aware of the prior hypothecation of these securities for Debtor's notes.

81(a). Chittenden's in-house attorney also testified that the Winer's personal note #141 would be less secure if the hypothecated securities were to be utilized for Debtor's notes #75 and #83. (June 26, 1986 transcript, page 151). In that event, Chittenden would be secured by the first mortgage on the Bristol property, which is also collateral for the Winers' personal notes #117 and #125. (June 26, 1986 transcript, pages 151–152). Chittenden can, as it has done with other notes, (see, finding #7), demand that David Winer and Janet Winer provide substitute collateral at the time notes #141 and #133 are rolled over. (Finding 19).

81(b). If either Debtor's hypothecated securities or the personal guarantees of David Winer and Gordon Winer are to be utilized to discharge Debtor's Chittenden debt, rather than Debtor's machinery and equipment, Chittenden concedes it will not suffer a financial loss on Debtor's notes #75 and #83. (June 26, 1986 transcript, pages 165, 174).

82. We find that Chittenden's admitted mismanagement of Debtor's and Winers' loans and its knowing contribution to Debtor's financial crises, as demonstrated by its dominant participation in Debtor's so called "loan workouts," has caused the extensive cross-collateralization between the Debtor and the Winers.

83. David Winer testified that he never received a salary or any form of remuneration from Debtor (June 26, 1986 transcript, page 32); however, David Winer testified that Debtor has repaid approximately $20,-000.00 of his loan. (June 26, 1986 transcript, page 20).

83(a). Debtor's general ledger (Exhibit C-1, page 8) reveals that David Winer was paid $14,000.00 by the Debtor in 1985: $5,000.00 during February; $4,000.00 during May; and, $5,000.00 in September of 1985. David Winer admitted that the September 1985 $5,000.00 payment was made when he knew Debtor was in serious financial trouble and insolvent. (June 26, 1986 transcript, pages 132–133).

83(b). Debtor's general ledger (Exhibit C-1) reveals that a number of loans were made by "WNB," Woodstock National Bank, and were recorded as "Stockholder Loans." A Woodstock National Bank's Officer testified that none of the loans, from Woodstock National Bank to Debtor, listed in Debtor's ledger appeared in any of their loan records. (June 26, 1986 transcript, pages 79–81, 86–88). Debtor's general ledgers, however, incorrectly reflected the

Woodstock National Bank loans as "stockholder loans" from David Winer. (June 26, 1986 transcript, page 120; June 27, 1986 transcript, pages 25–31). The Woodstock National Bank loans are unauthorized corporate loans (Exhibit C–11) and reflect, at worst, sloppy accounting and Debtor's failure to observe corporate formalities. In this specific finding, although Sebert would like us to find otherwise, we do not find any inequitable conduct or wrongdoing on the part of David Winer other than his failure to observe the corporate formalities as Debtor's director.

## CLAIMS OF THE PARTIES

### A. STANDING

Chittenden claims that the Trustee lacks standing to raise the equitable doctrine of marshaling of assets. It urges us to hold that only a secured creditor may invoke the doctrine, and that the Trustee's position as a hypothetical lien creditor, under the "strong arm" clause 11 U.S.C. § 544(a)(1),[14] does not rise to the requisite secured party status necessary to summon the marshaling doctrine into application in this proceeding.

The Trustee's response [15] to Chittenden's standing argument is that: this is a "no asset" case without a successful application of the doctrine of marshaling of assets; a successful marshaling defense would create a dividend, which would not otherwise exist, from which Sebert and other unsecured creditors would share; it has a secured party status under 11 U.S.C. § 544(a)(1) and Vermont law; and, in the alternative, the doctrine of marshaling does not require two secured creditors, but rather two creditors.

### B. DOCTRINE OF MARSHALING

In the event we hold that the Trustee may properly invoke the doctrine of mar-

shaling of assets, Chittenden argues that the requirements of marshaling had not been met because: there is no "common debtor;" the Debtor, the guarantors, and the hypothecators are separate legal entities; Debtor does not have an interest in two funds subject to the secured claims of both Chittenden and the Trustee since the machinery and equipment was lawfully repossessed and Debtor waived its redemption; the guarantees of David Winer and Gordon Winer are not funds but only invitations for a lawsuit; and, finally, the hypothecated securities are not owned by the Debtor, but rather, are owned by David Winer and Janet Winer.

The Trustee's response is that there are three funds from which Chittenden may satisfy the Debtor's notes: fund 1, the personal guarantees of David Winer and Gordon Winer that waive notice, demand, nonpayment, or protest of any such note or other obligation representing an indebtedness or liability of the Debtor to the Chittenden. These guarantees incur liability which is indistinguishable from that of the Debtor; fund 2, the securities, hypothecated to the Debtor by David Winer and Janet Winer; and, fund 3, Debtor's machinery, equipment, inventory, and accounts receivable.

Alternatively, the Trustee claims that the facts and circumstances of this case and adversary proceeding give rise to certain exceptions to the "common debtor" element of marshaling, namely, the doctrines of piercing the corporate veil, alter ego, equitable contribution of capital, and the doctrine of substantive consolidation.

### 1. *Piercing the Corporate Veil and Equitable Contribution of Capital*

In the context of piercing the corporate veil and equitable contribution of capital, the Trustee asserts that David Winer is the

**14.** See, footnote 8 supra.

**15.** As indicated earlier, (footnote 10, supra), Sebert, an unsecured creditor of Vermont Toy, is the named Defendant in the adversary proceeding. After the Trustee's intervention, Sebert continued to defend, but on behalf of the Trustee, the representation of the Estate. Chittenden

initially objected to Sebert's representation of the Trustee, but waived this objection in a colloquy with the Court. (June 27, 1986 transcript, pages 36–39). Thus, though it is Sebert's attorney's voice, it is the Trustee's standing that is disputed.

true alter ego of Debtor and, thus, the guaranty and hypothecated securities ought to be deemed in equity as contributions to Debtor's capital.

The Trustee parades (paraphrased for brevity) the following examples of inequitable conduct for these exceptions to the "common debtor" rule of marshaling:

a. David Winer and Chittenden knew or should have known that Debtor was grossly undercapitalized and, even with the personal financial contributions from David Winer and Debtor's officers, was unable to meet its debts as they became due;

b. The hypothecated securities, used by Debtor to obtain working capital, gave the appearance to Debtor's suppliers and unsecured creditors that Debtor was a solvent concern;

c. Appropriate corporate formalities, such as duly constituted director's meetings and disinterested quorums, were disregarded when shareholder loans were executed without contemporaneous promissory notes or without approved repayments of shareholder loans;

d. David Winer forced Debtor to execute certain transactions in an attempt to create a secured status for himself during Debtor's insolvency;

e. David Winer diverted Debtor's corporate opportunities and customers. Specifically, by refusing to loan additional working capital for the Tech Furnishing's order, he diverted opportunities to Vermont Wood, a corporation owned 50% by him, and of which he is its president. Instead, David Winer invested the necessary operating capital in Vermont Wood to acquire Debtor's opportunities; and,

f. David Winer caused the Debtor to transfer its toy patent to him without any prior independent evaluation of its worth or value or prior approval by a disinterested quorum of Debtor's directors.

The Trustee also claims that David Winer, Debtor's corporate officers and Chittenden schemed to form Vermont Wood to become a depository for the contemplated transfer of Debtor's assets and Chittenden's secured debts without prior notification to Debtor's creditors. This scheme (paraphrased for brevity) was implemented when:

a. They refused to advance any additional operating funds and abruptly closed the Debtor;

b. David Winer unilaterally terminated the real estate lease with Debtor and subsequently leased the premises to Vermont Wood;

c. David Winer agreed to act as Chittenden's agent to repossess Debtor's machinery, equipment, inventory, and accounts receivable;

d. Chittenden, as lessor, agreed to lease Debtor's machinery, equipment, inventory, and accounts receivable to Vermont Wood as the lessee;

e. The personal property rental payments were calculated to pay off the outstanding interest on the two Chittenden notes, and were designed to result in a discharge of David and Gordon Winer's personal guaranties and a release of the hypothecated securities; and,

f. The released hypothecated securities would then be used by David and Janet Winer for an expanded base of collateral for their personal loans to Chittenden.

Chittenden responds (paraphrased for brevity) to the piercing doctrine and alter ego exceptions with:

a. Debtor was not undercapitalized when David Winer paid $10,000.00 for his stock and personally loaned over $450,-000.00 to Debtor for its working capital;

b. The lack of corporate formalities and contemporaneous promissory notes for the shareholder loans is excused by the fact that Debtor was a closely-held or family corporation;

c. David Winer borrowed funds, pledged his own assets as security, and then advanced those funds to Debtor as working capital because of Debtor's inability to secure additional financing;

d. Admits that Vermont Wood was created as a successor to Debtor by Chittenden and the Winers, because of the latter's inability to attract subsequent investors, but denies that this "workout"

was an attempt to defraud Debtor's unsecured creditors; and,

e. That although David Winer and others provided Vermont Wood with the working capital, Vermont Wood did not divert Debtor's corporate opportunities because Debtor lacked the necessary capital to fill the Tech Furnishings's order.

Chittenden also claims that the doctrine of equitable contribution of capital is not applicable in this proceeding. Since Janet Winer is not a shareholder of Debtor, and did not guarantee Debtor's debt, this Court cannot reach their jointly owned hypothecated securities or property. Additionally, Chittenden argues there is no evidence that any of Debtor's unsecured creditors were induced to extend credit based on the hypothecated securities or guarantees.

### 2. *Prejudice*

The Trustee's goal is to have us apply the doctrine of marshaling of assets and order Chittenden to obtain satisfaction of Debtor's notes from the guarantees of David and Gordon Winer. Moreover, he argues, the hypothecated stocks and bonds, and Debtor's machinery and equipment should also be marshaled and made a part of Debtor's estate for a dividend to Debtor's unsecured creditors.

Chittenden's responds, arguendo, even if the Trustee meets the requirements of marshaling, nevertheless, this doctrine may not be applied if the application might result in an economic detriment to its status as Debtor's senior lienholder. For support, Chittenden says that if the guaranties are marshaled, this would increase the risk of loss because it would be forced to initiate a lawsuit, obtain judgment, and execute against the guarantors' assets in order to realize payment. Furthermore, although David Winer is not in default on his personal notes with the Chittenden, an application of marshaling increases its risk of loss on the personal notes of David Winer, thus further prejudicing it. Chittenden also claims that if the hypothecated securities are marshaled, it would lose its partial security on David Winer's note # 133 and David Winer would be required to provide replacement security within twenty-four hours, otherwise that personal note would be in default. Similarly, David Winer's personal note # 141 would lose the hypothecated securities since those securities were also pledged by David Winer as partial collateral and the remaining collateral, Bristol property, was cross collateralized with other personal notes.

The Trustee counters: Prejudice to a secured creditor may only be determined by an examination of that creditor's status with Debtor, and not of other debts with other debtors; the Chittenden actively participated in the scheme to pass Debtor's assets and Chittenden's secured status to Debtor's successor, Vermont Wood; finally, that Chittenden invited the risk of losing partial collateral for David Winer's personal notes by its own gross mismanagement in permitting extensive cross collateralization between Winer's and Debtor's notes. Alternatively, the Trustee advances that the alleged harm or prejudice is highly speculative. Even if the Court were to accept David Winer's testimony that his personal net worth is in excess of $300,-000.00 and that over $900,000.00 of his net worth disappeared in two years, David Winer's personal net worth is more than sufficient to pay back his personal notes. The only harm which would result to the Chittenden would be that the Bank would have to notify the Winers that their note # 133 was in default, and the Winers would then have 24 hours to pledge adequate collateral for that loan. Additionally, Chittenden has in its possession bonds worth over $66,000.00, which the Winers transferred to Chittenden, and these bonds could be pledged as collateral for loan # 133. Since loan # 133 has matured, if Chittenden follows the same procedure that was utilized when Debtor's notes were replaced, Chittenden may demand supplemental collateral prior to rewriting. Lastly, Chittenden created its own peril when note # 133 was executed six months after Debtor's notes and Chittenden failed to increase its collateral base for the personal notes at that time.

Chittenden's final position is: that if the doctrine of marshaling is applied by this Court, and the Debtor's machinery and equipment becomes part of the estate, then Vermont Wood threatens to not purchase the machinery and equipment for the amount required to discharge Debtor's notes with the Chittenden. Instead, Vermont Wood will simply await the Trustee's auction. (We do not address this argument in our discussion, infra, because the machinery, equipment, etc., has already been sold to Vermont Wood).

## C. SUBSTANTIVE CONSOLIDATION [16]

The Trustee raises the doctrine of "substantive consolidation" upon the Court's inquiry early in the trial on the doctrine's efficacy to the present proceeding. While the Trustee admits that the doctrine should be used sparingly because of the significant effect on the rights of debtors and creditors, the Trustee argues (paraphrased for brevity) that the doctrine is appropriate here as among Debtor, Vermont Wood, and David Winer for the following reasons:

a. Chittenden relied upon David Winer's financial statements to determine the appropriateness of loans to Debtor, Vermont Wood, and to David Winer personally;

b. David Winer is the sole shareholder of Debtor and a 50% shareholder of Vermont Wood and has guaranteed loans from the Chittenden to Debtor and Vermont Wood;

c. David Winer has sufficient assets to pay off the liabilities of Debtor, Vermont Wood, and his own liabilities;

d. Examples of transfers of assets among David Winer, Debtor, and Vermont Wood without the observance of corporate formalities include shareholder loans, payments to shareholders on outstanding loans, transfer of an interest in a toy patent, and transfer of a leasehold interest to Vermont Wood without a termination of this interest with Debtor; and,

e. Assets and business functions between Debtor and Vermont Wood were confused and commingled, and that corporate opportunities were diverted from Debtor to Vermont Wood.

Chittenden says (paraphrased for brevity) to the Trustee the facts do not support equitable consolidation:

a. The relationship of David Winer to the Debtor is that of a shareholder to a corporation, not that of a parent to a subsidiary;

b. All transactions between David Winer, Debtor, and Vermont Wood were at arm's length and were subsequently documented by promissory notes, corporate resolutions and entered on the corporation's ledgers;

c. David Winer's and Debtor's financial affairs were kept separate;

d. No corporate opportunities were usurped by David Winer or Vermont Wood from Debtor;

e. There is no difficulty in segregating the respective assets and liabilities of Debtor and Vermont Wood and no assets have been commingled; and,

f. Appropriate corporate formalities were followed in the transfer of assets from Debtor to Vermont Wood.

### ISSUES PRESENTED

1. Does the Trustee have standing as a hypothetical lien creditor under 11 U.S.C. § 544 to raise the doctrine of marshaling of assets and alter ego against a secured creditor and the Debtor's sole shareholder?

2. If the Trustee has standing to assert marshaling and the alter ego doctrines, are they causes of action under Vermont law?

3. If allowed under Vermont law, are the actions of marshaling and alter ego property of the Estate?

4. If the doctrine of marshaling applies, does the conduct of Debtor's sole

---

**16.** We do not address this issue because our holding that marshaling applies to this case renders it unnecessary. Moreover, the facts ultimately shown at trial do not justify its application to Vermont Wood. The claims are applicable, however, to inequitable conduct, breach of fiduciary duty, alter ego, and piercing the corporate veil.

shareholder require the application of equitable subordination, 11 U.S.C. § 510(c) to prevent his guaranty from assuming the position of the marshaled senior creditor?

## DISCUSSION

### I. Introduction

#### A. *Federal and State Law*

■ Courts have generally held that in the absence of a Congressionally expressed exercise the substantive nature of a creditor's property rights in bankruptcy is defined by reference to state law. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136, 141–42 (1979):

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both State and federal courts within a state serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'

Id. 440 U.S. at 55, 99 S.Ct. at 918, 59 L.Ed.2d at 141–42, (1979) (citing, *Lewis v. Manufactures National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323, 327 (1961)). Reference to State law, to the extent of the absence of controlling Federal law, will also define the nature of a debtor's interest as well as the extent of the bankruptcy estate's interest in property. *Robinson v. U.S. Small Business Administration (In re Catamount Dyers, Inc.)*, 50 B.R. 788, 789 (Bkrtcy.D.Vt.1985). Similarly, a creditor's property rights are also defined by State law. *Kors, Inc. v. Howard Bank*, 819 F.2d 19, 22, 16 B.C.D. 162, 164 (2d Cir.1987); *Purcell v. STN Enterprises, Inc. (In re STN Enterprises, Inc.)*, 47 B.R. 315, 318 (Bkrtcy.D.Vt.1985). ■ Where Congress has acted, however, (see e.g., 11 U.S.C. §§ 547, 548), this Court's equitable and Federal powers will supersede conflicting State law to properly administer and enforce the provisions of the bankruptcy laws.

> What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law. In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits.... But bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles.

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161–62, 67 S.Ct. 237, 239, 91 L.Ed. 162, 165–66 (1946) (citations and footnotes omitted). See also, *Butner v. United States*, supra, 440 U.S. at 55, n. 10, 99 S.Ct. at 918, n. 10, 59 L.Ed.2d at 142, n. 10 (1979) (dicta, Federal statutory basis for voiding preferential and fraudulent transfers as examples where Federal law modifies State defined property interest); *Lewis v. Manufactures National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323, 327 (1961) (instances where the trustee has Federal rights which existing creditors may not have).

#### B. *Doctrine of Marshaling*

There is no doubt that we possess equitable jurisdiction to entertain a proper application for marshaling of assets. *Moody v. Century Savings Bank*, 239 U.S. 374, 377, 36 S.Ct. 111, 113, 60 L.Ed. 336, 340 (1915).

■ The Doctrine of marshaling concerns itself with an effect on the property interests of liens, thus, State law governs its application. *Meyer v. United States*, 375 U.S. 233, 239, 84 S.Ct. 318, 321, 11 L.Ed.2d 293, 299 (1963); *Moody v. Century Savings Bank*, supra, 239 U.S. at 377–78, 36 S.Ct. at 113, 60 L.Ed. at 340 (1915); *In re C & B Oil Co., Inc.*, 72 B.R. 228, 230 (Bkrtcy.N.D.Ohio 1987).

We do not, however, mean to imply that Vermont's property law of liens and contracts, as opposed to equity, will provide our rule of decision:

> In considering the relevance of the doctrine here it is well to remember that marshaling is not bottomed on the law of contracts or liens. It is founded instead in equity, being designed to promote fair dealing and justice. Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security. It deals with the rights of all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties.

*Meyer v. United States,* 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293, 297 (1963).

> Marshaling in Vermont may occur:

> When one man holds security on two funds, with perfect liberty to resort to either for his pay, and another party has security upon only one of the same funds, equity will compel the first to exhaust the fund upon which he alone has the security, before taking any part of the other, and thereby depriving the other party of his security.

*Warren v. Warren,* 30 Vt. 530, 535 (1858).

■ The doctrine of marshaling of assets developed as an equitable principle to benefit junior secured creditors. Traditionally, it is applied when two or more secured creditors claim against one debtor and the senior secured creditor can reach two or more of a debtor's property interests or funds while the junior secured creditor may reach only one. By forcing the senior secured creditor to elect the fund which is not subject to satisfaction by the junior secured creditor, both the junior and senior secured creditors may realize satisfaction of their respective claims against their common debtor.

■ There are three elements to marshaling: 1). a senior creditor with rights to two or more funds in which a common debtor has an interest; 2). a common debtor with an interest in two funds; and, 3). a junior creditor with a lien on or interest in only one of the funds in which the common debtor has an interest. *Warren, supra,* 30 Vt. at 535 (1858); *Poole v. Tyler "The Edith,"* 94 U.S. (4 Otto) 518, 522, 24 L.Ed. 167, 168 (1877). See, 53 Am.Jur.2d, Marshaling Assets, §§ 7 et seq. (1970); 55 C.J. S. Marshaling of Assets and Securities, § 1 et seq. (1948); Annot. Doctrine of Marshaling Assets Where the Two Funds Governed by the Paramount Lien are Subject Respectively to Subordinate Liens in Favor of Different Creditors, 76 A.L.R.3d 326 (1977) (Supp.1987).

■ Before a Court invokes the equitable doctrine of marshaling, either the funds on which marshaling may be impressed, or all of the parties must be subject to the Court's jurisdiction:

> And in marshalling (sic) assets strictly, it is always regarded as indispensable that all the parties in interest should be before the court, so that the decree shall be final and conclusive upon their rights; or at the very least, that the fund should be so before the court that the judgment might operate in rem.

*Shedd & Co. v. Bank of Brattleboro,* 32 Vt. 709, 717 (1860).

Bankruptcy Courts are Courts of equity. They are the gatekeepers of the fair allocation of assets to creditors. As such, when faced with facts which demand a remedy for inequitable conduct they have fashioned various exceptions to marshaling's technical requirements of two or more funds, one of which would otherwise be considered a non-estate asset.

## II. Standing [17]

The Supreme Court in *Sowell v. Federal Reserve Bank,* 268 U.S. 449, 45 S.Ct. 528,

---

**17.** Unlike the Courts in *Matter of Dealer Support Services Intern., Inc.,* 73 B.R. 763, 764, 15 B.C.D. 1274, 1275 (Bkrtcy.E.D.Mich.1987) and *Pittsburgh National Bank v. Lomb (In re Lomb),* 74 B.R. 711 (Bkrtcy.W.D.Pa.1987), we do not shun our responsibility to determine the standing issue merely because a particular application of marshaling, or an exception to one of its elements, might not have had merit. We will not sit on the merits as an advisory Court if the

69 L.Ed. 1041 (1925), held that ordinarily a debtor may not invoke the marshaling doctrine:

> The equitable doctrine of marshaling rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds. The debtor may not ordinarily invoke the doctrine, for by doing so he would disregard the express provisions of his contract on which the creditor is entitled to rely.

*Sowell v. Federal Reserve Bank,* supra, 268 U.S. at 456–57, 45 S.Ct. at 530–31, 69 L.Ed. at 1049 (1925).

Although Chittenden sued Sebert and has conceded Sebert's prosecution of the action on behalf of the intervening Trustee, it did not concede the Trustee's standing, nor Sebert's for that matter, to assert the doctrine of marshaling of assets.[18] We are compelled to examine the fundamental precept of standing to determine whether the Trustee is a cognizable and real party in interest, Rules of Practice and Procedure in Bankruptcy Rule 7017,[19] with power to prosecute the affirmative and equitable defense of marshaling.

■ Standing requires a personal stake in the outcome of a controversy adequate to ensure that the matter will be presented in an adversarial context and will be amendable to judicial resolution. See, *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556, 569 (1984); *Sierra Club v. Morton,* 405 U.S. 727, 731–32, 92 S.Ct. 1361, 1364–65, 31 L.Ed.2d 636, 640–41 (1972). The standing issue: "[I]s whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant **HIS** invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450, 460 (1976) (quoting, *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343, 354 (1975)) (emphasis in original).

■ We hold that the Trustee's status as a hypothetical lien creditor under 11 U.S.C. § 544(a) satisfies the first element of marshaling, i.e., that there be two secured creditors; next, the marshaling action and the Trustee's use of the alter ego exception to the "common debtor" element of marshaling constitutes § 541(a)(1),[20]

parties are not properly constituted before us. Conversely, we do not assume that a trustee is empowered to request the remedy of marshaling, on behalf of the bankrupt's estate and the unsecured creditors, merely because § 544(a) grants a trustee in bankruptcy the status of a hypothetical lien creditor—a secured creditor—as of the date the petition was filed. See, Note, Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine, 6 Cardozo L.Rev. 671, 676 (1985). But See, *Cullen v. Revere Copper & Brass, Incorporated (In re John I. Pauling, Inc.),* 76 B.R. 7, 9, n. 1 (Bkrtcy.D.Mass.1987) (Court properly avoided consideration of the trustee's powers to marshal under § 544 since he already had the ability to marshal as a junior lien creditor as an incident to the exercise of his preferential powers under 11 U.S.C. §§ 547 and 551). Additionally, the facts of this proceeding and our decision demonstrates that not only is there merit for the proper application of marshaling, but there also exists inequitable conduct sufficient to subordinate David Winer's subrogated relationship, after Chittenden liquidates his guaranty, under 11 U.S.C. § 510(c).

**18.** We allowed the attorney of Sebert to prosecute the equitable defense of marshaling in lieu of the intervening Trustee for the benefit of the

Debtor's Estate. (See, footnotes 10, 15 supra). Chittenden's standing argument goes only to the issue of whether the Trustee, by virtue of its status, may raise marshaling under § 544 and not as to whether Sebert may summon this doctrine without stepping into the Trustee's shoes. Chittenden acknowledged that if we were to hold the intervening Trustee has the prerequisite standing to raise marshaling, then, a fortiori, Sebert's attorney, as the active Estate prosecutor with a passive albeit intervening Trustee, also has standing to marshal. (June 27, 1986 transcript, pages 36–39).

**19.** Bankruptcy Rules of Practice and Procedure Rule 7017, *Parties Plaintiff and Defendant; Capacity,* provides: "Rule 17 F.R.Civ.P. applies in adversary proceedings ..." Federal Rules of Civil Procedure, F.R.Civ.P., Rule 17(a) provides, in pertinent part, that: "Every action shall be prosecuted in the name of the real party in interest."

**20.** 11 U.S.C. § 541(a)(1), Property of the estate, provides:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the

property of the estate; lastly, the Trustee has the prerequisite standing to invoke the marshaling doctrine and the related actions of breach of fiduciary duty, piercing the corporate veil, and alter ego under Vermont law.[21]

## A. "Strong Arm," 11 U.S.C. § 544

In opposing marshaling, Chittenden claims that the Trustee is not a junior secured creditor within the penumbra of the marshaling doctrine and, hence, has no standing to raise it. The Trustee claims that the "Strong Arm" clause of 11 U.S.C. § 544 provides the necessary standing since his status under State law is that of a judgment lien creditor holding an execution duly returned unsatisfied as of the date of Debtor's petition. We accept the Trustee's argument and hold that he is entitled to the status of a secured creditor under the facts present in this case.

The legislative history of § 544 indicates: Subsection (a) is the "strong arm clause" of current law, now found in Bankruptcy Act § 70c. It gives the trustee the rights of a creditor on a simple contract with a judicial lien on the property of the debtor as of the date of the petition; of a

creditor with a writ of execution against the property of the debtor unsatisfied as of the date of the petition; and a bona fide purchaser of the real property of the debtor as of the date of the petition. "Simple contract" as used here is derived from Bankruptcy Act § 60a(4). The third status, that of a bona fide purchaser of real property, is new. (H.Report. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) p. 370).

Reprinted in 4 *Norton Bankruptcy Law and Practice, Annotated Legislative History,* page 442, (parenthetical supplied for clarity).

The Supreme Court in *Lewis v. Manufacturers National Bank of Detroit,* 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961), held, under a predecessor[22] to 11 U.S.C. § 544, the trustee acquired the status of an existing or hypothetical lien creditor as of the date of the bankrupt's petition:

We think that one consistent theory underlies the several versions of § 70c which we have set forth, viz., that the rights of creditors—whether they are existing or hypothetical—to which the trustee succeeds are to be ascertained as

following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

The relevant exception to § 541(a)(1) is § 541(b)(1), the latter Subsection provides:

(b) Property of the estate does not include—

(1) any power that the debtor may exercise solely for the benefit of an entity other than the debtor;

**21.** We agree with the author of Note, Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine, 6 Cardozo L.Rev. 671 (1985), that most Bankruptcy Courts have not addressed the issue of standing when deciding whether to invoke marshaling. We disagree, however, with the author's premises:

Because requests for marshaling of assets are generally made by an appointed trustee of the debtor's creditors, and because section 544(a) ... grants a trustee in bankruptcy the status of a hypothetical lien creditor ... bankruptcy courts have assumed that a trustee is empowered to request the remedy of marshaling on behalf of unsecured creditors. But this assumption confuses the status of the trustee with the status of those he represents: the

traditional requirement is not that marshaling be invoked by a secured creditor, but that it be invoked for secured creditors.

Lachman, Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine, 6 Cardozo L.Rev. 671, 675–76 (1985) (emphasis in original). It is not "for" whom that is dispositive of the standing issue, but rather, whether the trustee is a secured party under applicable state law with power to trigger marshaling, and whether that action is property of the Debtor's Estate.

**22.** § 70(c) of the Bankruptcy Act, 11 U.S.C. § 110(c), which, so far as material here, read:

The trustee, as to all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt could have obtained a lien by legal or equitable proceedings at the date of bankruptcy, shall be deemed vested as of such date with all the rights, remedies, and powers of a creditor then holding a lien thereon by such proceedings, whether or not such a creditor actually exists.

Subsection (a) of § 544 is known as the "strong-arm clause" and was derived from § 70 of the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, 565, repealed by the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (codified at 11 U.S.C. §§ 101–151326 (1982)).

of "the date of bankruptcy," not at an anterior point of time. That is to say, the trustee acquires the status of a creditor as of the time when the petition in bankruptcy is filed. We read the statutory words "the rights ... of a creditor [existing or hypothetical] then holding a lien" to refer to that date.

*Lewis v. Manufacturers National Bank of Detroit*, 364 U.S. 603, 607, 81 S.Ct. 347, 349, 5 L.Ed.2d 323, 326 (1961) (Footnotes omitted).

■ Once the Trustee assumes the status of a hypothetical lien creditor under § 544, State law is used to determine what a lien creditor's priorities and rights are. *Kors, Inc. v. Howard Bank*, 819 F.2d 19, 22, 16 B.C.D. 162, 164 (2d Cir.1987). As eloquently noted by Colliers on the interaction of Federal status and State rights on the trustee's standing:

> Whether the trustee is entitled to such status and the conditions under which he may attain it, are federal questions governed by the Bankruptcy Code. But the extent of the trustee's rights, remedies and powers as a lien creditor are measured by the substantive law of the jurisdiction governing the property in question. It is not for the state law to determine what rights conferred on lien creditors are transferred to the trustee under the Code. Nor, on the other hand, does section 544(a)(1) or (2) confer on the trustee any greater rights than those accorded by the applicable law to a creditor holding a lien by legal or equitable proceedings. These are fundamental concepts in the application of the strong-arm clause of section 544(a) which must not be forgotten.

4 *Collier on Bankruptcy*, § 544.02, pages 544-8, 544-11 (15th Ed.1987) (emphasis in original). Simply stated, Federal law bestows the hypothetical lien status, State law determines its parameters.

The leading case within the Second Circuit which addresses the scope of a trustee's § 544(a) powers, in a marshaling context, is *Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.)*, 53 B.R. 772, 13 B.C.D. 792 (Bkrtcy.S.D.N.Y.1985). In *Tampa*, supra, a perfected and secured creditor, Fundex, had made a $194,760.00 working capital loan to the debtor, Tampa, secured by Tampa's inventory, receivables, and other assets. The loan was not based on the strength of Tampa's collateral or ability to repay since Tampa had no assets, no operating history, no capital, and a meager $2,500.00 bank account. Rather, the loan was made on the protection afforded by certain collateral, a $300,000.00 interest in a cooperative apartment (Co-op), provided by guarantors of Tampa's debt. An involuntary Chapter 7 was filed against Tampa and an Order for relief was entered. The Chapter 7 trustee ultimately realized $200,000.00 from a liquidation of Tampa's assets. Fundex then sought an 11 U.S.C. § 725 [23] Order directing the trustee to turn over certain inventory proceeds to satisfy its secured claim, attorney's fees, costs and Section 506(b) charges. The trustee countered with a marshaling request which would require Fundex to first proceed against the guarantors, and then the Co-op.

The *Tampa* Court found, inter alia, that: Fundex had made its loan to debtor without monitoring the debtor's operations; within the first four months of Tampa's brief life the guarantors had spent all of the loaned money; the guarantors had contributed $216,000.00 to Tampa, but, up to $315,-000.00 had been spent on a separate in-family company which operated on Tampa's premises and used Tampa's inventory.

In response to the secured creditor's and the guarantors' argument that the trustee was not a junior secured creditor within the contemplation of the marshaling doctrine, the *Tampa* Court held that 11 U.S.C. § 544(a)(2) was the exception to the Code's policy of leaving creditors in the status

---

**23.** 11 U.S.C. § 725, *Disposition of certain property,* provides:

After the commencement of a case under this chapter, but before final distribution of property of the estate under section 726 of this title, the trustee, after notice and a hearing, shall dispose of any property in which an entity other than the estate has an interest, such as a lien, and that has not been disposed of under another section of this title.

they enjoyed under State law, although the application of marshaling had the effect of enriching unsecured creditors over secured creditors:

> In providing a trustee with "the rights and powers of" an unsatisfied execution creditor as of the commencement of the bankruptcy case, however, § 544(a)(2) of the Code is a principal exception to that policy and not so limited. Neither the language of the statute nor its legislative history gives the slightest indication that Congress contemplated that such "strong arm" rights and powers are not to apply in a marshaling context. By stepping into the "overshoes" of such a creditor, *In re Leichter*, 471 F.2d 785, 787 n. 4 (2d Cir.1972), whether or not one exists, the trustee enjoys whatever rights and powers that status conveys under state law.

*Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.)*, supra, 53 B.R. at 777, 13 B.C.D. at 794 (citation in original) (footnote omitted). The *Tampa* Court then concluded the standing issue by noting that under the applicable State law, (New York), the trustee was deemed a secured creditor and thus entitled to raise the doctrine. *Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.)*, supra, 53 B.R. at 777–78, 13 B.C.D. at 794. See, *In re C & B Oil Co., Inc.*, 72 B.R. 228, 229–30 (Bkrtcy. N.D.Ohio 1987) (held trustee had standing under § 544(a) to bring the marshaling issue before the Court); *Committee of Creditors of Ludwig Honold Manufacturing Company, Inc., (In re Ludwig Honold Mfg. Co.,)*, 34 B.R. 645, 646 (Bkrtcy.E.D.Pa. 1983) (senior lien holder's contention that unsecured creditors lacked standing was moot since the trustee was a joined party in the adversary proceeding and the trustee had standing as a secured party to bring marshaling under § 544(a)).

Representative of the rationale of the Courts' holdings that a trustee may not invoke marshaling by virtue of its § 544 status is *Federal Land Bank of Columbia v. Tidwell (Matter of McElwaney)*, 40 B.R. 66, 10 C.B.C.2d 820 (Bkrtcy.M.D.Ga.1984):

> To allow the Trustee to invoke the marshaling doctrine, by virtue of his status

as a hypothetical lien creditor, would be a use of the strong-arm clause not contemplated by Congress. In this Court's opinion, the Trustee's construction would frustrate the Code's policy by enriching unsecured creditors over secured creditors.

*Federal Land Bank of Columbia v. Tidwell (Matter of McElwaney)*, supra, 40 B.R. at 70–71, 10 C.B.C.2d at 826 (Bkrtcy. M.D.Ga.1984) (citation omitted).

In *McElwaney*, supra, the Court was faced with a marshaling request by a trustee which would have recovered certain Federal Land Bank stock for the benefit of the debtor's unsecured creditors; forced a senior lienholder, Federal Land Bank, to seek full satisfaction from a farmland sale proceeds instead of the stock; and, a junior lienholder, FmHA, would have received less satisfaction on its claim then it would have if the senior lienholder first looked to the stock for a reduction of the latter's claim. Under these circumstances, the *McElwaney* Court found the application of marshaling would have resulted in a detriment to a perfected junior secured creditor of the debtor, a result not intended by marshaling or § 544:

> Section 544 was intended to protect the estate from secret, unperfected liens, and it was not intended to benefit the Trustee over a perfected junior secured creditor. Because the marshaling, as the Trustee requests, would harm the FmHA's (junior secured creditor's) position, the Trustee's request for marshaling must be denied.

Id., 40 B.R. at 72, 10 C.B.C.2d at 828 (Bkrtcy.M.D.Ga.1984) (parenthetical supplied for clarity). See, *Owens Corning Fiberglas Corp. v. Center Wholesale, Inc. (In re Center Wholesale, Inc.)*, 788 F.2d 541, 544 (9th Cir.1986) (citing, inter alia, its prior decision, *Owens Corning Fiberglas Corp. v. Center Wholesale, Inc. (In re Center Wholesale, Inc.)*, 759 F.2d 1440, 1447 (9th Cir.1985) and *Duck v. Wells Fargo Bank (In re Spectra Prism Industries, Inc.)*, 28 B.R. 397, 399 (9th Cir. BAP 1983), for the proposition that the imposition of marshaling must avoid a prejudicial result

to third persons, and denied a trustee's authority to apply reverse marshaling; i.e., a trustee may not require a senior lienor to satisfy its claim out of a junior lienor's collateral); *Canal National Bank v. Larry's Equipment Service, Inc. (In re Larry's Equipment Service, Inc.)*, 23 B.R. 132, 134 (Bkrtcy.D.Me.1982) (Court has equitable power to order marshaling, however, it will not be applied at the request of a trustee to the detriment of a senior and junior lien creditor).

Actually, few Courts squarely address the trustee's standing under § 544 to marshal. They usually seek to avoid the issue by jumping ahead to the other elements of marshaling, such as common debtor, two funds or prejudice. Finding one or more of the elements missing or lacking, they declare marshaling is not available. Arguably, *McElwaney*, supra, also falls into this "ducking the issue" camp since its decision was controlled by the fact that prejudice would have resulted to a non-trustee junior secured creditor. We question whether *McElwaney* would have treated the standing issue in this manner if prejudice to a secured junior creditor was absent and demonstrable inequitable conduct was present.

We chose to follow the lead of *Balaber-Strauss v. Reichard (In re Tampa Chain Co., Inc.)*, 53 B.R. 772, 13 B.C.D. 792 (Bkrtcy.S.D.N.Y.1985) and hold that if applicable State law permits, the Trustee has standing under § 544 to raise marshaling.

Our next step is to determine whether under Vermont law the Trustee is a secured creditor by virtue of his § 544 status; and, whether both marshaling and alter ego actions belong to the bankrupt corporation, and hence, constitute § 541(a)(1) property of the Estate.

### B. *Applicable State Law*
#### (1) *Vermont law*

Vermont law tells us that the Trustee is a secured creditor armed with the status of a judicial lien creditor with an execution returned unsatisfied.

Under Vermont's U.C.C., 9A Vt.Stat. Ann. §§ 9–105(2) and 9–301(3), a lien creditor is defined as:

> A "lien creditor" means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for the benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment. Unless all the creditors represented had knowledge of the security interest such a representative of creditors is a lien creditor without knowledge even though he personally has knowledge of the security interest.

9A Vt.Stat.Ann. § 9–301(3).

9A Vt.Stat.Ann. § 9–301(3) was derived, in part, from the 1933 Uniform Trust Receipts Act, (See, Comment 6, 9A Vt.Stat. Ann. § 9–301 ("Subsection (3) defines 'lien creditor,' following in substance the provisions of the Uniform Trust Receipts Act"), which contained, in Section 1 therein, the following definition of "lien creditor:"

> 'lien creditor' means any creditor who has acquired a specific lien on the goods, documents or instruments by attachment, levy, or by any other similar operation of law or judicial process, including a distraining landlord.

Volume 9C *Uniform Laws Annotated,* Uniform Trust Receipts Act, pages 231–32 (Thompson 1957).

The 1962 Code was adopted in Vermont by Act No. 29, § 1, March 12, 1966. We note that the 1972 Uniform Commercial Code eliminated the "knowledge" provision,[24] of the 1962 version of § 9–301(3) to avoid a possible conflict between the U.C.C. and the Bankruptcy Act. The "knowledge" aspect of 9A Vt.Stat.Ann. § 9–301 was derived, in part, from Section 5 of the Uniform Conditional Sales Act which provided:

> knowledge even though he personally has knowledge of the security interest."

---

**24.** "Unless all the creditors represented had knowledge of the security interest such a representative of creditors is a lien creditor without

§ 5. *Conditional sales void as to certain persons.* Every provision in a conditional sale reserving property in the seller, shall be void as to any purchaser from or creditor of the buyer, who, without notice of such provision, purchases the goods or acquires by attachment or levy a lien upon them, before the contract or a copy thereof shall be filed as hereinafter provided, unless such contract or copy is so filed within ten days after the making of the conditional sale.

Book 2 *Uniform Laws, Annotated,* Uniform Conditional Sales Act, page 6 (Thompson 1922). See, *McPhail & Co. v. Gerry,* 55 Vt. 174, 176–77 (1882) (held that an attaching creditor who had notice of the conditional nature of the buyer's rights could not maintain a claim against the vendor under an 1872 Act relating to liens reserved on property sold). To the extent that § 544(a) renders such knowledge immaterial and Vermont's adoption of the 1962 version of 9–301(3), 9A Vt.Stat.Ann. § 9–301(3), appears to be in conflict, § 544(a) will control. See, *Vanston Bondholders Protective Comm. v. Green,* supra, 329 U.S. 156, 161–62, 67 S.Ct. 237, 239, 91 L.Ed. 162, 165–66 (1946).

▮▮▮ Thus, the Trustee is a secured party as a "lien creditor" under Vermont law without regard to his or any other creditor's knowledge of Chittenden's interest.

▮▮▮ We need not only rest the Trustee's secured status as a lien creditor solely on § 9–301. Since the Trustee is also armed as a judicial lien creditor with an execution returned unsatisfied, he also has the right under Vermont law to institute a creditor's bill.

Marshaling is nothing more than an alternate expression of a "creditors' bill," which is defined as:

A creditor's suit or bill is generally defined as an equitable proceeding brought by a creditor to enforce the payment of a debt out of property or interests of his debtor which cannot be reached by ordinary legal process.

21 Am.Jur.2d, *Creditors' Bills,* § 1, page 6 (1981).

▮▮▮▮ When a creditor seeks a creditor's bill, a Court of equity will not ordinarily interfere on behalf of a creditor unless he has established his claim so far as he can at law. *Rice v. Barnard,* 20 Vt. 479, 484, 50 Am.Dec. 54 (1848). As noted by the United States Supreme Court, a creditor must show that an execution has been issued in the form and manner required by law and has been returned unsatisfied before an action on a creditors' bill may be maintained.

The true rule in equity is that under usual circumstances a creditor's bill may not be brought except by a judgment creditor after a return of 'nulla bona' on execution.

*Harkin v. Brundage,* 276 U.S. 36, 52, 48 S.Ct. 268, 274, 72 L.Ed. 457, 464 (1928).

As Collier points out, § 544(a) is much broader than its predecessor § 70(c) of the Bankruptcy Act:

If the description of the trustee's position under former Section 70c was apt, it is even more so under the broader language of section 544(a). It is evident that this hypothetical status depends for meaning upon a substantive law that is not explicitly indicated but is incorporated by reference. Therefore, the trustee's powers, in every case governed by section 544(a), are those which the state law would allow to a supposed or hypothetical creditor of the debtor who, as of the commencement of the case, had completed the legal (or equitable) processes for perfection of a lien upon all the property available for the satisfaction of his claim against the debtor.

4 *Collier on Bankruptcy,* § 544.02, pages 544–5, 544–6 (15th Ed.1987) (footnotes omitted).

A more apt description of the creditor's bill is found in *Bean v. Parker,* 89 Vt. 532, 541, 96 A. 17 (1915). In *Bean,* the debtor, as mortgagor, had executed a note to his mother and the note was later secured by a new note and several chattel mortgages. Later, the debtor, his mother, and another person executed several notes to a bank, and the debtor executed a mortgage for his mother. The bank later called upon the

mother for payment. Debtor's mother then caused her son's notes and mortgages to be placed in the hands of her attorney who, in turn, placed the same in the hands of a deputy sheriff, a defendant in the action, with instructions to foreclose on the debtor. The defendant sheriff eventually realized proceeds from a sale of property after the debtor had filed bankruptcy but prior to the trustee's suit to recover the proceeds. In the State proceeding, the bankruptcy trustee maintained that this sale was in fraud of the rights of the creditors, whose claims were established in bankruptcy. The *Bean* Court found no fraud and affirmed the lower Court's judgment for the sheriff since the mortgage was given for the indemnity of the mother against her liability as a surety for the debtor.

*Bean* is important because it addressed the trustee's status, in reference to § 544's 1910 predecessor, as a *judgment creditor holding an execution duly returned unsatisfied:*

> The trustee in bankruptcy stands in these proceedings with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied. This is in accordance with the provisions of the Federal Bankruptcy Act as amended by the Act of 1910. It is said in Collier on Bankruptcy, 9th Ed. 942, that this amendment disposes of any doubt which may have existed as to the rights of the trustee to proceed as a judgment creditor against conveyances invalid for failure to record or file, or because of fraud as against creditors. It is upon the last named ground that the plaintiff (trustee in bankruptcy) has proceeded in this case. But as we have seen neither fraud in fact nor intent by either the bankrupt or his mother, to defraud creditors, has been

found, and on the findings there was no fraud in law.

*Bean v. Parker,* 89 Vt. 532, 541, 96 A. 17 (1915) (parenthetical and emphasis supplied).[25]

In Vermont, an action on a judgment is not dependent upon the exhaustion of a judgment creditor's ability to collect on a prior judgment by execution, since a judgment creditor has two independent means of satisfaction of its judgment: "The judgment creditor not only can maintain execution proceedings for the enforcement of the judgment, but also can maintain an action upon the judgment." *Koerber v. Middlesex College,* 136 Vt. 4, 7, 383 A.2d 1054 (1978).[26]

Marshaling does not require fraud, but merely a demonstration that its application will prevent an otherwise inequitable result to a junior creditor or is necessary to correct inequitable conduct.

The remedy of marshaling under Vermont law appears to be available to all lien or judicial creditors of a debtor so long as the other requisite elements are established. We perceive no impediment under Vermont law to the Trustee's request for marshaling as a secured creditor.

Thus, under § 544(a)(2) and Vermont law, the Trustee is a secured party either as a lien creditor or as a judicial lien creditor with an execution returned unsatisfied and has met Vermont's jurisdictional prerequisite to invoke the equitable remedy of marshaling in the form of a creditors' bill.

*(2) Marshaling as a Cause of Action Within § 541(a)(1) Property of the Estate*

We also hold that under Vermont law marshaling is a cause of action which is

---

**25.** Arguably, the *Bean* Court's decision concerning the trustee's status, coming at the end of the decision, is dicta; however, the Court could not have reached its decision, i.e. no fraud, unless the trustee had the right to attack the transaction in the first place as a judgment creditor holding an execution duly returned unsatisfied.

**26.** The Vermont Supreme Court in *Koerber v. Middlesex College,* supra, noted that while Vermont Rules of Civil Procedure Rule 2, *"One Form of Action,* There shall be one form of action to be known as 'civil action'," abolished debt as a specific form of action, the right to a specific kind of relief was not changed. *Koerber v. Middlesex College,* supra, 136 Vt. at 6, n. 1, 383 A.2d 1054.

part of the Debtor's Estate within § 541(a)(1)'s "all legal or equitable interests of the debtor in property."

Vermont law on the doctrine of marshaling of assets is sparse and ancient. Nevertheless, an examination of those few cases which discuss it supports our determination that under modern circumstances equity can invoke this tool of natural justice in Vermont.

Despite the absence of fraud, in *Warren v. Warren*, 30 Vt. 530 (1858), the Vermont Supreme Court adopted the following marshaling rule:

> When one man holds security on two funds, with perfect liberty to resort to either for his pay, and another party has security upon only one of the same funds, equity will compel the first to exhaust the fund upon which he alone has the security, before taking any part of the other, and thereby depriving the other party of his security. And this principle is founded upon so plain an equity, that parties will sometimes be compelled to follow it, without the direct interposition of the power of the court in advance, and especially when the party was bound by contract to do so.

*Warren v. Warren*, supra, 30 Vt. at 535 (1858).[27]

The case of *Edgerton v. Martin*, 35 Vt. 116 (1862) involved an application of marshaling in a trustee process context and is particularly illustrative of the powers of a judicial lien creditor to summon marshaling. In *Edgerton, id.*, the trustee was a recipient of certain property that was subject to pre-judgment attachments against the principal defendants. The trustee also received a right to, but not actual possession of, certain accounts and notes from the defendants as security for indemnification of liabilities which might result from his receipt of the property. The defendants retained possession of the accounts and notes. The trustee then purchased other property from the principal defendants and executed his own notes and retained his own notes as security for all liabilities which he had contracted for with them. Plaintiffs, after reducing their claims against the principal defendants to judgment, then served the trustee with their trustee process. Afterwards, the trustee assumed new liabilities for the principal defendants and pledged the accounts and all prior notes as security. At this point, the trustee received possession of the accounts and notes (which were previously in the defendants' possession subject to the trustee's rights) from the principal defendants and realized certain sums from his collection. Thus, at the time of the service of the trustee process, the trustee had acquired two means of indemnity by which he could rely on for his security against the liabilities he had incurred on account of the principal defendants: one being his own notes to the principal defendants, which were retained by the trustee; and the other being the contract concerning the notes and accounts and the monies collected from the demands which belong to the principal defendants but were turned over to the trustee as security.

■ The Vermont Supreme Court, in *Edgerton v. Martin*, id., 35 Vt. at 122 (1862), upheld plaintiffs' request that the sums received and collected by the trustee be applied in satisfaction of the liabilities incurred by the trustee prior to the service of the plaintiffs' trustee process, and expressed as an alternate ground for its holding that this case was a proper one for the application of marshaling:

> The general principles of equity law in respect to the marshalling (sic) of securities (1 Story Eq. Jurisp., by Redfield, §§ 633, 645,) may well be applied in this case to the extent of the money collected by the trustee. For his liabilities for the principal defendants assumed prior to the commencement of this suit, he had a lien on, or interest in, two means of indemnity, viz.: on his own notes which he had executed to them, and on the money collected on demands belonging to them,

---

27. As we noted earlier, marshaling is an equitable remedy which is not dependent on the law of contracts. *Meyer v. United States*, supra, 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293, 297 (1963).

which, by their agreement, were "turned out" to him for the express purpose of securing these liabilities. The plaintiffs by their attachment acquired an interest in or lien upon only one of these funds.

*Edgerton v. Martin,* 35 Vt. 116, 122 (1862) (citation in original).[28]

The *Edgerton* Court defined the nature of the paramount and junior parties' status as either a "lien" on or an "interest in" the proposed funds. Though the *Edgerton* Court dealt with lien creditors, arguably, "interest in" would broaden the class of parties entitled to raise marshaling to not only include secured and unsecured creditors, but also, under appropriate circumstances, non-creditors:

> In some cases the doctrine is defined strictly in terms of lien or secured creditors. In other cases the doctrine is defined in terms of "interests" which are not limited to secured creditors or even to creditors.

53 Am.Jur.2d Marshaling Assets § 1, page 6 (1970) (footnotes omitted).

The Vermont Supreme Court has not addressed marshaling since the 1862 case of *Edgerton,* supra, consequently, it has not provided us with an evolved view of marshaling under today's modern equitable principles.

The principle of marshaling assets had its origin in a desire on the part of the chancellor to protect junior creditors, and its early application was considered solely with regard to the respective rights of creditors. The debtor was not given a hearing or allowed a voice in the matter. While assets are ordinarily marshaled, not at the suit of the debtor, but only at the instance of one creditor against another, modern equitable principles have extended the doctrine in many instances to include debtors. There is no sound reason why a court of equity should not marshal assets in favor of the debtor if, in the circumstances, it can do justice to the other parties concerned and at the same time accomplish a more nearly just result.

53 Am.Jur.2d, Marshaling Assets, § 30, page 29 (1970) (footnotes omitted).

■ We believe the Vermont Supreme Court applying equitable principles [29] would allow an insolvent debtor, as well as a trustee standing in debtor's shoes as a secured party representative of the debtor's estate, a hearing as a party with an "interest in" funds sought to be marshaled among creditors of its estate.

---

**28.** In both *Warren v. Warren,* supra 30 Vt. at 535 and in *Edgerton v. Martin,* supra, 35 Vt. at 122, the Vermont Supreme Court added that the senior secured parties, against whom marshaling was allowed, also had knowledge of the equitable interests of the junior lienors before the former proceeded to realize their interests to the detriment of the latter in the event marshaling was not applied. This knowledge, however, is not necessary for the per se invocation of marshaling, but only further serves an equitable corollary, i.e., natural justice, to buttress the Court's ·application of marshaling as an equitable remedy.

**29.** Equity policy in Vermont, as it is generally in Federal Bankruptcy, favors the honest debtor. For example, Vermont has long held, within the context of the "allocation of payment" doctrine, that when neither the debtor nor the creditor has made an allocation of payment and the controversy is before the court, the court will make an allocation which is more favorable to the debtor and not the creditor:

> There is still another case, which not infrequently occurs, where neither party makes any application of payments until a controversy arises. In cases of this character, the law

will make such application as it deems equitable. *Cremer v. Higginson,* 1 Mason, 323. In equity, it is said, the application will, in such cases, be made to those debts where the security is most precarious. *United States v. January et al.,* 7 Cranch, 572 [3 L.Ed. 443]. *Field et al. v. Holland et al.,* 6 Cranch, 8 [3 L.Ed. 136]. In the case of *Gwinn v. Whitaker,* 1 Har. & Johnson, 754, it is said, the law will make such application of money paid, and not appropriated by either party, as will be most beneficial to the debtor. I should consider this latter rule more in accordance with the principles of natural justice and equity, and more correspondent with other established principles upon the same subject, than the doctrine of the cases from the 6th and 7th Cranch, just alluded to.

*Robinson & Wiggin v. Doolittle,* 12 Vt. 246, 249 (1840). Accord, *National Bank of the Commonwealth of New York City v. Mechanics' National Bank of Trenton, New Jersey,* 94 U.S. 437, 439, 4 Otto 437, 439, 24 L.Ed. 176, 178 (1877); *In re Vermont Fiberglass, Inc.,* 76 B.R. 358 (Bkrtcy. D.Vt.1987).

**(3)** *Fiduciary Duty, Alter Ego and Piercing the Corporate Veil as Causes of Action Within § 541(a)(1) Property of the Estate*

■■■ We turn now to the Trustee's utilization of alter ego theory cause of action as property of the estate, an exception to marshaling's "common debtor" requirement, and thereby hold Debtor's sole shareholder accountable.[30]

Piercing the corporate veil and alter ego actions against a corporation's sole shareholder-director and guarantor are actually constituents of the larger cause of action for breach of fiduciary duty since each of these actions involves an equitable infraction of the duty owed toward the corporation, and, in some cases, others.

■■ The issue of fiduciary law involving corporate directors and stockholders must be resolved by reference to State law, since corporations are creatures of the State, *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26, 40 (1975), in the absence of otherwise controlling Federal law.

As we said in the past, the first place one must look to determine the powers of corporate directors is in the relevant State's corporation law.

*Burks v. Lasker*, 441 U.S. 471, 478, 99 S.Ct. 1831, 1837, 60 L.Ed.2d 404, 412 (1979) (citations omitted).

As we examine fiduciary law, we are mindful of Justice Frankfurter's observations concerning a court's inquiry into fiduciary law:

> But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?

*SEC v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626, 632 (1943).

■■ Although there is a presumption in Vermont that every man has conformed his private and official duty according to the demands of law and equity, *Morse v. Bruce's Estate*, 70 Vt. 378, 380, 40 A. 1034 (1898), and the Court will not presume an agent has profited at the expense of its principal, *Noyes v. Landon*, 59 Vt. 569, 574, 10 A. 342, 343 (1887), nevertheless, the

---

**30.** We note, sua sponte, that the Debtor's sole shareholder director and one of its guarantors, David Winer, is not a named party to this proceeding though it is he whom the Trustee claims to be the Debtor's true alter ego. Although not raised by the parties, it would appear, at first glance, that we might not have jurisdiction over the Debtor's alter ego and the assets sought to be marshaled because he is a non-party; however, where a bankrupt corporate debtor is pierced to reach a responsible non-party alter ego because of inequitable conduct, in effect substituting the alter ego for the corporation, the non-party is bound by this Court's equitable judgment sustaining an alter ego action. This is so only if a party's interests are so closely affiliated with the non-party's interests that it can fairly be said that those interests were merged.

We hold that Debtor's alter ego, David Winer, is so bound. Our findings show that he not only controlled the Debtor as a fiduciary in all respects, but as we observed at trial, he was also Chittenden's chief witness; was persistently sought by Chittenden's counsel for consultation during the trial; and, actively participated in this trial. See, *Montana v. United States*, 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210, 217 (1979) (non-party-United States' control over State Court litigation was sufficient to col-

laterally estop the United States' challenge in Federal Court); *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1350 (2d Cir.1974) cert. denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) (held in a New York action by a corporation against its stockholder that the District Court was entitled to pierce the corporate veil and to treat the holding company as the equivalent of the stockholder, over whom the Court had in personam jurisdiction, and acquired in personam jurisdiction over the holding company, a Delaware company, although that company did not do business in New York); *Kreager v. General Electric Company*, 497 F.2d 468, 472 (2d Cir.1974) cert. denied, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95–96 (1974) reh'g. denied, 419 U.S. 1041, 95 S.Ct. 530, 42 L.Ed.2d 319 (1974) (defense of res judicata sustained in a second action against a non-party in the first action who effectively controlled the first action, was the corporation's principal witness, and was present in court throughout the trial); *Hadar Leasing International Co., Inc. v. D.H. Overmyer Telecasting Co., Inc. (In re D.H. Overmyer Telecasting Co., Inc.)*, 53 B.R. 963, 982–85 (N.D.Ohio 1984) affirmed without published opinion, 787 F.2d 589 (6th Cir.1986) (judgment of Bankruptcy Court could be enforced and directed against alter ego non-parties who intervened during the appeal to the District Court).

law demands the utmost good faith and undivided loyalty from agents for the furtherance and advancement of the interests of their principals, *Capital Garage Co. v. Powell,* 96 Vt. 145, 149, 118 A. 524 (1922); *Leno v. Stewart,* 89 Vt. 286, 289, 95 A. 539 (1915), especially between a shareholder-director and his corporation since such transactions are not at arms-length:

> [D]ealings between a majority stockholder and director and the corporation he controls are not arms-length transactions. They are subject to close scrutiny at the instance of persons having an interested relationship to the operation, such as a stockholder. The relationship of a director-stockholder to his corporation binds him to use utmost good faith and loyalty for the furtherance and advancement of the interest of that corporation. He is not permitted to make profit for himself in the transaction of the business of the corporation, against its interest.

*Lash v. Lash Furniture Co. of Barre, Inc.,* 130 Vt. 517, 522, 296 A.2d 207, 211 (1972) (citations omitted).

 Fiduciary duty requires that directors cannot let competing interests interfere with their undivided loyalty and duty to further the interests of the corporation they represent. This competing interest might be the representative director's ownership in another corporation where it might have interfered with the fiduciary corporation since:

> The directors of the defendant company would, in effect, be selling the property to themselves. The right to do this is denied to all persons acting in a fiduciary capacity. The directors of a corporation cannot represent it in transactions with another corporation in which they are shareholders, if their interest in the latter company might induce them to favor it at the expense of the company whose interests have been intrusted to their care.

*Corry v. Barre Granite & Quarry Co.,* 91 Vt. 413, 418, 101 A. 38 (1917).

 As stated by the United States Supreme Court in *Twin–Lick Oil Company v.*

*Marbury,* 91 U.S. (1 Otto) 587, 23 L.Ed. 328 (1876), the degree of judicial scrutiny of a fiduciary will increase proportionately according to the status of control held by that fiduciary:

> It is very true, that as a stockholder, in making a contract of any kind with the corporation of which he is a member, is in some sense dealing with a creature of which he is a part, and holds a common interest with other stockholders, who, with him, constitute the whole of that artificial entity, he is properly held to a larger measure of candor and good faith than if he were not a stockholder. So, when the lender is a director, charged, with others, with the control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness.

*Twin–Lick Oil Company v. Marbury,* supra, 91 U.S. at 589, 23 L.Ed. at 330 (1876) (not all transactions between a director or stockholder and his corporation are void *ab initio* as where an honest director openly makes a fair loan to his corporation secured by a deed of trust).

 The competing interest might also be the representative's personal interest which may be set aside by a Court of equity, *Lash v. Lash Furniture Co. of Barre, Inc., supra,* 130 Vt. at 521–22, 296 A.2d 207 even if the consideration was fair or there was no injury to the corporation, *Hooker, Corser & Mitchell Co. v. Hooker,* 88 Vt. 335, 353–54, 92 A. 443 (1914), since the director's duty is to exercise his inde-

pendent judgment from the standpoint of an ultimate benefit to the corporation:

> In short, the business management of a corporation is confided to its directors and they must act in behalf of the corporation. They represent all the stockholders and creditors and cannot enter into agreements, either among themselves or the stockholders, by which they abrogate their independent judgments.

*Creed v. Copps*, 103 Vt. 164, 168, 152 A. 369 (1930) (citations omitted). *See, Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d 255, 264–65 (2d Cir.1984) (applying New York law held that directors as corporate fiduciaries owe two duties, loyalty and care, and once self-dealing, self-interest, or bad faith is demonstrated, then the burden shifts to the director to show the transaction was in the best interest of the corporation).

Vermont's statutory law requires full disclosure and formal approval by disinterested quorums concerning the subject of a director's contract with the corporation:

> A contract may be made between a corporation and one or more of the directors, if the contract is approved by a quorum of the board of directors, the contracting director not being present. In entering into such contract, the directors shall act in good faith, and, if their good faith is attacked, the burden shall be upon them to prove it. Subject to these provisions, such contract shall be voidable by the corporation only in case it would have been voidable if made with a stranger. The term 'contract' as used herein is intended to include loans, and corporation guarantees of personal obligations.

11 Vt.Stat.Ann. § 1888.

A director is a fiduciary who possesses by virtue of trust and this duty is owed to and enforceable by the corporation as well as the corporation's shareholders. *Hooker, Corser & Mitchell Co. v. Hooker*, supra, 88 Vt. at 353, 92 A. 443.

In the event of the corporation's bankruptcy, the trustee of the bankrupt corporation may pursue an action against the offending fiduciary:

> Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transactions but also to show its inherent fairness from the viewpoint of the corporation and those interested therein ... The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interest in the corporation—creditors as well as stockholders.

*Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed. 281, 289–90 (1939) (citations omitted). *Accord, S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In the Matter of S.I. Acquisition, Inc.)*, infra, 817 F.2d 1142 (5th Cir.1987); *Koch Refining v. Farmers Union Central Exchange, Inc.*, infra, 831 F.2d 1339, 1346 (7th Cir.1987); *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857 (10th Cir.1986) (reversed and remanded with directions to dismiss District Court's ruling of lack of subject matter jurisdiction over a creditor's Colorado common law fiduciary action in federal district court against director of insolvent corporation in bankruptcy since it was the trustee's cause of action which could only be maintained in Bankruptcy Court); *Mitchell Excavators Inc. by Mitchell v. Mitchell*, infra, 734 F.2d 129 (2d Cir. 1984); *American National Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, infra, 714 F.2d 1266, 1276 n. 9 (5th Cir.1983); *Bayliss v. Rood (Matter of West Virginia Industries Development Corp.)*, infra, 424 F.2d 142, 146 (4th Cir.1970). *See*, 3 *Fletcher Cyclopedia Corporations* § 849 (M. Wolf perm. ed. revised 1986); 3A *id.* §§ 1180–84.

But see, *In re Morgan–Staley Lumber Co., Inc.*, 70 B.R. 186 (Bkrtcy.D.Or.1986) (Court dismissed adversary proceeding on grounds that the Chapter 7 trustee lacked standing to prosecute a shareholder's or creditor's derivative action for direct harm to corporation under applicable State law); 4 *Collier on Bankruptcy* § 541.10[8] (15th ed. 1986) (trustee cannot enforce, under 11 U.S.C. § 541(a), State created obligations which run personally to corporate creditors, rather than to the corporation).

In *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 905 (2d Cir.1985) the Second Circuit ordered a reversal and a remand to the District Court for its failure to consider whether, under Vermont law, creditors of an insolvent corporation in bankruptcy had an implied right to maintain an action, on behalf of and for the benefit of the bankrupt corporate debtor, against its directors for, *inter alia*, breach of fiduciary duty:

> The district court's ruling failed to take into account that, although in most states directors of a *solvent* corporation do not owe a fiduciary duty to creditors, quite the reverse is true when the corporation becomes insolvent … Thus, the 'majority rule' permits recovery by creditors of an insolvent corporation for mismanagement as if the corporation itself were the plaintiff … while the 'minority rule' precludes suit by injured creditors of an insolvent corporation … although a suit for misappropriation or diversion of corporate property may stand on different and more solid footing …

*In re STN Enterprises, supra*, 779 F.2d at 904–05 (2d Cir.1985) (Emphasis in original, citations omitted). Upon Order of Referral from the District Court, we held, *inter alia*, that we had jurisdiction and the unsecured creditors' committee had standing to sue debtor's corporate officers and di-

rectors when the debtor in possession unreasonably failed to do so:

> It is our opinion that Vermont would follow the "majority rule" to allow creditors a "qualified right" to sue, on behalf of the debtor corporation under circumstances presented in this adversary proceeding, for breach of fiduciary duty, fraudulent conveyances, and director negligence against directors or officers.

*Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises, Inc.)*, 73 B.R. 470, 490 (Bkrtcy.D.Vt.1987). *Cf., Murdock v. Allina (In re Curtina Int'l)*, 15 B.R. 993, 995 (Bkrtcy.S.D.N.Y.1981) (Bankruptcy Court held that it did not have jurisdiction to adjudicate a creditor's *personal* claim of alter ego against non-debtor defendants, debtor's officers and stockholders, when that creditor sought a *personal* recovery which was not for the benefit of the debtor's estate, and the trustee had asserted no interest in the otherwise private controversy).[31]

Upon proper proof, equity will not only enforce this loyalty and trust, but also will apply the doctrine of unjust enrichment when fiduciaries "[H]ave yielded to the temptation of self-interest …," *Manufacturers Trust Co., Trustee v. Becker*, 338 U.S. 304, 312, 70 S.Ct. 127, 132, 94 L.Ed. 107, 114 (1949), where:

> The fact stands out in unmistakable clearness that they (directors) evolved and carried out plans to benefit themselves at the expense of the corporation of which they were the directors. Equity will not suffer them to withhold from the corporation the benefits so obtained.

*Hooker, Corser & Mitchell Co. v. Hooker, supra*, 88 Vt. at 357, 92 A. 443 (1914). See, Restatement of Restitution, §§ 123, 150, 168, 178, 204 (1936).

---

**31.** *Murdock v. Allina (In re Curtina Int'l), supra*, 15 B.R. 993 (Bkrtcy.S.D.N.Y.1981) is actually another application of the *personal* interest issue from the *Caplin, infra*, line of cases we discuss and distinguish *infra*. For the same reasons we discuss *infra*, (our holding that the Trustee's causes of action belong to the Debtor and, as such, constitutes property of the Estate,

dispenses with the *personal* interest issue of *Caplin* and its progeny), *Murdock's* rationale and jurisdictional holdings are not applicable here. Furthermore, the Trustee has intervened to assert the Estate's interest in this controversy and any recovery is directly for the Estate's benefit.

In *Assoc., Haystack Property Owners v. Sprague,* 145 Vt. 443, 494 A.2d 122 (1985), the Vermont Supreme Court reversed and remanded a trial court's order granting defendant's Vermont Rules of Civil Procedure Rule 12(b)(6) motion to dismiss class action plaintiffs' amended complaint for failure to state a claim upon which relief may be granted. Plaintiffs alleged that: defendants, as directors of a corporation, owed members of the plaintiffs' class, creditors, a fiduciary duty; defendants breached that duty; and, plaintiffs were entitled to damages caused by the director's breach. After ruling that a novel legal theory should be explored by facts developed by evidence at trial, the Vermont Supreme Court acknowledged the "qualified right" of creditors to maintain an action against the directors of an insolvent corporation:

> It is true, as the lower court pointed out, that while corporate directors do owe fiduciary duties, the duties are not owed to the world at large. Also it may be generally true that those duties are owed to the corporation and to its stockholders but *not* creditors of the corporations. Nevertheless, some courts have held that corporate directors do owe a fiduciary duty to creditors ... particulary when the corporation becomes insolvent ...

*Haystack,* supra, 145 Vt. at 448, 494 A.2d 122 (1985) (emphasis in original). See, *In re STN Enterprises,* supra, 779 F.2d at 904–05 (2d Cir.1985).

In *Lash v. Lash Furniture Co. of Barre, Inc.,* supra, 130 Vt. at 522, 296 A.2d at 211 (1972), the Vermont Supreme Court held:

> [D]ealings between a majority stockholder and director and the corporation he controls are not arms-length transactions. They are subject to close scrutiny at the instance of persons having an interested relationship to the operation, such as a stockholder.

*id.,* (citations omitted).

In *Haystack,* supra, the Court seized on the just quoted language in *Lash,* supra, to preserve the corporate creditors' (plaintiffs') "novel" theory of recovery against the directors of an insolvent and dissolved corporation and held:

> This language suggests that parties other than stockholders, *may,* under certain circumstances, also subject corporate director's dealings to close scrutiny. Again, however remote the possibility or novel the claim may be, we cannot say as a matter of law at this point that there is no possibility that plaintiffs could present sufficient evidence to establish a fiduciary duty and a breach thereof; a dismissal based on V.R.C.P. 12(b)(6) was at least premature in this case.

*Haystack,* supra, 145 Vt. at 448, 494 A.2d 122 (1985) (emphasis in original).

The rationales of the corporate fiduciary cases decided by the Vermont Supreme Court, including *Haystack,* supra, which permitted corporate creditors to sue a director for breach of fiduciary duty, and of the United States Supreme Court in *Pepper,* supra, which held a trustee may enforce a cause of action against a bankrupt's director or stockholder, are applicable in this proceeding. The transactions and conduct of Debtor's sole shareholder and director with the corporate Debtor are in issue. Moreover, it is quite unlikely that the sole shareholder or his fellow family directors would cause their corporation to scrutinize such matters against him. We hold that a corporation under Vermont law may sue a director for breach of fiduciary duty, and upon the event of bankruptcy the action becomes property of the estate. Thus, the Trustee may prosecute a cause of action for breach of fiduciary duty against an offending director-sole shareholder on behalf of the insolvent corporate Debtor for the benefit of the Debtor's Estate and its creditors.

We turn now to the components of fiduciary law; namely, piercing the corporate veil and alter ego.

The rule that a corporation is separate and distinct entity from the identity of its shareholders, *Eureka Marble Co. v. Windsor Manufacturing Co.,* 47 Vt. 430, 447 (1874), or its agents, *Wheelock v. Moulton,* 15 Vt. 519, 512–22 (1843), is elementary to corporation law. This legal fiction was de-

signed as a privilege by the legislature for the furtherance of convenience and promotion of commerce, 18 Am.Jur.2d, Corporations §§ 42–43, pages 840–43 (1985), and it is axiomatic that a corporation has no other power than those conferred upon it by the sovereignty which creates it. *Vermont Acc. Ins. Co. v. Burns,* 114 Vt. 143, 40 A.2d 707 (1944).

Equity, however, will not blindly accept mere corporate form over the actual substance of the transactions involved, *Chicago, M. & St. P.R. Co. v. Minneapolis C. & C. Assn.,* 247 U.S. 490, 501, 38 S.Ct. 553, 557, 62 L.Ed. 1229, 1237 (1918), and will scrutinize such a privilege "where it otherwise would present an obstacle to the due protection or enforcement of public or private rights," *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 442, 54 S.Ct. 788, 791, 78 L.Ed. 1348, 1353 (1934), to serve the ends of natural justice, *Bangor Punta Operations v. Bangor & A.R. Co.,* 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418, 427 (1974), or to correct inequitable conduct which demands an individual be held responsible for the abuse of this privilege to the injury of the corporation or its creditors. See e.g., Annot. Stockholder's Personal Conduct of Operations or Management of Assets as Factor Justifying Disregard of Corporate Entity, 46 A.L. R.3d 428 (1972) (Supp.1987).

It has long been established in Vermont and elsewhere, contrary to the position taken by Chittenden in its briefs, that actual fraud is not a requirement for piercing the corporate veil.

In *Roberts v. W.H. Hughes Co.,* 86 Vt. 76, 88, 83 A. 807, 812 (1912) the Vermont Supreme Court held that the absence of actual or intended fraud was immaterial where mere implied fraud may be imputed to an insolvent sole shareholder who conveyed, as an individual, property to his corporation in exchange for stock. After a recital of the general rule that corporations are distinct from the individuals who comprised it and the exception that courts will not permit the general rule to become a shield for the "contrivers of fraudulent schemes," id., the *Roberts* Court stated:

It has even been said that in an appropriate case, and in furtherance of the ends of justice, a debtor corporation and the individual owning all its stock and assets will be treated as identical, independent of any question of fraud. But cases of this class, in which the individual is held liable merely because he owns all the stock of the corporation, have been spoken of as of doubtful authority. However this may be, there is ample authority for saying that in cases of fraud the courts will look behind the corporation to the individuals composing it. The business of an individual or partnership is often continued through the formation of a corporation, and the transfer to it of the property of the individual or partnership in exchange for the stock of the corporation. A fraud upon creditors may be effected by this process as well as by a conveyance to an individual, and when the one who makes use of it is insolvent the corporation issuing the stock for the property will not be treated as a bona fide purchaser.

*Roberts v. W.H. Hughes Co.,* supra, 86 Vt. at 88, 83 A. at 812 (1912) (citations omitted). The *Roberts* Court's dicta implies that the corporate shield ought not be lowered merely because a sole stockholder is involved. We agree. This is simply another statement of the basic principle of separate identities as between a corporation and its stockholder.

On the other hand, equally as well settled as is (sic) the principle that plain fraud is not a necessary prerequisite for piercing the corporate veil is the rule that the mere fact that all or almost all of the corporate stock is owned by one individual or a few individuals, will not afford sufficient grounds for disregarding corporateness.

*DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir.1976) (footnote omitted).

The *Roberts'* Court cited *Wilson v. Spear,* 68 Vt. 145, 34 A. 429 (1894) for the distinction between actual and implied fraud: "[m]erely the fraud which the law imputes to him from the condition of his

estate and the necessary consequence of his act." *Roberts v. W.H. Hughes Co.*, supra, 86 Vt. at 88, 83 A. at 812. This distinction rests on the principle that: "It is only in cases where no actual fraud appears that the conveyance can be sustained on the ground that the grantor retained sufficient property to satisfy his debts." *Wilson v. Spear*, supra, 68 Vt. at 148, 34 A. 429. *Roberts* does not require fraud for the invocation of the piercing the corporate veil doctrine, rather *Roberts* requires looking at the factual circumstances of the transaction and:

> Upon these facts we think it must be considered that the corporation was but an instrumentality for enabling Hughes (insolvent grantor) to hold his property and continue his business in another name and a different manner; that in conveying his property to the corporation he was in effect deeding it to himself; and that the corporation, in exchanging its stock for his property, was but returning his property in a different form. The property which he at first held by title he afterwards held through stock. In this situation, the defendant company is not entitled to be treated as a purchaser for value.

*Roberts v. W.H. Hughes Co.*, supra, 86 Vt. at 90, 83 A. 807 (parenthetical supplied for clarity).

 Fraud is merely one of the many circumstances from which the equitable exceptions to the general rule of limited liability may arise. Inadequate capitalization is another:

> But there are occasions when the limited liability sought to be obtained through the corporation will be qualified or de-

nied.... The cases of fraud make up part of that exception. But they do not exhaust it. An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defenses of limited liability.

*Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793, 802–03 (1944) (citations and quote omitted), reh'g. denied, 321 U.S. 804, 64 S.Ct. 845, 88 L.Ed. 1099 (1944). Accord, *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In the Matter of S.I. Acquisition, Inc.)*, infra, 817 F.2d 1142, 1152 (5th Cir.1987) (the doctrine of alter ego does not require a showing of fraud on a particular creditor, nor does it rest upon a particular creditor's dealings with or reliance on a controlled entity); [32] *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, infra, 540 F.2d 681, 684 (4th Cir.1976) (citing, *Anderson v. Abbott*, supra).

As explained by the United States Supreme Court in the context of the "instrumentality rule," of which breach of fiduciary duty, piercing the corporate veil and alter ego actions are likened, these actions are actually remedies:

> Petitioners invoke the so-called instrumentality rule,—under which they say, Deep Rock (subservient entity) is to be regarded as a department or agent of Standard (dominant entity),—to preclude the allowance of Standards claim in any amount. The rule (instrumentality) was much discussed in the opinion below. It is not, properly speaking, a rule, but a convenient way of designating the appli-

---

**32.** The Court in *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In the Matter of S.I. Acquisition, Inc.)*, infra, 817 F.2d at 1152 (5th Cir. 1987) cited, inter alia, *Edwards Co. v. Monogram Industries, Inc.*, 730 F.2d 977, 982–84 (5th Cir.1984). *Edwards* indicated that under Texas law fraud was an essential element of an alter ego finding in contract cases, id. at 980–81, but was not essential for an alter ego finding in tort cases, id. at 982. *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir.1985). The Fifth Circuit's 1985 opinion of *Jon–T Chemicals*, supra, was not cited by the same Court in its 1987 *S.I. Acquisition* opinion, and while it may

appear that this distinction was overlooked by the *S.I. Acquisition* Court, nevertheless, the *S.I. Acquisition* Court cited the recent Texas Supreme Court decision of *Castleberry v. Branscum*, 721 S.W.2d 270, 272–73 (Tex.1986), which expressly held that neither fraud nor fraudulent intent was required before alter ego may be applied. Thus, there is no longer a distinction in Texas between contract and tort alter ego actions, i.e. neither requires fraud. *See Valdes v. Leisure Resource Group, Inc.*, 810 F.2d 1345, 1352–53 (5th Cir.1987) (discussed Texas law on alter ego).

cation, in particular circumstances, of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice.

*Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669, 676 (1938) (parentheticals supplied for clarity). In *Taylor,* the Supreme Court, using the "Deep rock" doctrine, held that loans from a controlling shareholder to his corporation may be deemed capital contributions if the corporation was initially under-capitalized or thereafter ineligible for a loan from a disinterested source.

■ The following non-exhaustive list contains some of the collective equitable factors utilized by various Courts for their inquiry into the factual circumstances concerning alter ego:

(1) The corporate fiction is used as a means of perpetrating fraud;

(2) A corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) The corporate fiction is employed as a means to the end of avoiding existing legal or moral obligations;

(4) Failure to observe proper corporate formalities or there is an absence of corporate records or meetings;

(5) Gross undercapitalization or thin capitalization;

(6) Non-functioning of other officers or directors;

(7) Corporation is a mere facade for the operations of the dominant stockholder(s);

(8) Insolvency of the debtor corporation;

(9) Siphoning or commingling of corporate funds by the dominant stockholder; and,

(10) The corporate fiction is used to achieve or perpetrate monopoly.

See, *Valdes v. Leisure Resource Group, Inc.,* 810 F.2d 1345, 1352–53 (5th Cir.1987) (discussed Texas law, *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986), on alter ego); *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981); *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* supra, 540 F.2d at 685–87 (4th Cir. 1976) (excellent case for authorities on the various factors throughout the jurisdictions); *Lowen v. Tower Asset Management, Inc.,* 653 F.Supp. 1542, 1552–53 (S.D. N.Y.1987) (New York criteria) affirmed, *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1220 (2d Cir.1987); *Solomon v. Klein,* 770 F.2d 352, 353–54 (3d Cir.1985) (dicta, listed factors not used in its decision, citing, inter alia, *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976)); *In re BDW Associates, Inc.,* 75 B.R. 909, 912–13 (Bkrtcy.W. D.Pa.1987) (factors within the Third Circuit). See also, 18 Am.Jur.2d, Corporations, Disregarding Corporate Entity, In General, §§ 43–54 (1985).

■ Although some facts are entitled to more weight than others, it is important to keep in mind that no one factor will be determinative, with the possible exception of actual fraud. Rather, the collective facts and circumstances aid the Court's equitable determination:

> The conclusion to disregard the corporate entity may not, however, rest on a single factor, whether undercapitalization, disregard of corporation's formalities, or what-not, but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness.

*DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* supra, 540 F.2d at 687 (4th Cir.1976). See, Gelb, Piercing the Corporate Veil-the Undercapitalization Factor, 59 Chicago Kent Law Review 1 (1982).

Vermont has few cases where, based upon equitable concerns, an alter ego remedy was applied. These involved facts where there was such identity between the corporation and a control individual or dominant entity that the Court felt bound to disregard the corporate entity.

In *Administratrix of Bigelow v. Congregational Society of Middletown,* 11 Vt. 283 (1839), the Vermont Supreme Court permitted a judgment creditor, with a writ re-

turned unsatisfied, to levy upon the individual members of the corporation for satisfaction of a judgment against the corporation, a congregational society. The society had hired the administratrix's husband as it's minister, and at his death, the society was indebted to him for unpaid salary. Members of the society had taken the available funds of the society, consisting principally of notes for money lent, and transferred it to a new corporation where it appears to have been used to pay the salary of a new minister and finance resistance to the administratrix's claims. Before the transfer, the available funds were earmarked to pay the deceased's salary and would have satisfied the administratrix's judgment. The only other asset of the society consisted of their meeting house, which was exempt from process. On the first appeal to the Supreme Court, (citation unknown), and after the society had successfully presented a request for an off-set of their claims against the deceased as their treasurer, the Court upheld the Commissioners' allowance of a balance due the estate, on the estate's claim for the unpaid salary and entered judgment against the society.

On the second appeal to the Supreme Court, *Administratrix of Bigelow v. Congregational Society of Middletown*, Id., the Court noted the general rule of confining liability to the corporation was not without exceptions and permitted the administratrix to pierce the society's veil and hold the individual members liable for the society's debt in the absence of fraud:

> ... There may be a difficulty in ascertaining what remedy should be afforded in the case of a corporation, and in applying the remedy so as to not to do injustice to individual interests, but still, if individuals have not done all they mght (sic) or could do to fulfil their legal and moral duties, the consequences are their own ...
>
> ... The individuals composing the society are not personally liable, unless they have made themselves so by some act or default. An execution against the society cannot be levied on the separate property of the individual members ...

... It was the duty of the society, on the death of Mr. Bigelow, to appropriate this fund for that purpose, and what was the duty of the society was the duty of the individual members, and if they have suffered the fund to be wasted and lost, through carelessness, negligence, or misfeasance, it must be their loss ...

*Administratrix of Bigelow v. Congregational Society of Middletown*, Id., 11 Vt. at 286–88 (1839). The *Bigelow* Court held the society's members responsible and decreed that a receiver be appointed to collect whatever remained of the funds and a master be appointed to determine both the amount of the funds at the time the deceased died, prior to the funds transfer to the new corporation, as well as the identity of the society's members to be held accountable for the funds short-fall. See, *Administratrix of Bigelow v. Congregational Society of Middletown*, 15 Vt. 370 (1843) (third appeal, upholding the Chancellor's decree adopting the Master's report).

Public policy may require that a corporation's veil be pierced in order to protect a public interest:

> Public policy dictates that the veil of Bushey's and Spentonbush's (parent and subsidiary corporations respectively) separate corporate entities be pierced, since these corporations wholly own, control, manage, operate and in all ways supervise the operations of the many subsidiaries of Bushey. The subsidiaries are mere corporate shells established for purposes of avoiding tort liability to the parent for the acts of the subsidiaries which are alter egos of Bushey and Spentonbush.

*United States v. Ira S. Bushey & Sons, Inc.*, 363 F.Supp. 110, 119 (D.Vt.1973) affirmed 487 F.2d 1393 (2d Cir.1973) cert. denied 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974) (citations omitted) (parenthetical supplied for clarity). The District Court in *Bushey* held that the public interest in preserving the environmental integrity of Lake Champlain and preventing future oil spills was paramount to that of the corporate fiction of separate identities and enjoined the parent and all of its

subsidiaries from making further oil deliveries on the "sixth largest lake in the country and a jewel of nature." Id. 363 F.Supp. 110, 119 (D.Vt.1973).

Vermont law, beyond *Bigelow* and *Bushey*, supra, has not provided us with a litmus test to aid our determination of the factual circumstances which will allow the corporate form to be disregarded. This failure is not due solely to the absence of cases on the subject, rather its absence is partially explained by the requirement that the facts of each case be individually examined on its own merits to ascertain whether the particular circumstances fall within the general principles of public convenience, fairness and equity. As the Court in *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222 (E.D. N.Y.1978) noted:

> The circumstances under which the court should disregard the corporate fiction are not always clear and it is difficult, if not impossible, to formulate a precise and categorical definition applicable to all situations, each case being sui generis.

*Brunswick Corp. v. Waxman*, supra, 459 F.Supp. at 1229 (E.D.N.Y.1978), (citation omitted), aff'd 599 F.2d 34 (2d Cir.1979) (New York law in the area of piercing the corporate veil and the disregard of the corporate fiction "[i]s hardly as clear as a mountain lake in springtime," Id. 599 F.2d at 35, and cited with approval, Cary, Corporations 110 (4th ed. 1969) that: "[n]o concept of separate corporate personality will suffice to solve an actual problem." Id. 599 F.2d at 36.

Another explanation why Vermont has not provided us with much guidance on the full reach of equity to pierce a corporate veil and to hold accountable the alter ego(s) who have misused the corporate entity lies in the inherent conflict of interest which arises when a corporation's facade is sought to be lowered. As explained earlier, dominant directors or shareholders are unlikely to cause their corporation to institute an action for breach of fiduciary duty against themselves. They are even less likely to direct their corporate victim to properly inquire whether the latter ought to hold the former responsible for the corporate obligations to creditors. When

viewed in this light, the absence of Vermont precedent on the ability of the injured corporation to pierce its own veil, is quite understandable:

> The corporation may be thought of as a separate legal entity which has an interest of its own in assuring that it can meet its responsibility to its creditors, while at the same time allowing it to argue that it should be deemed to be identical to its alleged alter ego for purposes of paying those creditors. There is only a practical—not a legal or logical—difficulty in a corporation's bringing an alter ego action in its own name: The defendants who so completely dominate the corporation as to constitute its alter ego are not likely to institute an action to determine their own liability for corporate debts. Therefore, it is not surprising that the parties can produce no such case. The corporation needs an independent voice, such as a trustee in bankruptcy, in order to act to protect its creditors.

*Henderson v. Buchanan (In re Western World Funding, Inc.)*, infra, 52 B.R. 743, 783 (Bkrtcy.D.Nev.1985) (citations omitted). The Fifth Circuit recently reached the same conclusion in the absence of Texas precedent and under the general policy of holding alter egos accountable for corporate obligations held:

> Since the corporation has an independent existence at law, we do not believe it is inconsistent in light of the above policy to say that a corporation may pierce its own corporate veil and hold accountable those who have misused the corporation in order to meet its corporate obligations.

*S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In the Matter of S.I. Acquisition, Inc.)*, infra, 817 F.2d 1142, at 1152 (5th Cir.1987).

█ We, therefore, conclude that the Trustee has standing under Vermont law to pursue the alter ego and piercing the corporate veil actions.

### C. *Property of the Estate, 11 U.S.C. § 541(a)*

█ The third aspect of standing is whether the Trustee's cause(s) of action is

property of the Estate. A bankruptcy trustee must not only possess a sufficient status to bring an action, but must also establish its action as one which belongs to estate.

■ We do not perceive *Caplin v. The Marine Midland Grace Trust Company of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), or its progeny, *Rochelle v. Marine Midland Grace Trust Co.*, 535 F.2d 523, 527 (9th Cir.1976); *Fisher, Hecht & Fisher v. D.H. Overmyer Telecasting Co., Inc. (In re D.H. Overmyer Telecasting Co., Inc.)*, 56 B.R. 657, 659–60 (Bkrtcy.N.D. Ohio 1986), as obstacles to the standing of a trustee to marshal for the ultimate benefit of Debtor's estate under § 544(a) or § 541(a)(1).

*Caplin*, a Bankruptcy Act case interpreting 11 U.S.C. § 110 now embodied in relevant part within 11 U.S.C. §§ 541 and 544, denied standing to a reorganization Chapter X trustee to maintain an action against non-bankrupt third parties on behalf of creditors, and debenture holders with potential conflicting interests that were not represented by the debtor's trustee, for pre-bankruptcy losses which resulted from misconduct of an indenture trustee.

The denial in *Caplin* was based on the fact that the case involved creditors with *personal claims* which did not belong to the debtor or his estate, see 11 U.S.C. § 541(b)(1).

Likewise, the Second Circuit in *Babbitt v. Read*, 236 F. 42, 46 (2d Cir.1916) held that defrauded purchasers of "no recourse" stock, and not the trustee, had the right to assert a claim against stockholders as individuals for fraudulent inducement. The trustee, however, had capacity to sue stockholders for issuance of stock for less than par value as an asset of the debtor and for the benefit of the estate since this was a "question wholly of state law as well, depending upon whether the liability created by the statute is regarded as running towards the creditor individually or towards the corporation," id. 236 F. at 50, and under Missouri law this liability ran toward the corporation as well as to the benefit of creditors individually.

The Second Circuit in *Cumberland Oil Corporation v. Thropp*, 791 F.2d 1037 (2d Cir.1986) cert. denied —— U.S. ——, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986), held that under New York law, a creditor's fraud action against persons associated with a bankrupt corporation was a *personal right*, and, as such, not property of the estate:

> Benchmark's (debtor) right to recover misappropriated corporate assets was vindicated by the bankruptcy trustee's suit against the Thropps (debtor's president and sole shareholder and his father). In this case before us, however, Cumberland (a creditor of the debtor) has not claimed a right on its own or Benchmark's behalf to recover misappropriated assets. Instead, it alleges that it suffered damages because of Gregory Thropp's intentional fraud. The right to recover for this alleged tort belongs to Cumberland, not Benchmark. The cause of action is Cumberland's property, not part of the bankruptcy estate.

*Cumberland Oil Corporation v. Thropp*, 791 F.2d 1037, 1042–43 (2d Cir.1986) (parentheticals supplied for clarity).

*Caplin, Babbitt* and *Thropp* are all distinguishable from this adversary proceeding. The Trustee here is not asserting the *personal rights* of others, but rather, he is asserting the alter ego, fiduciary and piercing the corporate veil actions, actions permitted under Vermont law, as actions that, if successful, will benefit the Estate. In other words, the Trustee is representing the interests of the Debtor's corporation.

In *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir.1985), the Second Circuit, citing *Caplin*, indicated that a trustee had the pre-requisite standing to sue on behalf of the debtor corporation debtor's counsel for alleged damages resulting from a sale of securities. *Bloor*, id., 754 F.2d at 62, n. 4. The Court affirmed the lower Court's Fed.R.Civ.P. Rule 12(c) dismissal, however, since the trustee had failed to establish a requirement of Section 10(b) of the Securities Exchange Act of 1934, namely, proximate causation between the debtor's counsel's alleged

breach of fiduciary duty and debtor's injury. The *Bloor* Court also stated that what the trustee alleged might have been sufficient to prevent harm to the purchasers of securities but added that the trustee did not have standing to assert *personal* damage *claims* on behalf of the non-party defrauded purchasers of securities. *Bloor,* Id., 754 F.2d at 62, n. 4; at 63.

In *Mixon v. Anderson (In re Ozark Restaurant Equipment Co., Inc.),* 816 F.2d 1222, 16 C.B.C.2d 1148, 16 B.C.D. 134 (8th Cir.1987) cert. denied *Jacoway v. Anderson,* —— U.S. ——, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987), the Eighth Circuit, relying on *Caplin* and the assumed Congressional intent created by Congress' silent failure to enact the proposed Subsection (c) of § 544,[33] held that under the applicable Arkansas law, an alter ego action on behalf of debtor's creditors was not property of the estate, 11 U.S.C. § 541(a)(1), consequently, the trustee had no standing under § 544 to sue on this personal interest.

We note the Court in *Ozark* cited a Texas Bankruptcy Court opinion, *In re S I Acquisition, Inc.,* 58 B.R. 454, 461 (Bkrtcy. W.D.Tex.1986), as authority for its proposition that alter ego actions are not property of the estate. *Mixon v. Anderson (In re Ozark Restaurant Equipment Co., Inc.),* supra, 816 F.2d at 1229, 16 C.B.C.2d at 1157, 16 B.C.D. at 139 (8th Cir.1987). The Texas Bankruptcy Court, *In re S I Acquisition, Inc.,* 58 B.R. 454 (Bkrtcy.W.D.Tex. 1986) (affirmed without opinion by the District Court, Western District of Texas,

James R. Nowlin, J.), was reversed by the Fifth Circuit on its conclusion that such matters were not property of the bankrupt's estate. *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In the Matter of S.I. Acquisition, Inc.),* 817 F.2d 1142 (5th Cir.1987).[34]

In *S.I. Acquisition,* supra, the lower Courts denied the debtor's motion to show cause why certain creditors, plaintiffs in a state court action, should not be held in contempt for serving interrogatories on debtor's non-bankrupt co-defendants, its parent corporation and principal (after the debtor was severed) by the State plaintiff's motion, from the State Court action because the debtor had filed bankruptcy. The State Court causes of action were based on breach of contract, alter ego, and piercing the corporate veil of the debtor. The interrogatories were designed to delve into the financial and control relationships among the non-severed State defendants with the severed debtor. The Bankruptcy Court's decision, 58 B.R. 454, 459–62, (affirmed by the District Court without opinion), held that: the state court alter ego action was not a claim assertable by either the debtor or the trustee under § 544; it was not a § 541(a)(1) property of the estate; and, therefore the automatic stay, 11 U.S.C. § 362, did not apply to the State Court plaintiffs against the non-bankrupt defendants.

The Fifth Circuit in *S.I. Acquisition,* supra, relies on *American National Bank of Austin v. MortgageAmerica Corp. (In re*

**33.** The House amendment deleted, without comment, the proposed Subsection (c) of § 544, (H.Rept. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) p. 370, U.S.Code Cong. & Admin.News 1978, p. 6326; 124 Cong. Rec. H 11097 (Sept. 28, 1978)), which would have otherwise overruled *Caplin. Mixon v. Anderson (In re Ozark Restaurant Equipment Co., Inc.),* 816 F.2d 1222, 1227–28, n. 9, n. 10, 16 C.B.C.2d 1148, 1155–56 n. 9, n. 10, 16 B.C.D. 134, 138–39 n. 9, n. 10 (8th Cir.1987); *Robert K. Morrow, Inc. v. Kelson (In re Morgan–Staley Lumber Co., Inc.),* 70 B.R. 186, 188 (Bkrtcy.D.Or. 1986). Our holding that the Trustee is a secured creditor, for marshaling purposes under applicable state law and § 544(a), and that his application of the alter ego doctrine, as an exception to the common debtor element of marshaling, is

a corporate cause of action and a § 541(a)(1) property of the Estate suffices the Caplin issue.

**34.** *Mixon v. Anderson (In re Ozark Restaurant Equipment Co., Inc.),* 816 F.2d 1222, 16 C.B.C.2d 1148 (8th Cir.1987) was decided by three Eight Circuit Judges on April 14, 1987 and rehearing and rehearing En Banc was denied, with one of the three Eight Circuit Judges voting to grant rehearing en banc, on July 6, 1987. *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In the Matter of S.I. Acquisition, Inc.),* 817 F.2d 1142 (5th Cir.1987) was decided on May 29, 1987. The reported cases on *Ozark* do not reflect whether the Eight Circuit Judges were aware of the Fifth Circuit's reversal of *In re S I Acquisition, Inc.,* 58 B.R. 454 (Bkrtcy.W.D.Tex. 1986).

*MortgageAmerica Corp.),* 714 F.2d 1266 (5th Cir.1983), for its analytical scheme in determining the State Court suit against the non-severed state defendants was stayed under 11 U.S.C. § 362(a)(3). It concluded that under Texas Law, the State cause of action based on alter ego, which did not require fraud, belonged to the bankrupt corporate debtor and, as such, was property of the estate subject to the automatic stay. *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In the Matter of S.I. Acquisition, Inc.),* 817 F.2d 1142, 1152–53 (5th Cir.1987). See, *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293, 1298 (1941) reh'g. denied, 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941) (property of the alter ego is property of the debtor's estate to be administered for the benefit of its creditors; an unsecured creditor of the alter ego, who had knowledge of the fraudulent character of the alter ego's corporation, was not entitled to a priority against the alter ego's assets, but only to a "pari passu" participation with other creditors of the debtor); *Henderson v. Buchanan (In re Western World Funding, Inc.),* 52 B.R. 743, 782–83 (Bkrtcy.D.Nev.1985) (trustee had standing under either § 544(a)(1) or § 541(a)(1) to pursue alter ego action of a debtor corporation and pierce its own veil to hold accountable those who have misused the corporation in order to meet its corporate obligations).

The Fifth Circuit in *American National Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.),* 714 F.2d 1266 (5th Cir.1983), answered in the affirmative the issue of whether the automatic stay, 11 U.S.C. § 362(a)(3), extended to suspend a bank's State Court actions against a debtor's sole stockholder and control person. Pivotal to the Fifth Circuit's rationale in *MortgageAmerica Corp.,* supra, is the combination of both the all-encompassing phrase in § 541(a)(1): "all legal and equitable interests of the debtor in property," and the basic policy of the Code:

"equality of distribution among creditors." *American National Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.),* supra, 714 F.2d at 1274 (citations omitted). The Fifth Circuit Court concluded that since the State causes of action (corporate trust fund doctrine or denuding the corporation theory and the state fraudulent transfer act) were created to vindicate injury from improper actions by control persons of the corporation, then those actions belonged to the corporate debtor's estate even though they could also be asserted by creditors. Id. 714 F.2d at 1276, 1277. See e.g., *Pepper v. Litton,* 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed. 281, 289–90 (1939) (construing § 70(a) of the Bankruptcy Act of 1898, 11 U.S.C. § 110(a) (repealed 1978), and noting that trustee can bring both direct and derivative actions for breach of fiduciary duty); *Mitchell Excavators, Inc. v. Mitchell,* 734 F.2d 129, 131 (2d Cir.1984) (citing, *In re MortgageAmerica Corp.,* supra, 714 F.2d at 1276–77, held a shareholder's derivative action is property of the estate); *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1346 (7th Cir. 1987) (held a bankruptcy trustee has standing to bring an alter ego action against debtor's shareholders as Section 541 property of the estate under Indiana and Illinois law); *Bayliss v. Rood (Matter of West Virginia Industries Development Corp.),* 424 F.2d 142, 146 (4th Cir.1970) (Bankruptcy Act case, trustee has standing to enforce breach of fiduciary duty against director or officer of a bankrupt corporate debtor as property of the bankrupt's estate); *Hassett v. McColley (In re O.P.M. Leasing Services),* 28 B.R. 740, 759 (Bkrtcy.S.D.N.Y.1983) (right to sue directors and officers for breach of their fiduciary duties and for violations of fraudulent conveyances law passes to bankruptcy trustee).

We conclude that the Trustee has met the third aspect of standing since his actions belong to Debtor's Estate.[35]

---

**35.** Our conclusion on the Trustee's standing renders it unnecessary for us to determine, as an alternative, whether the Trustee and his prose-

cutor, Defendant Sebert, are also a "party in interest" for purposes of opposing Chittenden's relief from stay motion. See, 11 U.S.C.

### III. Marshaling

There are three elements to the traditional doctrine of marshaling: 1. the existence of two or more creditors; 2. the existence of two or more funds belonging to a common debtor; and 3. the right of the paramount creditor to satisfy its demand from more than one of the funds, while the junior creditor(s) may only resort to less than all of the same funds. *Warren v. Warren*, 30 Vt. 530, 535 (1858). We have already held that, under Vermont law and 11 U.S.C. §§ 541(a), 544(a), the Trustee has met the first element of marshaling since the Trustee is a secured creditor and marshaling is a cause of action that is property of the Estate.

#### A. *Burden of Proof*

At the outset, we note that although most Courts are in agreement that certain exceptions to marshaling may be utilized in appropriate cases, many decline to do so because of a movant's failure to establish its factual burden by a clear and convincing standard.

In *Whirlpool Corp. v. Plad, Inc. (In re Plad, Inc.)*, 24 B.R. 676 (Bkrtcy.M.D.Tenn. 1982), the Court acknowledged that marshaling a corporate guarantor's assets may be appropriate where a court determines that the corporate veil should be pierced or where the assets contributed by the individual officer or director were in fact contributions to capital; however, the *Plad* Court declined to do so since the trustee failed to meet his clear and convincing burden of proof:

> Although this court is of the opinion that the aforementioned exceptions should be applied in appropriate cases, clear proof of their existence must be presented in order to overcome the strong presumption that a corporation is a distinct entity from those individuals who manage its affairs. Such a stringent standard of proof is necessary since the marshaling of an individual's assets to extinguish a corporate debt will in all likelihood be detrimental to the interests of the individual's personal creditors.

*Whirlpool Corp. v. Plad, Inc. (In re Plad, Inc.)*, supra, 24 B.R. at 679 (Bkrtcy.M.D. Tenn.1982) (citation omitted). See, *McDonald v. First National Bank of Athens (In the matter of Harrold's Hatchery and Poultry Farms, Inc.)*, 17 B.R. 712, 717 (Bkrtcy.M.D.Ga.1982) (agreed in principle with cases where piercing the corporate veil or contribution to capital exceptions to marshaling's "common debtor" element were applied, but insufficient evidence prevented its application).

Other Courts, who also agree with the proper application of marshaling exceptions, also decline to marshal because of an insufficient showing of inequitable conduct. In *Stuhley v. United States Small Business Administration (In re United Medical Research, Inc.)*, 12 B.R. 941 (Bkrtcy.C. D.Ca.1981), the Court refused to apply the exceptions in a guarantors of a corporate debtor's debt and piercing the corporate veil context where there was no demonstrable showing of fraud, overreaching or other inequitable conduct since:

> It is poor policy for courts to upset legitimate business transactions because of some vague concept of equity. We tend to forget that these decisions affect future commercial transactions. Advantageous and proper loans to corporations may be frustrated because shareholders would be fearful of having their personal assets marshaled for corporate creditors should they guarantee a corporate debt.

*Stuhley v. United States Small Business Administration (In re United Medical Research, Inc.)*, Id., 12 B.R. at 943 (Bkrtcy.C. D.Ca.1981). See, *In re Rich Supply House, Inc.*, 43 B.R. 68, 70 (Bkrtcy.N.D.Ill. 1984) (stipulated facts failed to indicate in-

§§ 362(d) and (g); *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571, 573–74 (2d Cir.1983); *In re Thayer*, 38 B.R. 412, 418 (Bkrtcy.D.Vt.1984); *Greg Restaurant Equip. and Supplies, Inc. v. Tour Train Partnership (In re Tour Train Partnership)*, 15 B.R. 401, 402–03 (Bkrtcy.D.Vt.1981); Annot. Who is "Party in Interest" Entitled to Request Relief From Automatic Stay Provision of the Bankruptcy Code of 1978, 73 A.L.R.Fed. 324 (1985) (Supp. 1987). See also, Rules of Practice and Procedure in Bankruptcy, Rule 7024; 9 Am.Jur.2d, Bankruptcy §§ 115, 232 (1980).

equitable conduct where debtor's principal pledged personal assets as part of a collateral package to secure a loan to the debtor). See also, *In re United Retail Corp.,* 33 B.R. 150, 154 (Bkrtcy.D.Ha.1983) (proponent of marshaling has the burden of proof to establish lack of prejudice to the senior lienholder).

 We agree that marshaling ought not to be applied without careful reflection on the surrounding legal, equitable and factual circumstances of the case, and, in cases where the exceptions to the elements of marshaling are sought to be applied, such exceptions will not be successful unless the moving party has met its burden by producing clear and convincing evidence of not only the basis of the exception but also shows inequitable conduct exhibited by the person(s) or entity whose assets are the subject of marshaling. Such reflection will ensure the stability of legitimate commercial transactions, but subject the illegitimate commercial transactions to the judicial scrutiny they deserve.

## B. *Exceptions to the Marshaling Doctrine*

As a malleable tool of equity, many Courts have forged the "two fund" or "common debtor" element of marshaling into a sword which is then used for the capture of or preservation of assets for the ultimate benefit of the general unsecured creditors of a debtor's estate.

There are various rationales for exceptions to the "two fund" or "common debtor" element of this doctrine.

### (1) *General Equity Principles*

A leading but highly criticized case for this exception to the "common debtor" of marshaling is *Berman v. Green (In re*

*Jack Green's Fashions for Men–Big and Tall, Inc.),* 597 F.2d 130 (8th Cir.1979).

In *Green,* the corporation and its controlling stockholders, with one abstaining, had respectively filed for corporate and individual bankruptcy. Prior to bankruptcy, the individuals had established a partnership and later the partnership and the spouses of individual partners executed a promissory note to a bank. The bank obtained a security interest in all of the inventory, furniture and fixtures then held or thereafter acquired by the partnership. The bank also obtained as additional security a deed of trust on real estate. This deed of trust was executed by the bankruptcy individuals and their spouses. The following year, the partnership and the bankruptcy individuals, along with their spouses, executed a new promissory note for $75,000.00 and the bank again obtained the same security. Several months later, the partnership was succeeded by the corporation. The corporate bankruptcy trustee, pursuant to a court order, realized approximately $28,-000.00 from a liquidation of the corporation's inventory, furniture and fixtures, leaving a balance due to the bank of approximately $65,000.00. Despite the insufficiency of the liquidation proceeds to satisfy the bank's balance due, the bank asserted its security interest in the liquidation proceeds. Thereafter, the trustee filed his complaint to marshal the liens and alleged that the real estate, worth approximately $135,000.00, had more equity than was needed to fully satisfy the bank. The bank and the individuals, along with their spouses, opposed the trustee's motion [36] to require the bank to foreclose on the real estate and to leave the proceeds for distribution to the unsecured creditors.

The Bankruptcy Court in *Green,* disallowed the bank's claim for the $65,000.00

---

**36.** The Circuit Court in *Berman v. Green (In re Jack Green's Fashions for Men–Big and Tall, Inc.),* supra, 597 F.2d at 132 (8th Cir.1979) stated that the record did not reveal whether or not the bank had opposed the trustee's marshaling motion. Id. Seven years after the publication of the Circuit Court's opinion in Green, (and after much criticism by intervening sister Courts and commentators alike), the District Court's opinion was submitted for publication.

*Berman v. Green (In re Jack Green's Fashions for Men–Big and Tall, Inc.),* 65 B.R. 317 (W.D.Mo. 1978). Within the District Court's belatedly published opinion, it is clear that the bank, along with the bankruptcy individuals and their wives, opposed the trustee's marshaling motion before the Bankruptcy Court. Id. 65 B.R. at 319. The bank, however, did not appeal from the Bankruptcy Court's May 26, 1978 Order to the District Court.

and granted leave to the bank to foreclose upon the real estate, and, in the event that the bank suffered a deficiency, provided that the bank could assert any deficiency against the liquidation proceeds. As the District Court noted, the Bankruptcy Court found that:

> [U]nder the facts of this case, it would be grossly unfair to the general creditors not to apply the doctrine of marshalling (sic). They are the ones who sold the inventory on open account to the bankrupt which fell under the bank's lien. (p. 4 Bankruptcy Order of May 26, 1978).

*Berman v. Green (In re Jack Green's Fashions for Men–Big and Tall, Inc.),* 65 B.R. 317, 319 (W.D.Mo.1978) (first parenthetical supplied).

The bankruptcy individuals and their spouses, but not the bank, appealed the Bankruptcy Court's Order to the District Court. On appeal to the District Court, the bankruptcy individuals and their spouses argued that the lower Court did not have jurisdiction because the property was held by the couples as tenants by the entirety and thus it was not an asset of the bankruptcy estate, and, moreover, section 5(h) of the Bankruptcy Act could not be utilized for marshaling. The District Court affirmed the Bankruptcy Court's Order and held that the lower Court had jurisdiction over the bank since the lower Court's Order was directed only to the bank and concerned the manner in which that senior creditor could proceed to satisfy its claim against the bankrupt corporation. After quoting *Meyer,* supra, for its general marshaling rules and the doctrine's equitable policy of preventing the arbitrary actions of a senior lienor, by exhausting the only available assets to those junior or partially secured creditors which would otherwise result in a needless destruction of the lesser creditor's rights, the District Court agreed with the couples that section 5(h) of the Act was not the source of the Bankruptcy Court's power to marshal, rather:

> It is clear that bankruptcy courts as courts of equity have the power to marshal liens of creditors subject to their jurisdiction to insure (sic) that an equitable distribution of assets is achieved.

*Berman v. Green (In re Jack Green's Fashions for Men–Big and Tall, Inc.),* supra, 65 B.R. at 320 (W.D.Mo.1978) (citations omitted).

The Eighth Circuit in *Green* supra, affirmed the District Court's ruling that the Bankruptcy Court possessed general equitable jurisdiction to order the bank to marshal assets, thereby compelling the bank to satisfy its loan from the personal assets of the individuals and their spouses before the bank could foreclose on the bankrupt corporate's collateral:

> Federal courts of bankruptcy are courts of equity and may apply the doctrine of marshaling in proper cases. In this case it would be the highest degree inequitable (sic) to allow the Bank to exhaust the business assets of the corporate bankrupt without first looking to the real estate mortgaged to it. To permit such a course would leave the general creditors of the business with nothing.

*Berman v. Green (In re Jack Green's Fashions for Men–Big and Tall, Inc.),* supra, 597 F.2d at 133 (8th Cir.1979). In *Merrigan v. Small Business Administration (Matter of Clary House, Inc.),* 11 B.R. 462 (Bkrtcy.W.D.Mo.1981), the Court, following the reasoning of the *Green* case and exercising its general equitable powers to order marshaling against a senior secured creditor, directed the secured creditor to first satisfy its claim from available assets of the debtor's guarantor. The *Merrigan* Court specifically found that the guarantor had expressly waived demand, presentment, and guaranteed payment and was, as a matter of law, unconditionally liable as a co-maker.

The Eighth Circuit's opinion in *Green,* supra, has been severely criticized by several Courts and commentators. See, *Federal Land Bank of Columbia v. Tidwell (Matter of McElwaney),* supra, 40 B.R. at 71–72 (Bkrtcy.M.D.Ga.1984) (stating it was unclear whether the marshaling by the trustee in *Green* would result in a harm to the secured creditor); *Peoples Bank of Tuscaloosa v. Computer Room, Inc. (In re Computer Room, Inc.),* 24 B.R. 732, 735 n. 5, 737 (Bkrtcy.N.D.Ala.1982) (dicta, *Green*

Court erroneously permitted a trustee as representative of unsecured creditors to invoke the doctrine); *Stuhley v. United States Small Business Administration (In re United Medical Research, Inc.)*, supra, 12 B.R. at 942–43 (Bkrtcy.C.D.Ca.1981) (the *Green* Court's opinion was not clear as to what separate and independent equity persuaded the *Green* Court to marshal). See also, Lachman, Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine, supra, 6 Cardozo L.R. 671, 679–80 (1985) (questioned soundness of the equitable imperative since the *Green* Court disregarded, without discussion, two of the three requirements for marshaling: 1. although trustee is a secured creditor the doctrine was invoked for the benefit of unsecured creditors; and, 2. the marshaled assets were not the corporate's assets); Labovitz, Marshaling Under the UCC: The State of the Doctrine, 99 Banking L.J. 440, 446 (1982) (expressed concern about the potential effect of the *Green* case on present and future commercial transactions where secured lenders rely primarily upon and grant loans on the corporation's collateral's strength and not on the assets of corporate guarantors).

We need not enter into this legal fray, however, since the *Green's* marshaling exception, (i.e., general equitable principle without an express finding of inequitable conduct), need not be applied to this proceeding *sub judice*.

### (2) *Contributions to Capital*

In *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437 (Bkrtcy.N.D.Fla.1980), a senior creditor lent working capital to a corporation. The corporation's promissory note was guaranteed by its president and principal stockholder, individually, and also by his spouse. This loan was secured by a mortgage on the corporate real estate and real estate of the individuals, the latter consisted of non-homestead acreage and a homestead residence. A second promissory note was executed by the corporation as maker and the individuals as co-makers. At the time of bankruptcy, the bank would not realize the full amount due if it were to have its satisfaction from only the corpora-

tion's assets. The trustee asserted that the total value of the senior creditor's security far exceeded the debt owed to it, and sought a marshaling order to force the bank to first exhaust the value of the individuals' real estate thereby leaving a substantial value balance on the corporate's real estate for the ultimate benefit of the corporation's creditors. The bank countered: marshaling was not appropriate since the general rule for marshaling to be appropriate requires the debtor to be a debtor of both creditors and the funds sought to be marshaled must belong to that common debtor; the individuals were mere guarantors of the corporate obligation without any liability to the corporation's trade creditors; and, as a reciprocal of its first argument, marshaling could not be applied since the funds sought to be marshaled were properties of different debtors.

While the *Farmers'* Court acknowledged the bank's position on marshaling and stated the general rules of guaranty principles that, ordinarily, the property of one who has no legal duty or liability to another cannot be subjected to the demands of that other, it was clear to the Court that the bank never intended to obtain a full realization of its security from the corporation. Moreover, the guarantors' assets provided the bulk of the bank's security. Thus, the individuals assets must be regarded in equity as contributions to capital and the rule that there must be a common debtor with funds being sought which also belonged to that common debtor is satisfied:

Here, the foreseeable and likely result of obtaining such working capital, partly on the strength of the guarantor's personal liability and any property which the guarantor may have specifically pledged to secure such guaranty, is the inducement of others to innocently commence or continue to extend supplies or services to the principal on credit.

Upon failure of the business and in a marshaling context, the balance of equities tips in favor of the creditors of the principal as against the guaranty claimant with respect to any individually owned property that was specifically

pledged to secure the guaranty and obtain working capital.

*Farmers & Merchants Bank v. Gibson,* supra, 7 B.R. at 441 (Bkrtcy.N.D.Fla.1980). Contra, *Committee of Creditors of Ludwig Honold MFG., Co. v. Central Penn National Bank (In re Ludwig Honold MFG Co.),* 33 B.R. 724, 728 (Bkrtcy.E.D.Pa.1983) reconsideration denied 34 B.R. 645 (Bkrtcy. E.D.Pa.1983) ("We believe that if the Pennsylvania Supreme Court were faced with this situation it would hold that the mere guaranteeing of a business debt by a surety is not an adequate basis for deeming the surety's collateral a contribution to the capital of the debtor corporation"). Id. 33 B.R. at 728 (citations omitted).

*Farmers & Merchants Bank v. Gibson,* supra, 7 B.R. 437 (Bkrtcy.N.D.Fla.1980) was appealed by the intervening individual guarantors, James and Mary Peacock (Peacocks). The original order held that certain properties owned by the Peacocks constituted contributions to the capital of Bill Peacock Chevrolet, Inc. (Chevrolet). These properties included the personal residence of the Peacocks. Upon the first appeal, the Honorable District Court Judge Lynn C. Higby, United States District Judge, Northern District of Florida, Tallahassee Division, vacated the Bankruptcy Court's Order and remanded the case to the Bankruptcy Court for further factual findings. The District Court noted two areas required further support for the Bankruptcy Court's unexplained evaluations of the evidence and its conclusions. First, the Bankruptcy Court's common debtor determination rested in part on a finding that the Peacocks were makers of the second note despite Peacocks' and the Bank's testimony that their intent was for the Peacocks to be guarantors rather than co-makers of the second note. Second, the conclusion that the mortgages were contributions to capital based on the guarantees was deficient where the Bankruptcy Court's findings failed to show evidence that: personal control was exerted by the Peacocks over the corporation; the guarantees were treated as a capital contribution; or, the corporation was thinly capitalized. *James W. Peacock, Jr., and Mary P. Peacock v. Gibson,* unpublished *"Order",* Lynn C. Higby, D.J., 81 B.R. 79 (Bkrtcy.N.D.Fla.1981).

Upon remand and further evidence, the Bankruptcy Court noted that new evidence revealed all of the non-exempt property had already been foreclosed by the bank without a surplus and any remaining property was the Peacocks' homestead. The Bankruptcy Court concluded Florida's homestead policy dictated that the Peacocks' homestead was not a proper res subject to marshaling and vacated as moot its prior order directing marshaling:

> Since the only property that remained without there being a surplus was the property which was exempt as homestead it is unnecessary at this juncture to make supplemental specific and additional findings as to the trustee's allegations, the evidence, and the court's prior determinations thereon concerning the actions of the stockholder and directors as to the failure to maintain corporate minutes, resolutions and other records, the kiting of checks and bookkeeping methods to conceal this procedure, the submission of false corporate and personal financial statements to various creditors, the advancements and transfers to another wholly owned and controlled corporation of substantial funds and assets while the subject corporation was in precarious financial circumstances, and the disappearance of the corporate books and records.

*Farmers and Merchants Bank v. Gibson,* unpublished *"Memorandum Opinion Upon Remand,"* Honorable N. Sanders Sauls, B.J., 81 B.R. 81, 82 (Bkrtcy.N.D.Fla. 1984); *Farmers and Merchants Bank v. Gibson,* unpublished *"Order Vacating Prior Orders"* Honorable N. Sanders Sauls, B.J., 81 B.R. 83 (Bkrtcy.N.D.Fla.1984).

The trustee appealed the Bankruptcy Court's "Memorandum Opinion Upon Remand" to the District Court with four arguments:

(1) that the Bankruptcy Court erred in failing to apply the law of the case; (2) that the trustee has proven that the Peacocks controlled Chevrolet and that there was inequitable conduct which compelled marshaling; (3) that the Bankruptcy Court's

finding that the marshaling issue was moot was clearly erroneous; and, (4) that the homestead was contributed to the capital of Chevrolet and the trustee is thus entitled to marshaling.

After noting its earlier opinion had not rejected the theory that contributions to capital may support marshaling, if it is supported by adequate evidence, the District Court rejected the trustee's law of the case argument since the Bankruptcy Court had made further equitable and legal determinations relating to marshaling and the new homestead exemption issue. The District Court then affirmed the Bankruptcy Court's mootness ruling, (*Farmers and Merchants Bank v. Gibson,* unpublished *"Memorandum Opinion Upon Remand,"* supra, Honorable N. Sanders Sauls, B.J., 81 B.R. 81, 82 (Bkrtcy.N.D.Fla.1984)), because the exempt homestead property was not available for marshaling and all other personal properties would still not satisfy the debt owed to the bank:

> The bankruptcy court below faced two very difficult decisions which were clearly within its discretion based upon the various equities involved: (1) whether to treat the Peacocks' mortgage personal property as contributions to capital of Chevrolet, and thereby enable them to be marshaled; and, (2) if so, whether to allow the exempt homestead property to be subject to marshaling.
>
> The bankruptcy court chose to tackle the latter issue first and found that the homestead should not be subject to marshaling. This finding renders the answer to the former question moot because without the homestead property there would be no benefit to marshaling.

*Gibson v. Farmers and Merchants Bank and James and Mary Peacock,* unpublished *Decision and Judgment,* William Stafford, C.J., 81 B.R. 84, 87 (Bkrtcy.N.D. Fla.1986). Chief Judge Stafford's Opinion implicitly affirms the marshaling holding of the Bankruptcy Court, but does not find it necessary to decide because of the mootness issue arising from the homestead exemption.

In *Matter of Multiple Services Industries, Inc.,* 18 B.R. 635 (Bkrtcy.E.D.Wis. 1982) a corporate debtor's officer and shareholder had guaranteed a corporate bank loan for working capital which was secured by life insurance policies with cash surrender values, a certificate of deposit and a second mortgage on his residence. In response to the trustee's marshaling request, the bank did not object to marshaling of the insurance policies or the certificate of deposit. It did object to the marshaling of the second mortgage since that required a foreclosure action with a potential for delay, additional expenses, and a risk of only partial satisfaction after the first mortgagee was paid, and otherwise generally prejudicing the bank. Additionally, the bank argued that neither it nor the guarantors had contemplated the potential results of marshaling at the time of the guaranty.

The *Multiple Services* Court, mindful of the criticism by *Stuhley,* supra, 12 B.R. at 943, of *Farmers',* supra, lack of a finding of inequitable conduct, concluded, as had the Green's and *Farmers'* Courts, that considerations of equity permitted it to consider pledges of shareholder property as a contribution to capital based upon the Wisconsin Supreme Court case of *Moser Paper Company v. North Shore Publishing Company,* 83 Wis.2d 852, 863–64, 266 N.W. 2d 411, 417–18 (1978):

> In keeping with that observation (common debtor requirement may be waived where there are additional equitable considerations) the Wisconsin Supreme Court (*Moser,* supra) found that the officers and principal shareholders of North Shore Publishing Company made a capital contribution when they guaranteed the corporation's debt and granted mortgages on their residences in order to get working capital for the business. Relying heavily on the fact that the mortgages directly secured North Shore's debt, the (*Moser*) court stated:
>
> We hold that under these circumstances the mortgages created a fund which equity will consider a fund of North Shore itself. Under these circumstances, the marshaling of assets is appropriate.

*Matter of Multiple Services Industries, Inc.,* supra, 18 B.R. at 636 (Bkrtcy.E.D.Wis 1982) citing *Moser Paper Company v. North Shore Publishing Company,* 83 Wis.2d 852, 863–64, 266 N.W.2d 411, 417–18 (1978) (parentheticals supplied for clarity).

 We agree that the contributions to capital exception to marshaling ought not to be applied unless there also exists sufficient inequitable conduct to warrant its application.

### (3) Inequitable Conduct

In *Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. 772, 13 B.C.D. 792 (Bkrtcy.S.D.N.Y.1985),[37] the bankruptcy trustee sought a marshaling order requiring a senior secured creditor to first exhaust the assets of shareholders/guarantors of the corporate debtor's debt to that creditor. The *Tampa* Court began its "common debtor" analysis by noting the general rule:

> Marshaling has traditionally required that both sources of payment belong to a common debtor. Ordinarily, this requirement is not met where the two funds sought to be marshaled are held separately by a corporation and its shareholder even though he guaranteed corporate debt.

*Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 778, 13 B.C.D. at 794 (Bkrtcy.S.D.N.Y.1985) (citation omitted). The *Tampa* Court distinguished *Green,* supra, and *Multiple Services,* supra, since:

> We need not reach that issue in this case, where the senior creditor looked to the collateral for the guaranty of the loan for protection and where the evidence amply demonstrates highly inequitable conduct by the shareholders/guarantors.

*Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 779, 13 B.C.D. at 795 (Bkrtcy.S.D.N.Y.1985).

The *Tampa* Court further stated:

> Finding a common debtor ... has the effect of first liquidating the collateral

posted by the corporate principals and requiring them to share equally with or be subordinated to other creditors upon subrogation. Equitable subordination, as a companion doctrine of the disregard of the corporate veil, lies where the principal(s) engaged in fraud or other inequitable conduct to the harm of creditors or an unfair advantage to the claimant and is not contrary to principles of bankruptcy law.

*Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 779, 13 B.C.D. at 795 (Bkrtcy.S.D.N.Y.1985) (citations omitted).

The inequitable conduct of the guarantor in *Tampa,* supra, compelled the Court to find that marshaling's "common debtor" requirement had been met by the trustee. This inequitable conduct consisted of using the corporate debtor as a "personal piggy bank," although corporate formalities and records were followed and kept, by withdrawals of the corporate debtor's capitalization and its replenishment from the guarantor's personal funds and the transfer of debtor's inventory to another family-owned company "on hardly commercial terms." *Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 779, 13 B.C.D. at 796 (Bkrtcy.S.D.N.Y.1985).

In addition to the inequitable conduct, certain "badges of fraud" bolstered the *Tampa* Court's marshaling order: lack of adequate consideration; close family relationships between the parties; retention of possession, benefit or use of the property in question; and, the financial condition of the party sought to be charged before and after the transaction in question. *Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 779–80, 13 B.C.D. at 796 (Bkrtcy.S.D.N.Y.1985). See, *Stuhley v. United States Small Business Administration (In re United Medical Research, Inc.),* 12 B.R. 941, 943 (Bkrtcy.C.D.Cal.1981) (it is improper to require a secured creditor to marshal assets of an individual guarantor unless the guar-

---

**37.** For the facts of *Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* 53 B.R. 772, 13 B.C.D. 792 (Bkrtcy.S.D.N.Y.1985), see Pages 293–94, supra.

antor was guilty of fraud, overreaching, or other inequitable conduct sufficient to deem the guarantor's assets those of the corporations).

Thus, *Tampa* stands for the proposition that the exception to marshaling's "common debtor" requirement will be met where the circumstances expose the senior creditor's reliance on the strength of the guarantor's collateral, not the principal debtor, and where there are sufficient facts to show the guarantor's inequitable or fraudulent conduct.

### (4) *Piercing the Corporate Veil*

Perhaps the most widely recognized exception to marshaling's "common debtor" element is the concept that:

> [W]here the corporate veil should be pierced upon the application of traditional doctrine, equity will subject the property of individual shareholders to the claims of corporate creditors thereby satisfying the 'common debtor' requirement for marshaling. Pursuant to that doctrine, the corporate veil will be disregarded in fraud, inadequate capitalization and alter ego cases.

*Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 778, 13 B.C.D. at 795 (Bkrtcy.S.D.N.Y.1985) (citations and footnote omitted).

While Courts have generally recognized that piercing the corporate veil is a separate and independent ground of equity that enables a party to summon marshaling and meet its "common debtor" element, most Courts decline to apply this exception because of lack of proper allegation or evidence. See e.g., *Matter of Dealer Support Services Intern., Inc.,* supra, 73 B.R. at 765, 15 B.C.D. at 1275 (Bkrtcy.E.D.Mich. 1987) (recognized the alter ego exception that property of the debtor's guarantor shareholders may be considered property of the corporate debtor for marshaling's "common debtor" purposes; however, no allegation was made to establish this exception); *Coors of North Mississippi, Inc. v. Bank of Longview (In re Coors of North Mississippi, Inc.),* 66 B.R. 845, 867 (Bkrtcy. N.D.Miss.1986) (recognized this exception to the common debtor element of marshal-

ing; however, evidence was insufficient to establish the traditional test for self-dealing or alter ego); *Loeb v. Franchise Distributors, Inc. (Matter of Franchise Systems, Inc.),* 46 B.R. 158, 163 (Bkrtcy.N.D. Ga.1985) (recognized the piercing the corporate veil exception to the common debtor requirement of marshaling; however, trustee failed to assert facts amounting to inequitable conduct to warrant piercing); *In re Rich Supply House, Inc.,* 43 B.R. 68, 70 (Bkrtcy.N.D.Ill.1984) ("Facts sufficient to sustain a piercing of the corporate veil may establish independent and separate equities which may overcome a deficiency in the common debtor requirement." id., citations omitted; however, the stipulated facts did not state a basis to pierce the corporate veil); *DuPage Lumber & Home Imp. v. Georgia–Pacific Corp. (In re DuPage Lumber and Home Improvement Center Co., Inc.),* 34 B.R. 737, 741 (N.D.Ill. 1983) (recognized the piercing the corporate veil exception to common debtor element of marshaling; however, party did not invoke this exception for marshaling purposes); *Whirlpool Corp. v. Plad, Inc. (In re Plad, Inc.),* supra, 24 B.R. at 679 (Bkrtcy.M.D. Tenn.1982) (trustee failed to sustain his burden of proof for this exception); *McDonald v. First National Bank of Athens (Matter of Harrold's Hatchery and Poultry Farms, Inc.),* 17 B.R. 712, 717 (Bkrtcy. M.D.Ga.1982) (same). See also, *Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 778, n. 5, 13 B.C.D. at 795, n. 5 (Bkrtcy.S.D.N.Y.1985) (citing cases where marshaling was denied although those Courts recognized the general availability of the marshaling remedy in a piercing the corporate veil context; however, did not apply this exception and relied on an alternative ground, discussed supra, for its holding that marshaling was appropriate); *Committee of Creditors of Ludwig Honold MFG Co. v. Central Penn National Bank (In re Ludwig Honold MFG., Co.),* supra, 33 B.R. at 728 (Bkrtcy. E.D.Pa.1983) reconsideration denied 34 B.R. 645 (Bkrtcy.E.D.Pa.1983) (although there were no Pennsylvania appellate cases which addressed the issue of a request for marshaling between a surety and corporate

debtor on grounds of inequitable conduct, disregard of corporate entity, or fraud, Bankruptcy Court believed Pennsylvania would adopt such exceptions and, accordingly, denied senior creditor's motion to dismiss trustee's marshaling complaint); *Farmers & Merchants Bank v. Gibson*, supra, 7 B.R. at 440 (Bkrtcy.N.D.Fla.1980) ("If the veil is pierced in equity, his (corporate president and principal shareholder) right or equity of limited liability, at that point, may be deemed to be of inferior rank to the equitable right of the corporation's creditors that his personal assets be marshaled.") Id., (parenthetical supplied for clarity); however, the Court expressly held it would not pierce the corporate veil, rather it considered the shareholder's guarantee as a contribution to the corporation's capital. (Id. at 441–42).

This Court subscribes to the view that marshaling's "common debtor" element is met where there are sufficient facts to establish inequitable conduct that warrants piercing of the corporate's veil to reach and join the alter ego's assets with those of the senior secured creditor. Moreover, we recognize that a breach of fiduciary duty is likewise an appropriate means to accomplish a disregard of marshaling's "common debtor" element.

### C. *Prejudice*

Ordinarily, marshaling, as an equitable remedy with natural justice at its keystone, will not be applied if its application results in substantial injustice, undue delay or demonstrable injury to a party in interest. 53 Am.Jur.2d, Marshaling Assets, § 13 (Necessity of absence of prejudice to senior creditor or other person) (1970); 55 C.J.S. Marshaling of Assets and Securities, § 4 (Equities of Paramount Creditor) (1948).

> It deals with the rights of all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties.

*Meyer v. United States*, supra, 375 U.S. at 237, 84 S.Ct. at 321, 11 L.Ed.2d at 297 (1963) (marshaling denied where it would prejudice a debtor's State exemption right).

See, *Matter of Beacon Distributors, Inc.*, 441 F.2d 547, 548 (1st Cir.1971) citing *Victor Gruen Associates, Inc. v. Glass*, 338 F.2d 826, 829 (9th Cir.1964) (imposition of marshaling must avoid substantial injustice to third persons); *Westinghouse Credit Corp. v. Central Trust Co. Rochester, N.Y. (In re Leonardo)*, 11 B.R. 453, 455 (Bkrtcy.W.D.N.Y.1981) (denied marshaling of debtor's homestead and life insurance assets where a senior creditor would be prejudice by delay and expenses in foreclosing upon these exempt assets). See also, *Peoples Bank of Tuscaloosa v. Computer Room, Inc. (In re Computer Room, Inc.)*, supra, 24 B.R. 732, 736 n. 7 (Bkrtcy. N.D.Ala.1982) (Court allowed marshaling; however, in dicta the Court cited *Victor Gruen Associates, Inc. v. Glass*, 338 F.2d 826, 829 (9th Cir.1964) for the proposition that marshaling will not be invoked where senior creditor will be prejudiced or has a mere "increased risk of loss").

In *Matter of Multiple Services Industries, Inc.*, supra, 18 B.R. at 637 (Bkrtcy.E. D.Wis.1982), The Court required marshaling despite the alleged fact that the senior creditor had protested of additional delay and expenses which might occur if it had to foreclose the encumbered assets.

The *Multiple Services'* Court cited *United States v. LeMay*, 346 F.Supp. 328, 330 (E.D.Wis.1972), and discarded the bank's potential prejudice argument for lack of substantiating evidence that there would be any unreasonable foreclosure difficulties or deficiency or unanticipated delay, the latter being other than that delay which a secured party, in the exercise of its foreclosure option, would normally contemplate at the time the loan was made.

As noted by the Wisconsin Supreme Court, an otherwise proper application of marshaling will not be denied simply because there may be mere delay:

> But a further well-established equitable rule is invoked by the defendant (senior creditor against whom marshaling was sought) and that is that (sic) equity will not marshal assets in the manner desired here, to the injury of the prior creditor. We are unable to see what substantial

injury will be inflicted upon the defendant by requiring him first to exhaust his mortgage security, at least upon lands within the state. It is true, there must result some delay, in case foreclosure is necessary, but there will be no diminishing of security, because the fund realized from the sale of the stock of goods should and must be kept intact pending the defendant's attempt to realize upon his mortgages. During this time, no part of his security will be taken from him. It is true that delay to the prior creditor has been sometimes spoken of as a bar to the relief here asked, but we are not ready to subscribe to the doctrine that mere delay is sufficient to compel the court to deny the relief when no other injury is involved. Some delay is a necessary consequence of the enforcement of all rights, and, if a possible delay would defeat the right of a junior creditor to have the assets of his debtor marshaled, such marshaling would rarely, if ever, take place.

*C. Gotizian & Co. v. Shakman*, 89 Wis. 52, 59, 61 N.W. 304, 306 (1894) (citations omitted) (parenthetical supplied for clarity).

In *Matter of Dealer Support Services Intern., Inc.*, supra, 73 B.R. at 766, 15 B.C.D. at 1276 (Bkrtcy.E.D.Mich.1987) the Court noted that in the absence of marshaling the senior creditor's debt could be satisfied out funds held by the trustee and assumed, without supporting evidence of the parties' contemplation at the time of the loan, that if marshaling were ordered and the guarantor refused to pay the note, the senior creditor would suffer prejudice from delay and expenses incurred in a foreclosure proceeding against the guarantor. Additionally, the *Dealer Support* Court also assumed that the guarantor's creditors would be prejudiced from a concomitant reduction of the guarantor's principal asset. Finally, the *Dealer Support* Court denied marshaling because of a lack of evidence of inequitable conduct exhibited by the guarantors which would justify subordinating the guarantor's subrogated claim under 11 U.S.C. § 510(c). *Matter of Dealer Support Services Intern., Inc.*, su-

pra, 73 B.R. at 766, 15 B.C.D. at 1276 (Bkrtcy.E.D.Mich.1987).

In *Armstrong v. First National Bank, Minot, North Dakota (In re Clothes, Inc.)*, 40 B.R. 997, 1001 (D.N.D.1984), the Court denied marshaling as an exercise of futility in the context where a trustee has requested that the senior creditor first proceed against the principals of the debtor on their personal guarantees, since the guarantors, upon payment of the corporate debtor's debt to the senior creditor, would step into the shoes of the senior creditor. In *Pittsburgh National Bank v. Lomb (In re Lomb)*, supra, 74 B.R. at 711 (Bkrtcy.W.D. Pa.1987), the Court assumed, as had the *Dealer Support* Court, the trustee had standing to marshal, but held there were no facts to establish guarantor's inequitable conduct for equitable subordination under 11 U.S.C. § 510(c) and denied marshaling since it would have left the unsecured creditors in the same position they would have been in the absence of an application of marshaling.

In *Burchett v. Central Trust Co., N.A. (Matter of Willson Dairy Co.)*, 30 B.R. 67, 71 (Bkrtcy.S.D.Ohio 1983), the Court assumed that to require marshaling of a surety's property would not only result in prejudice to the surety, but would also have a potential prejudicial effect upon the surety's other creditors. The *Burchett* Court also held that the surety had a right to subrogation to the position of the senior lienholder and applied this rationale to a guarantor situation.

 Although we agree with the *Dealer Support* Court's requirement of evidence of inequitable conduct (for 11 U.S.C. § 510(c) purposes) we take issue with its assumptions that mere delay or expense will ipso facto result in a denial of an otherwise proper request for marshaling. A per se delay or expense rule must be rejected. Especially where, as here, the initial and continued contemplation of the parties was that the guarantor's assets were to be the principal source of the senior creditor's satisfaction in the event of the debtor's default.

The *Tampa* Court likewise rejected the theory that mere delay is sufficient to defeat an otherwise proper application of marshaling and refused to speculate on the presence of prejudice:

> It has since come to be recognized by some courts that marshaling can, nevertheless, be ordered where there is no evidence of difficulties in foreclosing that were unanticipated by the senior creditor at the time the loan was made and which now prejudice its interest or unduly delay satisfaction of its claim.

*Balaber–Strauss v. Reichard (In re Tampa Chain Co., Inc.),* supra, 53 B.R. at 780 (Bkrtcy.S.D.N.Y.1985) (citations omitted).

■ We do not mean to suggest that the senior secured creditor or other interested party must bear the burden of proving that there is prejudice to defeat a marshaling applicant. Rather, the burden of proof for exceptions to marshaling's "common debtor" element is upon the marshaling applicant to prove by clear and convincing evidence that there will be no undue prejudice to the relevant parties in interest. *In re United Retail Corp.,* supra, 33 B.R. at 154 (Bkrtcy.D.Ha.1983). In *Whirlpool Corp. v. Plad, Inc. (In re Plad, Inc.),* supra, 24 B.R. at 680 (Bkrtcy.M.D.Tenn.1982), the Court denied marshaling where, inter alia, the trustee failed to produce any evidence of value or other possible encumbrances of the pledged assets of guarantor and without such evidence the Court had no knowledge of, if marshaling were to be ordered, whether the senior creditor would either realize satisfaction of its claim or would "incur additional expenses and delay in foreclosing on property which might very well be worthless." Id.

■ Once the marshaling applicant has produced evidence of the absence of prejudice and has met its burden by clear and convincing evidence, then the burden of going forward shifts to the opposing party to present rebuttal evidence establishing its prejudice. Of course, if the objecting party is also the party that committed fraud or engaged in inequitable conduct, such as being the alter ego of a pierced corporate debtor, then the degree of initial proof of non-prejudice required by a marshaling applicant need not be as great for that party.

## IV. Law and Equity As Applied to the Facts

■ We hold the Trustee is entitled to marshal since he has satisfied the clear and convincing standard of establishing marshaling, its common debtor exceptions of alter ego and inequitable conduct, and Chittenden's lack of prejudice.

### A. The Funds
(1) *Debtor's Machinery, Equipment, Inventory and Accounts Receivable*

On the one hand, Chittenden claims it is the owner of Debtor's machinery, equipment, inventory and accounts receivable as the result of the pre-petition execution of its "Repossession Acknowledgement" with the Debtor. On the other hand, Chittenden also declares that Debtor is the titled owner of the machinery and equipment in Chittenden's "Equipment lease Agreement" with Vermont Wood.[38]

Despite our reservations about Chittenden's conduct, infra, we assume, arguendo, for purposes of determining the existence of more than one fund subject to marshaling that Chittenden, in the absence of marshaling and Debtor's bankruptcy, would otherwise be entitled to the post-petition proceeds of Debtor's pre-petition repossessed machinery, equipment, inventory and accounts receivable.

---

**38.** See, findings 54, 60 and 61. Additionally, Chittenden's brief acknowledges Debtor's reservation of Debtor's interests in the repossessed collateral despite the "Repossession Acknowledgement:

> To the extent the Court finds the repossessed collateral is an asset of the bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1) because the Debtor reserved title to the equipment in the equipment lease admitted as Exhibit N, the repossessed equipment becomes an asset of the estate subject to the Debtor's waiver of its right of redemption as well as subject to the Chittenden and VIDA lease with option to Vermont Wood Industries, Inc.

Chittenden's "Request for findings of Fact and Conclusions of Law," page 26.

### (2) *Hypothecated Securities*

Hypothecation is a contractual right of a creditor to cause the hypothecated subject matter, in the debtor's or another's possession, to be sold and the proceeds applied to its claim.

Black's Law Dictionary defines "Hypothecate" as:

> To pledge property as security or collateral for a debt. Generally, there is no physical transfer of the pledged property to the lender; nor is the lender given title to the property; though he has the right to sell the pledged property upon default.

Black's Law Dictionary, *Hypothecate*, page 669 (5th ed. 1979) (citation omitted).

Hypothecation is:

> A term borrowed from the civil law, and, in so far as it is naturalized in English and American law, it means a contract of mortgage or pledge in which the subject matter is not delivered into the possession of the pledgee or pawnee; or, conversely, a right which a creditor has over a thing belonging to another, and which consists in a power to cause it to be sold in order to be paid as (sic) claim out of the proceeds.

42 C.J.S. Hypothecation, page 370 (1944) (footnotes omitted).

The lack of a creditor's actual possession of the pignus (a thing delivered to a creditor as security for a debt) distinguishes a hypothecation from a pledge or a pawn:

> 'Hypothecation' is distinguishable from 'pledge' or 'pawn' in respect of possession; in the case of a pledge the thing pledged passes into the possession of the pledgee, whereas in the case of hypothecation it remains in the possession of the owner.

72 C.J.S. Pledges, § 4, page 7 (1987) (footnote omitted).

David Winer and his spouse (Winers) executed the "Hypothecation Agreement" with the specific intention of complying with Chittenden's request that the Winers authorize the Debtor to pledge the securities as additional collateral for Debtor's loans. After the "Hypothecation Agreement" was executed and Chittenden was satisfied that the Debtor had the authority to pledge the Winers' securities, Chittenden accepted the hypothecated securities as Debtor's pledged collateral for its loans. The pledged hypothecated securities have a value of $125,000.00.

In the absence of marshaling and David Winer's inequitable conduct, Chittenden would be entitled to relief from stay to liquidate the hypothecated securities in satisfaction of Debtor's debt upon Debtor's prepetition default. See, *Nutting v. Bradford National Bank (In re Nutting)*, 44 B.R. 233, 236 (Bkrtcy.D.Vt.1984) (Court sustained bank's liquidation of debtors' hypothecated certificates of deposit upon debtors' prepetition default); *In re Tallant*, 72 B.R. 302 (Bkrtcy.M.D.Ala.1987) (dragnet clause in hypothecation agreement between debtor and his father, as borrowers, and their creditor, who continued to make future advances to the debtor; held bank was entitled to debtor's interest in the continued hypothecated property); *In re Ward*, 69 B.R. 36, 38 (Bkrtcy.E.D.Mo.1986) (debtor executed a hypothecation agreement with the bank which pledged her and her spouse's jointly owned stock as additional collateral for the bank's loan to debtor's and her spouse's corporation; debtor and her spouse also guaranteed their corporation's debt; Court rejected debtor's and trustee's argument that the hypothecation agreement had not expressly pledged the stock and held bank was entitled to relief from stay to liquidate the hypothecated stock).

### (3) *Guarantees*

A guaranty is an:

> [E]nforceable undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another, and which binds the obligor to performance in the event of nonperformance by such other, the latter being bound to perform primarily.

38 Am.Jur.2d, Guaranty, § 2, page 997 (1968) (footnotes omitted). Accord, *Merrimack Sheet Metal, Inc. v. Liv-Mar, Inc.,* 147 Vt. 85, 511 A.2d 992 (1986).

■ The language of David Winer's guaranty[39] is of an absolute nature and is a "guaranty of payment."

A guaranty of the payment of a debt is distinguished by the authorities from a guaranty of the collection thereof, the former being absolute and the latter conditional. The guaranty of payment binds the guarantor to pay the debt at maturity in the event the money has not been paid by the principal debtor; and upon default by the debtor, the obligation of the guarantor becomes fixed. The guaranty of collection is construed as a promise on the part of the guarantor that if the principal creditor cannot collect the claim with due diligence, generally following suit against the principal debtor, the guarantor will pay the creditor.

38 Am.Jur.2d, Guaranty, § 22, pages 1021–1022 (1968) (footnotes omitted). No "active means" are required by Chittenden to obtain payment upon Debtor's default, nor is any notice of non-payment required to be given to the guarantors for Chittenden to perfect its cause of action against David Winer. *Sylvester v. Downer,* 18 Vt. 32, 35 (1843); *Smith v. Ide,* supra, 3 Vt. 290, 301 (1830); 38 Am.Jur.2d, Guaranty, § 110, pages 1116–1117 (1968) (footnotes omitted).

In the absence of marshaling and David Winer's inequitable conduct, Chittenden would be entitled to relief from stay to liquidate the guarantees in satisfaction of Debtor's debt upon Debtor's prepetition default.

**B. *Debtor's Sole Shareholder's Inequitable Conduct, Breach of Fiduciary Duty, Alter Ego and Piercing the Corporate Veil*[40]**

**(1) *Insider Preference***

■ The purpose of insider preference law is to deny persons in a position to exert influence over a financially distressed debtor an undue benefit derived from the abuse of debtor's assets which would otherwise result in a detriment to debtor's unsecured creditors.

11 U.S.C. § 547(b), *Preferences,* provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

---

**39.** It is clear that David Winer maintained the Debtor for the benefit of providing for his son, Gordon Winer's, livelihood. No evidence was introduced as to the financial ability of Gordon Winer to fullfil his guaranty either at its inception or upon Debtor's default. Because of Gordon Winer's and Debtor's financial dependence upon David Winer, we doubt that Chittenden truly intended to look to Gordon Winer's pro forma guaranty for its protection upon Debtor's default. Accordingly, our guaranty discussion, while equally applicable to both guarantors, centers around David Winer.

**40.** See, supra, our discussion of the law on breach of fiduciary duty, alter ego and piercing the corporate veil. The facts of this case presents a mix of factors which Courts have regarded as justifying the disregard of the corporate entity in furtherance of fundamental fairness. We do not pretend to exhaust all of these factors in our discussion, rather we provide examples from our findings of fact of David Winer's inequitable conduct which entitles the Trustee to marshal and subordinate David Winer's subrogated guarantor relationship.

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

■■■ David Winer made several "shareholder loans" to the Debtor. David Winer acquired most of his funds from the loans he or he and his spouse, (Winers), had with the Chittenden. Chittenden and the Winers agreed that the Winers' loan proceeds were to be used for Debtor's operations. Chittenden intended to avoid the risks which might have otherwise resulted if it had directly made these loans with the financially distressed and collateral deficient Debtor. Indeed, after the initial loans from Chittenden to Debtor, Chittenden refused to make any further loans with the Debtor. David Winer's financial contributions to the Debtor made him a creditor. 11 U.S.C. § 547(b)(1).

Within one year of the filing of Debtor's petition, Debtor paid David Winer between $15,000.00 and $20,000.00 toward its repayment of the Winers' loans. The payments were for antecedent debts owed by the Debtor. 11 U.S.C. § 547(b)(2).

David Winer's loans to the Debtor are unsecured and David Winer acknowledged the Winers' unsecured status by conceding that Debtor's schedule correctly listed the Winers' debt as unsecured. David Winer tried to become a secured party by causing the Debtor to execute demand notes and security agreements for its antecedent debts to the Winers. David Winer had actual, let alone presumed, knowledge of Debtor's insolvency. 11 U.S.C. § 547(b)(3).

As Debtor's sole shareholder, director, vice-president, creditor, and guarantor of Debtor's debts to Chittenden, David Winer is a corporate "insider." 11 U.S.C. § 547(b)(4)(B) & § 101(30)(B).[41]

This is a "no-asset" Chapter 7 case in the absence of a dividend created by marshaling for Debtor's unsecured creditors. Debtor's pre-petition loan payments to the Winers, unsecured creditors, were more than the Winers would have received upon liquidation of Debtor's Estate. 11 U.S.C. § 547(b)(5).

Thus, Debtor's payments to the Winers constitute preferential transfers within the meaning of 11 U.S.C. § 547, and the Trustee would be entitled to recover this transfer for the benefit of Debtor's Estate. 11 U.S.C. § 550(a).

We hold David Winer's acceptance of the insolvent Debtor's preferential payments, both before and after his reckless attempt to become Debtor's secured creditor, represents not only poor judgment but also his bad faith in depriving Debtor of its badly needed operating capital.[42] Moreover, the fact that David Winer lent Debtor approxi-

**41.** 11 U.S.C. § 101(30) defines "insider," and, in relevant parts to this proceeding, a corporate debtor's insider includes one or more of the following:

(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor; ...
(vi) relative of a ... director, officer, or person in control of the debtor; ...
11 U.S.C. § 101(30)(B).

**42.** We need not reach the issue as to whether David Winer or Chittenden are insider(s) or non-insider creditor(s)/transferee(s), 11 U.S.C. §§ 547(b)(1) and 550((a)(1), because of either their respective domination of the Debtor's financial affairs or Debtor's insider guarantors' benefit from Debtor's payments to Chittenden. See e.g., *Mixon v. Mid–Continent Systems, Inc., (In re Big Three Transportation, Inc.)*, 41 B.R. 16, 11 C.B.C.2d 142 (Bkrtcy.W.D.Ark.1983) (non-insider lender liable to the trustee for payments made by the debtor between ninety days and one year of the bankruptcy petition on an insid-

er-guaranteed debt where such payments reduced insider/guarantor's contingent liability to creditors and constituted preferential transfers); Pitts, Insider Guaranties And The Law Of Preferences, 55 Bkrtcy.L.J. 343 (1981); Norton Bankruptcy Law Adviser, Insider Guarantees and Preference Liability–Round Three, Article 4, Professor Boshkoff (1986–10). But see, *Ray v. City Bank & Trust Co. (In re C–L Cartage Co., Inc.)*, 70 B.R. 928, 933–34 (Bkrtcy.E.D.Tenn. 1987) (rejects literal reading of § 550(a)(1)); *In re Aerco Metals, Inc.*, 60 B.R. 77 (Bkrtcy.N.D. Tex.1985) (dicta, even if transfer was preferential to insider/guarantor, transfer could only be recovered from insider and not from the bank); V. Countryman, The Trustee's Recovery in Preference Actions, 3 Bkrtcy.D.J. 449, 464 (1986); 4 Collier on Bankruptcy, § 550.02, at 550–8 (15th Ed. 1985). Our concern here is simply to provide examples of an insider/guarantor's inequitable conduct which entitles the Trustee to its marshaling request.

mately $466,000.00 during its insolvent life will not render such preferential transfers de minimis. No such defense is permitted by the Bankruptcy Code.

### (2) Settlement Agreement

■ David Winer, in his capacity as Debtor's sole shareholder, director, officer, landlord and unsecured creditor, caused Debtor to execute a "Settlement Agreement." David Winer had actual knowledge of Debtor's insolvency at the time of the "Settlement Agreement's" execution. Prior to the "Settlement Agreement's" execution, David Winer never intended that Debtor make any payments on its rent or the Winers' loans.

This "Settlement Agreement" provides David Winer with noncontemporaneous demand notes, security agreements, financing statements and an UCC-1 for Debtor's $48,000.00 unpaid past and future rent and his $132,580.00 consolidated personal loans to the Debtor.

No corporate formalities were observed by the Debtor's directors either prior to David Winer's personal loans to the Debtor, or Debtor's execution of its "Settlement Agreement." Furthermore, David Winer, an "interested party," never removed himself from discussions he may have had with his spouse or son, fellow directors, concerning this subject.

David Winer not only violated Vermont's statutory law, but he also breached his common law fiduciary duty of undivided loyalty to the insolvent Debtor (see, 11 Vt.Stat.Ann. § 1888) since it was his own and not the Debtor's interests which motivated him to force the Debtor to execute the "Settlement Agreement."

David Winer concedes that he is Debtor's true alter ego since his reason why he never made a demand for payment of Debtor's rent or loans in the first place was "I would be asking it of myself."

### (3) Toy Patent

Without any corporate formality or independent appraisal, David Winer used his capacities as Debtor's sole shareholder, director and officer to strip Debtor of its ownership in a wood toy patent and trans-ferred it to himself. There was no evidence of David Winer's good faith for his total disregard of Debtor's corporate formalities in this regard or for Debtor's lack of independent advice on the propriety of Debtor's transfer of its wood toy patent to its sole shareholder director.

Moreover, there was no evidence that the $25,000.00 payment by David Winer to the Debtor was the wood toy patent's fair market value. Even if we were to assume, arguendo, that David Winer's $25,000.00 payment was the patent's fair value or that there was no monetary injury to the Debtor by this transfer, David Winer's participation in causing the Debtor to part with its wood toy patent and the dominating presence of David Winer's personal interest demonstrates his total disregard of the corporate formalities and his treatment of the Debtor as his personal pocketbook and alter ego. Such transfers between shareholders and their corporations are not at arms-length. Compare, *Lash v. Lash Furniture Co. of Barre, Inc.*, supra, 130 Vt. at 521–22, 296 A.2d 207 (1972); *Creed v. Copps*, supra, 103 Vt. 164, 168, 152 A. 369 (1930); *Hooker, Corser & Mitchell Co. v. Hooker*, supra, 88 Vt. 335, 353–54, 92 A. 443 (1914).

### (4) Attempted Releases of Insider Guarantees and Debtor's Pledged Hypothecated Securities

Besides the lack of corporate formalities, David Winer maintained complete ownership and control of the Debtor for personal purposes.

The Trustee established beyond peradventure that Chittenden looked to David Winer's guaranty and Debtor's pledged hypothecated securities for its primary source of protection upon Debtor's default. David Winer's $148,562.00 guaranty was made at the same time as the Debtor's (principal's) loan contracts with the Chittenden, and, along with Debtor's pledged hypothecated securities, was "an essential ground of the credit given to the principal or direct debtor." *Smith v. Ide*, 3 Vt. 290, 297 (1830). But for the financial strength of David Winer's guaranty and Debtor's pledged hy-

pothecated securities, Debtor would not have acquired its loans from Chittenden.

Chittenden may have had a deficiency in the event of a foreclosure and a "garage sale" of Debtor's machinery, equipment, inventory and accounts receivable. In that event, Chittenden would look to the guarantees and Debtor's pledged hypothecated securities for its satisfaction—a situation no different from that which we now place it in.

David Winer sought to release both his $148,562.00 personal guaranty of Debtor's corporate indebtedness to Chittenden, and Debtor's pledged hypothecated securities. To activate this scheme, David Winer created Vermont Wood and caused Debtor to execute both the "Repossession Acknowledgement" with Chittenden and "Consent to Lease of Equipment." Next, Vermont Wood was to either lease or exercise its option to purchase Debtor's machinery and equipment for an amount calculated to discharge Debtor's debts to Chittenden through: an "Equipment Lease Agreement" between Chittenden and Vermont Wood whereby Chittenden would lease Debtor's machinery and equipment to Vermont Wood for a monthly rental in an amount equal to Debtor's loan schedules to Chittenden ("assumption"); or, in the alternative, Vermont Wood's option to purchase Debtor's machinery, equipment, inventory and accounts receivable from Chittenden for an amount calculated to immediately discharge Debtor's notes ("discharge"). Factually Vermont Wood has purchased the machinery and equipment.

By Vermont Wood's "assumption" or "discharge" of Debtor's debts with Chittenden, David Winer's guaranty and Debtor's pledged hypothecated securities would have been either immediately or eventually released and transferred solely to the Winers' personal notes with Chittenden.

David Winer's attempt to obtain the discharge of his guaranty and Debtor's pledged hypothecated securities demonstrates the breach of his fiduciary duties toward the Debtor and its creditors. Simply put, he let his personal interests dictate the course of his fiduciary charge.

Assuming, arguendo, that Debtor was a separate entity from its alter ego, David Winer had a clear conflict of interest with the Debtor. Instead of preserving the Debtor's interest in its machinery, equipment, inventory and accounts receivable, David Winer and Chittenden agreed that David Winer would: prevent the Debtor from making any further loan payments so Chittenden could declare a technical default; act as Chittenden's "cat's paw" and "repossess" Debtor's machinery, equipment, inventory, and accounts receivable; and, deposit it in Vermont Wood. Vermont Wood, as Chittenden well knew, was Debtor's successor without Debtor's unsecured liabilities.

Even if, arguendo, David Winer's and Chittenden's participation and declaration of Debtor's technical default was justified, David Winer should have honored his absolute guaranty and personally paid off Debtor's notes to Chittenden instead of trying to obtain a discharge of his guaranty and pass off Debtor's assets to Vermont Wood. In the alternative, or in connection with requiring that David Winer honor his guaranty, a prudent course for the Debtor would have required, at the very least, that it request Chittenden to reduce Debtor's pledged hypothecated securities to its cash value and apply it toward Debtor's amounts due. This result would not only have been prudent, but would have been consistent with Chittenden's and Debtor's true intention that Debtor's pledged hypothecated securities and guarantees were Chittenden's principal collateral for Debtor's loans.

David Winer's attempted removal of his guaranty and Debtor's pledged hypothecated securities by creating Vermont Wood demonstrates not only that David Winer's judgment yielded to his personal rather than Debtor's corporate interest, but also that David Winer is Debtor's alter ego.

(5) *Debtor's Corporate Opportunity*

During the summer of 1985, Debtor received a needed order from a new client, Tech Furnishings, Inc. The deal collapsed, however, when David Winer, Tech Furnishings, Inc.'s president and Mr. Jacobson

were not willing to advance the necessary capital for Debtor to purchase wood inventory to fill this order. Instead, David Winer, Tech Furnishings, Inc.'s president and Mr. Jacobson, Vermont Wood's directors, officers, and shareholders, agreed to provide Debtor's corporate successor with capital to purchase the necessary wood inventory, thus, Vermont Wood acquired Debtor's Tech Furnishings, Inc.'s contract.

Vermont Wood then entered into a consignment "Agreement" with the Debtor and paid the Debtor for the manufacture of the Tech Furnishings, Inc.'s order. This arrangement was made because Vermont Wood had not yet acquired Debtor's manufacturing machinery and leasehold premises to manufacture the order itself. After Debtor's cessation and, in accordance with David Winer's, Chittenden's and Vermont Wood's pre-conceived plan, Vermont Wood acquired Debtor's manufacturing premises and machinery.

Prior to Debtor's cessation, Debtor was so poorly managed that it had only six clients left by the middle of 1985. Indeed, Debtor's management was attempting to phase out their largest purchaser, responsible for 77.8% of Debtor's accounts receivable, because of "differences with their management."

David Winer not only had knowledge of Debtor's mismanagement of its corporate clientele, but also knew that Debtor was financially dependent upon him for its working capital. David Winer, as Debtor's sole shareholder, controlling director, financial banker and alter ego should have advanced the necessary capital to his financially dependent Debtor for it to retain its contract with Tech Furnishings, Inc. Instead, he withdrew his economic life support and committed corporate euthanasia; all to the detriment of the unsecured creditors.

Then, as an interlocking director of Debtor and Vermont Wood, he steered a valuable opportunity, along with Debtor's machinery, equipment, leasehold premises and remaining clientele, to Vermont Wood. Debtor, of course, had no meaningful choice other than to follow the course chartered by its alter ego.

### (6) Debtor's Inadequate Capitalization and Insolvency; Shareholder's Contributions to Capital

David Winer's inequitable conduct is best understood, although certainly not excused, when it is understood that Debtor was grossly under-capitalized by him from the outset.

In an attempt to overcome Debtor's inadequate capitalization without having David Winer increase its capital, Chittenden and David Winer agreed to make indirect "loans" to the Debtor by lending directly to the Winers. The Winers' 1984 November personal loans from Chittenden were intended to provide Debtor with working capital and construction improvements on Debtor's and David Winer's rental premises. Chittenden's loans to the Winers were nothing more than a mere device by the bank and the Winers to make indirect loans to the Debtor and, hopefully, avoid the risks that might result from Debtor's poor financial condition.

Instead of providing Debtor, an intended third party beneficiary of the Winers' loans, with needed working capital, David Winer misdirected the proceeds to pay off a pre-November 1984 personal loan he had with Chittenden. David Winer's misdirection left Debtor short of operating cash and overdrawn on its corporate checking account by $38,619.72 in November of 1984. As a result of David Winer's misdirection, Debtor was never able to overcome either its inadequate capitalization or insolvency. Indeed, Debtor had 36 overdrafts between November of 1984 and Chittenden's July 1985 audit.

It is patent that David Winer was actually operating the Debtor on his monies to coverup Debtor's insolvency and grossly inadequate capitalization. This fact was disclosed only to Chittenden, David Winer, Debtor and Debtor's successor, Vermont Wood. Debtor's unsecured trade creditors had no knowledge that Debtor could not meet its financial obligations without David Winer's constant infusion of operating monies and reasonably assumed they were

dealing with a solvent concern. Had Debtor's unsecured creditors known of Debtor's financial dependence on David Winer's personal loans, they could have protected themselves by contracting directly with Debtor's alter ego, David Winer. But, as if they were not mislead enough, even after Vermont Wood's creation and Debtor's cessation, David Winer caused the Debtor to send a factually misleading letter to Debtor's unsecured creditors with the intention of lulling them into complacency by conveying a message of total uncollectability on their debts and by throwing them off the scent of Debtor's alter ego.

Additionally, from our holding on David Winer's inequitable conduct and his alter ego status, his personal shareholder's loans will be considered as his contributions to Debtor's capital because: Debtor's secured and unsecured debts versus David Winer's equity in the Debtor and the ratio of David Winer's shareholder loans to Debtor's capital demonstrates Debtor's grossly inadequate capitalization; David Winer's shareholder loans were an attempt to alleviate a serious deficiency in Debtor's working capital and avoid the obvious need to increase his equity in Debtor's capital; his shareholder loans to the Debtor and his personal loans with Chittenden served as an intricacy of his plan to cover up his initial undercapitalization from Debtor's unsecured trade creditors; and, no other disinterested or outside source would have lent to or invested in the Debtor under these conditions. Under these circumstances, we hold David Winer is also Debtor's "deep rock." See, *Taylor v. Standard Gas & Elec. Co.,* supra, 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669, 676 (1939).

## C. *Lack of Prejudice*

Chittenden characterizes it's participation with David Winer's creation of Ver-

mont Wood as a mere "workout," and attempts to justify their pre-petition repossession of Debtor's collateral as necessary to fulfill Debtor's security agreement and Vermont's Uniform Commercial Code [43] obligation of assisting a secured party to assemble and dispose of its collateral.

We disagree with Chittenden's characterizations where the evidence establishes, inter alia, that its conduct toward the Debtor compromises its position in this proceeding; namely: Chittenden's and David Winer's misuse of their economic leverage over the Debtor to create a default by their agreement that David Winer would withhold further personal advancement of needed capital and that Debtor would not make further loan payments to Chittenden; Chittenden's declaration of a technical default on Debtor's loans when Chittenden's prior history of loan mismanagement permitted default conditions to persist; in using Debtor's sole shareholder and controlling director, David Winer, to extract the "Repossession Acknowledgement" from the insolvent Debtor; by its participation with David Winer in the creation of Debtor's corporate successor to acquire the repossessed collateral and secured debts; and, Vermont Wood was to either "assume" or "discharge" Debtor's notes with Chittenden with the result of either an immediate or pro tanto release of Debtor's pledged hypothecated securities and David Winer's guaranty to increase Chittenden's unencumbered collateral pool for the Winers' personal notes.

Chittenden's admitted mismanagement of Debtor's and the Winer's personal loans does not evoke any sympathy from us insofar as Chittenden permitted Debtor's pledged hypothecated securities to be used as cross-collateral for the Winer's personal notes. Besides the fact that the hypothecated securities were already pledged by

---

**43.** 9A Vt.Stat.Ann. § 9–503, *Secured party's right to take possession after default,* provides:

Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may

require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under section 9–504.

the Debtor for its loans, there are other reasons why Chittenden may not liquidate Debtor's pledged hypothecated securities to satisfy the Winers' personal notes: the Winers are not in default on their personal loans; Chittenden has agreed to "roll over" the personal notes at the conclusion of this proceeding; David Winer has sufficient assets to discharge or "roll over" the Winers' personal notes to Chittenden; and, Chittenden has possession of David Winer's $60,000.00 Federal National Mortgage Association bonds which he had agreed that Chittenden may use as additional collateral for the Winers' personal notes.[44]

Besides the fact that Chittenden knew David Winer's guaranty was its principal collateral upon Debtor's default, Chittenden's participation and domination with David Winer over Debtor's respective financial mismanagement and ultimate demise invited delay in its realization of David Winer's guaranty.

Chittenden knew, inter alia, that: Debtor's existence and fate was totally dependent upon David Winer's financial ability, to provide and maintain Chittenden's collateral strength for Debtor's corporate and Winers' personal loans; David Winer, and not Debtor's machinery, equipment, inventory, and accounts receivable, was Debtor's principal source of protection in the event of Debtor's default; David Winer's personal financial contributions, from the Winers' personal loans with Chittenden to the Debtor, were necessary to create an appearance that the insolvent Debtor was a going concern; and, the easiest way of escaping from the consequences of their cross-collateral mismanagement and Debtor's innocent unsecured trade creditors would be to participate with David Winer in a scheme to create a solvent successor as a depository for Debtor's secured debts and assets and thus, free David Winer's guaranty and Debtor's pledged hypothecated securities for Chittenden's use as security for the Winers' personal loans.

██ Even if we were to assume, arguendo, that Chittenden had not participated in the creation of its own peril, we hold that marshaling is appropriate since Chittenden will not be financially prejudiced by the Trustee's marshaling request that Chittenden be required to seek its satisfaction from the guarantees of Debtor's president and vice-president and, if needed, Debtor's pledged hypothecated securities. David Winer alone has more than sufficient financial means to meet both the guaranty of his alter ego's debts and his personal loans with Chittenden. Moreover, that is exactly what Chittenden and David Winer intended all along.

### D. Equitable Subordination

██ We hold David Winer's inequitable conduct requires subordination of his guaranty and hypothecation to prevent him from becoming subrogated to Chittenden's secured status after marshaling is applied and Chittenden, if it chooses, liquidates David Winer's guaranty or Debtor's hypothecated securities for Debtor's debts with Chittenden.

In the absence of David Winer's inequitable conduct and our subordination ruling, David Winer would step into the shoes of Chittenden upon the liquidation of his guaranty or hypothecated securities for Debtor's secured debts with Chittenden:

> It is well settled that where one secondarily liable is called on to make good on his obligation and pays the debt, he steps into the shoes of the former creditor. He becomes subrogated to all the rights of the creditor against the principal debtor, including the security given to secure the debt.

---

**44.** See, *Goodwin v. Barre Savings Bank & Trust,* 91 Vt. 228, 235–36, 100 A. 34, 37 (1917) (over the objections of a trustee in bankruptcy, banker had a common law merchant's lien on securities or funds which came into its possession in the regular course of business, and has the right to set off any matured debt against such funds without direction or authority from its debtor).

See also, *Goggin v. Bank of America Nat. Trust & Savings Ass'n.,* 183 F.2d 322, 324–25 (9th Cir.1950) cert denied, 340 U.S. 877, 71 S.Ct. 122, 95 L.Ed. 637 (1950) reh'g denied 340 U.S. 898, 71 S.Ct. 237, 95 L.Ed. 651 (1950) (banker's statutory and common law lien extended to funds in its possession and debtor's bankruptcy could not affect these liens).

*Allen v. See,* 196 F.2d 608, 610 (10th Cir. 1952).

Despite the pre-Bankruptcy Code's absence of express provisions authorizing the equitable subordination of claims, it was well settled by Bankruptcy Act case law that Bankruptcy Courts possess equitable power to subordinate not only claims or interests but also relationships among creditors *vis a vis* their debtor:

> The power of the bankruptcy court to subordinate claims or adjudicate equities arising out of the *relationship* between the several creditors is complete.

*Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293, 1298 (1941) reh'g denied, 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941) (citations omitted) (emphasis supplied). See e.g., *Taylor v. Standard Gas & Elec. Co.,* supra, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed 669 (1939); *Pepper v. Litton,* supra, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281, 289 (1939).

Section 510(c) of the Bankruptcy Code provides:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing,[45] the court may—
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

Section 510(c) is simply a codification of the Bankruptcy Court's pre-Code equitable power to subordinate claims, interests, or relationships and to adjudicate equities among creditors. H.R.Rep. No. 595, 95th Cong., 1st Sess. 359 (1977) U.S.Code Cong. & Admin. News 1978, pp. 5787, 6315.

Rather than specify the criteria to be used by Bankruptcy Courts in subordinating claims under § 510(c), Congress intended Bankruptcy Courts to be governed by judicially created principles of equitable subordination. S.Rep. No. 989, 95th Cong., 2d Sess. 74 (1978); U.S.Code Cong. & Admin. News 1978, pp. 5787, 5860; 124 Cong.Rec. S. 17,412 (Oct. 6, 1978); 124 Cong.Rec.H. 11,095 (September 28, 1978) (Statement of Rep. Edwards). See, e.g., *Wilson v. Huffman (In re Missionary Baptist Foundation of America Inc.),* 818 F.2d 1135, 1142 (5th Cir.1987).

In *Benjamin v. Diamond (Matter of Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977), the Fifth Circuit extracted from existing case law three conditions that must be fulfilled before a Bankruptcy Court may exercise its power of equitable subordination:

> (i) The claimant must have engaged in some type of inequitable conduct.
>
> (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

Id., 563 F.2d at 700 (citations omitted).

As explained by the Fifth Circuit in *Wilson v. Huffman (In re Missionary Baptist Foundation of America Inc.),* supra, 818 F.2d at 1143 (5th Cir.1987), and as *Mobile Steel,* supra, noted, three principles should be kept in mind in determining whether the three conditions have been met:

> First, inequitable conduct directed against the debtor or its creditors may be sufficient to warrant the subordination of the claim irrespective of whether the conduct was related to the acquisition or assertion of that claim.
>
> Second, "claims should be subordinated only to the extent necessary to offset the

---

**45.** Initially, we note that Section 510(c) of the Bankruptcy Code requires "notice and a hearing" before the Court may exercise its powers of equitable subordination of a "claim" or "interest." 11 U.S.C. § 510(c)(1). Although David

Winer is technically a non-party in this adversary proceeding, his guarantor "relationship" is bound by our subordination ruling for the same reasons we discussed supra, footnote 30.

harm which the bankrupt and its creditors suffered on account of the inequitable conduct."

Third, with respect to the allocation of the burden of proof, a claim filed under section 501 of the Bankruptcy Code enjoys prima facie validity which may be overcome by the trustee's presentation of evidence.

*Wilson v. Huffman (In re Missionary Baptist Foundation of America Inc.)*, supra, 818 F.2d at 1143 (5th Cir.1987) (citations omitted).

The Trustee proved that David Winer engaged in the classic types of inequitable conduct which justifies subordination including: breach of fiduciary duty; unfair overreaching; insider preference; gross under-capitalization; contributions to capital; failure to observe corporate formalities; and, alter ego. See e.g., *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 732 (11th Cir.1986); *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709 (5th Cir. 1980); *Bankers Life and Casualty Co. v. Kirtley*, 338 F.2d 1006 (8th Cir.1964); *Henderson v. Buchanan (In re Western World Funding, Inc.)*, supra, 52 B.R. 743, 783 (Bkrtcy.D.Nev.1985).

The harm suffered by the Debtor and its trade creditors as the result of David Winer's inequitable conduct is evident. To take but one example discussed supra, David Winer operated the Debtor on his capital to cover up Debtor's insolvency and grossly inadequate capitalization from Debtor's unsecured trade creditors. Had Debtor's unsecured creditors known of Debtor's financial dependence on David Winer's personal loans, they could have protected themselves by contracting directly with Debtor's alter ego, David Winer.[46]

David Winer's inequitable conduct toward the Debtor and its unsecured creditors requires that he not be permitted to defeat marshaling by a subrogation of his guarantor relationship with Chittenden, a secured party, if Chittenden liquidates the guarantees or sells the hypothecated securities. To hold otherwise, we would not only have to condone such dealings by an alter ego at the expense of the Debtor and its unsecured creditors, but bestow upon the alter ego a further undue advantage over Debtor's unsecured creditors by elevating him from a mere unsecured creditor to a secured creditor. We will not permit the alter ego to escape the inequitable consequences of his conduct towards its insolvent Debtor and innocent trade creditors and hold that his subrogated guarantor relationship after marshaling is subordinated in full.

### CONCLUSION

An unsecured creditor's attorney may prosecute a contested matter on behalf of the Trustee with the latter's consent and Court's approval.

The Trustee has the prerequisite standing under Vermont law and 11 U.S.C. § 544(a) to invoke the marshaling doctrine, as a hypothetical secured judicial lien creditor with a writ of execution returned unsatisfied, as well as the related actions of breach of fiduciary duty, piercing the corporate veil and alter ego.

The marshaling action and the Trustee's use of the alter ego and inequitable conduct exceptions to the "common debtor" element of marshaling constitute § 541(a)(1) property of Debtor's estate.

The Trustee has proved by clear and convincing evidence that the inequitable conduct by Debtor's director, officer, sole shareholder, and insider-guarantor warrants the piercing of Debtor's corporate veil to hold him as Debtor's alter ego, and the application of this exception to the

**46.** This example easily distinguishes *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 732 (11th Cir.1986) where the Eleventh Circuit refused to find harm to trade creditors, (as opposed to consumer creditors), with assumed evidence of their access to information that a debtor's controlling shareholder and fiduciary was a surety for the debtor's corporate debts. While the trade creditors might have had such access in the case sub judice, they had no reason to suspect that the Debtor was insolvent or grossly under-capitalized, especially when its alter ego made undisclosed personal loans and contributions to capital to cover up this vital fact from them.

"common debtor" element for the marshaling of assets doctrine. The Trustee has also proved that the senior secured creditor will not be prejudiced by marshaling.

The Trustee's successful application of the doctrine of marshaling in this proceeding requires that: the proceeds from the repossessed collateral are property of the estate; Chittenden, as the senior secured party, is permitted to seek relief from the automatic stay for satisfaction of its claim from the personal guarantees of Debtor's president and vice president; and, Chittenden may seek relief from the automatic stay to liquidate the securities hypothecated by Debtor's director, officer, shareholder, his spouse, and pledged by the Debtor in the unlikely event the guarantees are insufficient.

After marshaling is applied and after Chittenden liquidates David Winer's guaranty for Debtor's debts with Chittenden, Debtor's director, officer and sole shareholder's inequitable conduct requires full equitable subordination under 11 U.S.C. § 510(c) of his guarantor relationship with Chittenden *vis a vis* the Debtor to prevent him from becoming subrogated to Chittenden's secured status.

Accordingly: Chittenden's complaint for declaratory relief and relief from stay must be dismissed; the Trustee's affirmative defense of marshaling is granted; David Winer's guarantor relationship is fully subordinated; and, Chittenden is entitled to seek relief from stay to liquidate Debtor's guarantees and hypothecated securities. Counsel for the Trustee is directed to submit a proposed order for our signature.